1    The Law Office of Ethan Mora
     Ethan E. Mora (SBN 317937)
2    1040 E. Herndon Ave., Suite 105
     Fresno, CA 93720
3    Telephone: (559) 370-1485

4    Attorney for Plaintiff RYAN DELLONE

5

6

7

8                   **THE UNITED STATES DISTRICT COURT**

9                 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11   RYAN DELLONE, an individual, | Case no. _____ |
| 12              Plaintiff, | <u>COMPLAINT</u> |
| 13   v. | 1. VIOLATION OF EFTA – 15 U.S.C. §§1693, ET. SEQ. |
| 14   COINBASE, INC., COINBASE GLOBAL, INC., and DOES 1-50; and *2.05698427 BITCOINS and various other digital currencies*, | 2. VIOLATION OF CFAA – 18 U.S.C. § 1030, ET. SEQ. |
| 15 | 3. VIOLATION OF CCPA – CAL. CIV. CODE §§ 1798.100, ET SEQ. |
| 16             Defendants. | 4. VIOLATION OF SHINE THE LIGHT LAW – CAL. CIV. CODE §§ 1798.83, ET SEQ. |

                                    5. VIOLATION OF CAL. PEN. CODE §496
17

18                           6. CONVERSION (DOES 1-50)
                          7. TRESPASS TO CHATTELS (DOES 1-50)
19                           8. TRESPASS TO CHATTELS (COINBASE)
                          9. NEGLIGENCE
20                         10. BREACH OF IMPLIED CONTRACT
                        11. BREACH OF GOOD FAITH AND FAIR
21                          DEALING
                       12. INTENTIONAL MISREPRESENTATION
22                        13. GROSS NEGLIGENCE
                       14. VIOLATION OF CLRA – CAL. CIV.CODE
23                      §§ 1770, ET SEQ.
                     15. VIOLATION OF CAL. BUS. & PROF.
24                      CODE § 17200 – UNFAIRNESS PRONG
                     16. VIOLATION OF CAL. BUS. & PROF.
25                      CODE § 17200 – UNLAWFUL PRONG
                     17. UNJUST ENRICHMENT
26                      18. DECLARATORY JUDGMENT
                     19. CONSTRUCTIVE TRUST
27                      20. REPLEVIN / DETINUE

28                      <u>**DEMAND FOR JURY TRIAL**</u>

**COMPLAINT**

## INTRODUCTION

1. This action arises out of: **(i)** material misrepresentations made by Coinbase and its employees concerning Coinbase's security, user-authentication practices, and its intention and ability to perform the duties it owed Plaintiff; **(ii)** Defendants' unlawful interferences with Plaintiff's personal property and privacy rights; **(iii)** Coinbase's egregious mishandling of Mr. Dellone's sensitive, personal, confidential, and financial information; and **(iv)** Coinbase's persistent failure to implement appropriate security and customer support measures reasonably designed to detect, prevent, and address fraud and unauthorized electronic fund transfers affecting retail consumer financial accounts hosted on the Coinbase Platform.

2. Defendant Coinbase is a publicly-traded financial institution that operates the largest online cryptocurrency exchange platform in the United States (the Coinbase "Platform"). Coinbase's users (or customers) can use the Coinbase Platform and Coinbase's other products and services to transact in over 100 unique digital assets, including cryptocurrencies like Bitcoin, as well as virtual "tokens," and U.S. dollar-denominated financial instruments like "USD Coin."

3. Coinbase's primary source of revenue is "transaction revenue," which Coinbase generates from transaction fees Coinbase charges to facilitate transactions on its Platform.

4. Plaintiff Ryan Dellone opened an online account with Coinbase (his Coinbase account) in October 2013. Mr. Dellone used his Coinbase account to store and transact using various digital assets offered to him by Coinbase on the Coinbase Platform.

5. In his first eight years as a Coinbase customer, Mr. Dellone's Coinbase account had never been breached. That changed just eight months after Coinbase turned public.

6. On December 14, 2021, while Mr. Dellone was sleeping, DOES 1-50 (cyber-criminals; scammers, hackers, and other presently unnamed tortfeasors) breached Mr. Dellone's Coinbase account and, within minutes, initiated over twenty highly-suspicious transactions, all in rapid succession. Coinbase promptly facilitated each and every one of these transactions, which essentially liquidated, or consolidated into Bitcoin, nearly all of the unique digital assets Mr. Dellone had spent the better part of a decade acquiring.

7. After Mr. Dellone's assets had been fraudulently consolidated, Coinbase irreversibly

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720
559-981-2588

1

transferred ostensibly the entire balance of Mr. Dellone's Coinbase account—which, at that point, was in the form of more than 2.05 Bitcoin—directly to DOES 1-50, without Mr. Dellone's knowledge, consent, or permission, and through no fault of his own, all in a single, near-instantaneous, peer-to-peer electronic fund transfer worth approximately $100,000 at the time.

8.     In addition, Defendants (Coinbase and DOES 1-50) used Mr. Dellone's Coinbase account to withdraw money from Mr. Dellone's online bank account, which was connected to the Coinbase Platform. The "digital dollars" Defendants transferred from Mr. Dellone's bank account to the Coinbase Platform were then used by Doe Defendants to purchase more Bitcoin, which, once again, Coinbase irrevocably transferred to Doe Defendants' cryptocurrency Wallet.

9.     Although Mr. Dellone was asleep when his Coinbase account was plundered, he noticed the unauthorized account activity shortly after he woke up to get ready for work, mere hours after the initial breach. He immediately reported the unauthorized activity to Coinbase.

10.    In turn, Coinbase locked Mr. Dellone, but frustratingly not DOES 1-50, out of his account.

11.    Coinbase has informed Mr. Dellone that, in Coinbase's view, Mr. Dellone is "100% responsible" for the losses resulting from the fraud on his account—and not just the losses he personally sustained, but for both his and Coinbase's purported losses, alike.

12.    Within days of squandering every cryptocurrency Mr. Dellone had patiently acquired during his eight-year tenure as a loyal Coinbase customer, Coinbase (Coinbase's "customer support" agents) began emailing Mr. Dellone, demanding that he "reimburse" Coinbase for the fraudulent bank transactions Coinbase itself negligently perpetuated on its own Platform.

13.    Incredibly, even after acknowledging the fraud, Coinbase issued Mr. Dellone a truly disgraceful and audacious ultimatum: either pay Coinbase the "reimbursement" money Coinbase baselessly claims it is owed, or remain locked out of his Coinbase account indefinitely.

14.    For years, Coinbase has exploited legal ambiguities and technological obscurities to wield its far-superior bargaining power and resources as swords, to riposte Mr. Dellone and innumerable other victimized Coinbase customers like him, by using deception and bully tactics, duplicitous fool's errands, wily one-sided contracts, and utter "customer support" quackery.

2

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

15.     Coinbase's flagrant disrespect for Mr. Dellone's privacy and personal property rights, and for the plain and simple truth, have only benefitted Coinbase. Meanwhile, Mr. Dellone, and many other retail Coinbase customers, as well as the broader "crypto-economy," Coinbase's competitors in the emerging financial sector writ large, and overall consumer confidence in governmental regulatory bodies charged with protecting retail financial consumers like Mr. Dellone (*e.g.*, the **Consumer Financial Protection** Bureau ("CFPB")), all suffer from Coinbase's brazenly unprincipled conduct.

16.     Since December 14, 2021, Mr. Dellone has been deprived of the 0.5 bitcoins he acquired in or around 2013, which had personal and sentimental value to Mr. Dellone; more than 37.5 million virtual tokens and unique cryptocurrencies, comprising more than 20 distinct digital assets (worth in excess of $70,000, collectively); his valuable online account information and data, which Coinbase leaked to unauthorized third-parties; and over $2,000 worth of dollar-denominated transaction fees collected or retained by Coinbase, resulting directly from the fraud that occurred on his Coinbase account.

17.     By this Complaint, Mr. Dellone intends to hold Coinbase accountable for its predatory, prejudicial, and senseless acts and business conduct, and for its breaches of its duties and reasonable care, which have resulted in Mr. Dellone's losses of his personal property and privacy, excruciating financial and emotional harms, and increased risks and costs Mr. Dellone has and continues to endure and incur to this day.

18.     Mr. Dellone intends to hold DOES 1-50 accountable as well, for the injuries and losses they jointly and severally caused him when they unlawfully accessed, interfered with, or received Mr. Dellone's digital assets, and for their violations of federal and state privacy and computer laws, as further alleged below.

19.     This Complaint also asserts Mr. Dellone's rights to and against the Bitcoin Wallet and the 2.05698427 Bitcoins currently located in the Bitcoin Wallet with the public key address, ***bc1qjp79ak6fxm4h7j0tsrwqx2n2k4tcqqveqxrvgm***; the Tezos "staking rewards" earned by Mr. Dellone's Coinbase account from December 14, 2021 to the present; the BSV tokens sent to the BSV Wallet with the public key address, ***14goHFL8GGyuKCvbFtGW9PqQ5Urspwn9uuv***; and

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

the U.S. Dollar Coins ("USDC"), and all other digital assets traceable to any digital wallets associated with Mr. Dellone's Coinbase account prior to the breach of his account.

## THE PARTIES

20.    Plaintiff Ryan Dellone is an individual citizen and a resident of Fresno, California.

21.    Defendant Coinbase Global, Inc. ("Coinbase Global") is a publicly-traded Delaware corporation involved in the business of cryptocurrency exchange, among other interrelated businesses. Coinbase Global has no formal physical headquarters, as it is a "decentralized" and "remote first" company.

22.    Defendant Coinbase, Inc. ("CBI"), is a Delaware corporation, and a wholly-owned subsidiary of Coinbase Global.

23.    CBI and Coinbase Global are operated as one corporation. Coinbase Global's SEC filings refer to CBI and Coinbase Global, together with subsidiaries of Coinbase Global, as "Coinbase." This Complaint does the same.

24.    The true names of Doe Defendants (DOES) 1-50 are not currently known to Plaintiff. Plaintiff will amend this Complaint to allege the true names of each unnamed Defendant as soon as Plaintiff ascertains their true names.

25.    Plaintiff claims exclusive right and legal title to, and ownership of those 2.05698427 bitcoins currently held in or associated with the Bitcoin Wallet address, *bc1qjp79ak6fxm4h7j0tsrwqx2n2k4tcqqveqxrvgm* (the "*bc1 Wallet*").

## JURISDICTION AND VENUE

26.    This Court has federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as this action is brought pursuant to the Electronic Fund Transfer Act of 1978 (15 U.S.C. § 1693, et seq.), and the Computer Fraud and Abuse Act (18 U.S.C. § 1030, et seq.).

27.    This Court has diversity jurisdiction over this matter under 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000 (exclusive of costs and interest), and Plaintiff is completely diverse from Coinbase. Plaintiff is a resident of California. CBI is a Delaware corporation. Coinbase Global is a Delaware corporation, or is "decentralized."

28.    On information and belief, DOES 1-50 are completely diverse from Plaintiff.

4

29.    This Court has jurisdiction pursuant to section 1331, because this Complaint presents fundamental questions pertaining to, or otherwise interpreting or applying the Bank Secrecy Act (31 U.S.C. § 5311), the Stamp Payments Act of 1862 (18 U.S.C. § 336), and the Securities Exchange Act (15 U.S.C. §§ 77-78c. et seq.).

30.    This Court has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367, because those claims are derived from a common nucleus of operative facts.

31.    This Court has personal jurisdiction over Defendants because Defendants transacted business, maintained substantial contacts, or committed overt acts in furtherance of their illegal schemes throughout the United States, including in this District. Defendants' conduct has been directed at, and has had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

32.    This Court has territorial *quasi in rem* jurisdiction because Plaintiff's rights to the property (or "*res*"), and the *res* itself, at issue in this Complaint are, on information and belief, present in this jurisdiction. The *res* is: the ***bc1 Wallet*** and/or the 2.05698427 bitcoins located at the ***bc1 Wallet*** as of the date of filing this Complaint.

33.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to the claims occurred in this District, and because Defendants transact business in, are found in, and/or have agents in this District, and have substantial and systematic contacts in this District.

## **FACTUAL ALLEGATIONS**

### **I.    Background**

34.    Plaintiff Ryan Dellone opened his Coinbase account in October 2013.

35.    Mr. Dellone was a markedly conservative user of the Coinbase Platform. In all his years as a Coinbase customer, Mr. Dellone initiated fewer than 300 transactions, *total*, on the Coinbase Platform.

36.    Mr. Dellone is a father, a husband, and a Registered Nurse. Mr. Dellone routinely sleeps during daytime hours because he works the nightshift in the Intensive Care Unit at one of California's largest hospitals.

**COMPLAINT**

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

37.     Defendant Coinbase is a consumer retail financial institution that provides its customers products and services, including custodial and digital currency exchange services relating to cryptocurrencies and other emerging electronic financial assets.

38.     Coinbase was founded in May 2012.

39.     Coinbase became a publicly-traded company in April 2021.

40.     Coinbase operates in over 100 countries and has over 1,000 employees. Coinbase claims to support over 50 million "verified" users on its Platform. In the fourth quarter of 2021, Coinbase claims it facilitated over $330 billion in cryptocurrency transactions on its Platform.[1]

41.     Coinbase has dubbed the Coinbase Platform[2] (or itself) the "most trusted crypto exchange," and has claimed to be "one of the longest running crypto platforms where customers have not lost funds due to a security breach of the platform."[3] [4]

42.     The cryptocurrencies and other digital financial assets currently under Coinbase's "management" are, collectively, worth hundreds of billions of U.S. Dollars.

43.     Coinbase has millions of units of Bitcoin ("bitcoins," or "BTC") under its management. Most of the assets under Coinbase's "management" belong to Coinbase's customers.

44.     In December 2021, Coinbase "managed" or controlled more than 2.05 bitcoins belonging to Mr. Dellone.

45.     Bitcoin is an electronic peer-to-peer ("P2P") cryptocurrency that is digitally transferrable between two or more parties, without need for an intermediary. Bitcoin uses a decentralized, distributed public blockchain ledger to record the number of "unspent transaction outputs" associated with digital "Wallets" that transact using the "Bitcoin Blockchain" ledger. Bitcoins and certain crypto-assets similar to bitcoins, are comparable to physical cash currencies, like

---

[1] See Coinbase, Letter to SEC Re: Custody Rule and Digital Assets, dated May 25, 2021 (accessed April 17, 2023), https://www.coinbase.com/files/coinbase-052521.pdf ("Coinbase was founded in 2012 as a consumer platform that makes it easy to purchase, sell, and transact in cryptocurrency. . . . We support over 56 million verified users across more than 100 countries who, in the last quarter, have traded over $330 billion in cryptocurrency on our platform.").
[2]  Although technically Coinbase operates and has operated more than one cryptocurrency exchange website (e.g., "Coinbase Pro," "Coinbase," "GDAX"), this Complaint refers to every Coinbase website (or so-called "platform") Mr. Dellone has used as, collectively, the "Coinbase Platform" (or the "Platform").
[3] Coinbase, Security, https://www.coinbase.com/security (accessed March 14, 2023).
[4] See, Coinbase Global Inc., SEC General Form for Registration of Securities (Form S-1) https://www.sec.gov/Archives/edgar/data/1679788/000162828021003168/coinbaseglobalinc-1.htm ("SEC Form-1") (Feb. 25, 2021).

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

U.S. Dollars ("USD") or gold coins, because the assets are: **(i)** tangible (*i.e.*, they can be transferred directly between parties, P2P); **(ii)** easily-movable (*i.e.*, they can be sent to and from virtually anywhere in the world); and **(iii)** valuable (*e.g.*, bitcoins are valuable because there are only 21 million units that will ever be placed into circulation; and only a handful of entities, including Coinbase, each control thousands of the approximately 19,000,000 BTC currently in circulation).

46.    Bitcoin and similar crypto-assets are not comparable to credit, debit, or any other familiar financial instruments based on underlying assets or obligations. Cryptocurrencies—specifically, the "unspent transaction outputs" and the cryptocurrency "Wallets" recorded on public, decentralized (or distributed) blockchains—are, themselves, the assets. They function much like fiat currency coins and paper bills; not like redeemable shares, contracts, or stock certificates.

47.    Unlike traditional physical cash fiat currencies, however, BTC can exist in multiple places, simultaneously, all at once; and control of BTC is proved by "spending" the BTC (or unspent transaction outputs) by initiating a valid transaction recorded on the Bitcoin Blockchain. With Bitcoin, any number of random strangers anywhere on earth can, theoretically, each have in their respective possessions, the *exact same* asset; because the asset is the exact same asset, if one person "spends" the asset, no one else with possession of the asset can spend the asset in the future (they are entirely dispossessed of the BTC as soon as it is spent). A person may "spend" BTC by moving it from one Wallet to another, either in a self-transfer between Wallets the person owns, or by transferring the BTC to another person's Wallet.

48.    The hundreds of billions of U.S. Dollars' worth of tangible, valuable, and easily-movable cryptocurrencies (essentially virtual "cash") under Coinbase's management is almost unfathomable by comparison to any familiar physical financial asset. Conceptually, if the cryptocurrencies under Coinbase's management were in physical form, they would probably look like mountains of cash-equivalent hard assets of the sort Scrooge McDuck might dive into, or like stacks of paper currency piled so high Pablo Escobar could have blushed at the sight.

49.    Using the digital assets and cryptocurrencies Coinbase has on-hand (under its control), Coinbase facilitates millions of revenue-generating P2P transactions each month.

**THE LAW OFFICE OF ETHAN MORA**
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

50.     Coinbase's primary source of revenue is "transaction revenue," which Coinbase generates from the fees it collects for facilitating digital asset transactions on its Platform.

51.     In the first quarter of 2023, Coinbase recorded $352 million in "transaction revenue." In Q4-2022, Coinbase recorded $322 million of the same. However, between October and December 2021 (the quarter when the events giving rise to this suit began), Coinbase recorded an astonishing ***$2.3 billion in transaction revenue***. For context, Coinbase's total company revenue in Q4-2021 ($2.49 billion) was nearly the amount of total state tax revenue collected by the entire State of Nevada during the exact same time period ($2.53 billion).[5]

52.     A portion of the "transaction revenue" Coinbase collected in Q4-2021 was unearned, or unethically earned, and has been unjustly retained by Coinbase.

53.     On information and belief, a substantial portion of the transaction revenue Coinbase collected between 2017 and 2022 was the direct result of fraud and Coinbase's unfair and unconscionable company policies, which, for instance, instructed Coinbase's employees and agents to make concerted efforts to hold its retail customers "100%" liable for all transactions completed on their Coinbase accounts—including clearly fraudulent transactions Coinbase improperly facilitated without customer permission in the course of its ruthless campaign to inflate its bottom line.

### A.     Types of Digital Assets on the Coinbase Platform

54.     The term "<u>digital assets</u>" refers to intangible, electronically-recorded items stored on a computer, digital device, or network (*e.g.*, digital data; digital currencies; crypto-assets).

55.     A "<u>digital currency</u>" is any currency available exclusively in electronic form, which is not based on fiat currency.

56.     The term "<u>crypto-asset</u>" refers broadly to digital unspent transaction outputs recorded on a blockchain-based ledger. Crypto-assets fundamentally exist in cryptographically-secure "Wallets," and are reflected on public, decentralized (or distributed) blockchain ledgers. A "<u>cryptocurrency</u>," is a class of crypto-asset that is also a "digital currency" (like BTC).

---

[5] *Compare*, Coinbase, *Quarterly Earnings* (available at https://investor.coinbase.com/financials/quarterly-results/default.aspx) *with* Census.gov, *2021 Quarterly Summary of State & Local Tax Revenue Tables* (available at https://www.census.gov/data/tables/2021/econ/qtax/historical.Q4.html#list-tab-495435152) (accessed June 2023).

**COMPLAINT**

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

57. A "<u>stablecoin</u>" is a digital currency or crypto-asset that derives its price from the price of a specific reference asset to which the digital currency or crypto-asset is pegged.

58. A "<u>Security Token</u>" is a type of crypto-asset that is not a digital currency, and which represents or constitutes an investment contract.

59. The term, "<u>Wallet</u>" (or "<u>Crypto Wallet</u>") refers to a blockchain-based "key pair" consisting of a digital public key and a digital private key. A "<u>public key</u>" is a Wallet's public-facing digital address; it is used to receive inbound crypto-assets and encrypt outbound transaction data. A "<u>private key</u>" is used to facilitate the transfer of crypto-assets out of a Wallet, and to prove ownership over crypto-assets held in a Wallet. A private key is also a blockchain-based asset, as it allows anyone to control the "unspent transaction outputs" associated with its corresponding public key address.

60. Any person or entity with access to a Wallet's private key can control the assets (or unspent transaction outputs) in the corresponding Wallet, and can thus transfer those assets to another Wallet.

61. In this Complaint, the term "digital wallet" or "<u>wallet</u>" (lower-case) denotes that a "wallet" is not a "Wallet" (or Crypto Wallet).

62. Coinbase provided Mr. Dellone with at least one financial account, or digital "wallet," which Coinbase has referred to as a "USD Wallet"; Coinbase also provided Mr. Dellone with various other digital wallets that Coinbase has referred to, generally, as "Digital Currency Wallets." In this Complaint, the "USD Wallet" and other so-called "Digital Currency Wallets" (*i.e.*, the digital wallets issued by Coinbase), are distinguished from Crypto Wallets, as "<u>Coinbase-issued wallets</u>."

63. Though some of the financial accounts Coinbase calls "Digital Currency Wallets" may reflect real, underlying Crypto Wallets owned by Coinbase's customers, Coinbase-issued wallets are notably distinguishable from Wallets because Coinbase-issued wallets are made accessible to consumers exclusively through Coinbase's centralized Platform. Conversely, crypto-assets stored in "Wallets" controlled (or hosted) by Coinbase can be transferred without logging into a Coinbase account, using only the Wallet's private key.

9

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

64.     Unlike transactions between Wallets, only Coinbase account credentials—and not (or at least not exclusively) a blockchain-based private key—are required to initiate electronic fund transfers from Coinbase-issued wallets.

65.     Electronic fund transfers between Wallets, which are recorded on blockchains, do _**not**_ inherently require Coinbase's express approval and facilitation, unlike transactions between Coinbase-issued wallets.

66.     Transactions between Wallets are almost always irreversible, unlike transactions between Coinbase-issued wallets, which can be reversed by Coinbase.

67.     Electronic financial transactions between Coinbase-issued wallets require Coinbase's express authorization and facilitation to effectuate the transfers, and are reversible exclusively by Coinbase.

68.     Unlike transfers between Wallets, transfers between Coinbase-issued wallets afford Coinbase the ability to rapidly facilitate exchanges and transfers of crypto-assets on its Platform. Coinbase has publicly promoted its facilitation of asset and currency exchanges and transfers on its Platform as "the easiest solution" for retail consumers of crypto financial products who are looking to "buy, sell, send, and receive crypto."[6]

### 1.   USDC Stablecoins are Not Legal Tender

69.     Coinbase circulates, pays out, and is one of the companies responsible for issuing a stablecoin called "USD Coin" (or "USDC").[7]

70.     In the United States, it is a crime "to issue, circulate, or pay out any note . . . token or other obligation, for a sum less than $1, intended to circulate as money or to be received or used in lieu of lawful money of the United States." STAMP PAYMENTS ACT OF 1862, 18 U.S.C. § 336.

71.     Coinbase has advertised that, "[u]nlike regular US dollars, USD Coin doesn't require a bank account. It doesn't require that [users] live in a particular geography."

72.     USDC is purportedly reserve-backed by legal tender fiat currency. Coinbase claims its

---

[6] Coinbase, *How to set up a crypto wallet*, https://www.coinbase.com/learn/tips-and-tutorials/how-to-set-up-a-crypto-wallet (accessed Mar. 2023).
[7] See Circle, *USD Coin – Ecosystem*, https://www.circle.com/en/usdc/ecosystem (accessed April 24, 2023) ("USDC is accessible via dozens of digital asset exchanges").

customers "can always redeem 1 USD Coin for US$1.00." Coinbase advertises that "[e]ach USDC is backed by one dollar or asset with equivalent fair value, which is held in accounts with US regulated financial institutions."[8]

73.     In addition to providing its customers with Coinbase-issued USDC wallets, Coinbase encourages its customers to connect their traditional online bank accounts to the Coinbase Platform.

74.     Mr. Dellone connected his online bank account to the Coinbase Platform.

75.     Coinbase customers can transfer obligations to pay US Dollars directly between the Coinbase Platform (*i.e.*, Coinbase) and the customer's bank.

76.     Coinbase customers, including Mr. Dellone, have used their Coinbase accounts to store USD-denominated "digital dollar" obligations in their respective Coinbase-issued USD wallets, which are made available to customers on the Coinbase Platform.

77.     Mr. Dellone, and other Coinbase customers with bank accounts linked to the Coinbase Platform, have used their bank accounts to purchase and "cash out" digital assets they custody with Coinbase, both into fiat currency and into USDC.

78.     Coinbase invites its customers to use USD and USDC interchangeably.

79.     Since at least 2020, Coinbase has shown preference toward its customers' use of USDC, over USD. For example, Coinbase has advertised that, unlike U.S. Dollars, which have limited denominations, Coinbase customers can "hold as little as 0.000001 worth of USD Coin."

80.     Coinbase has issued, circulated, and paid out "USD Coins" for sums less than $1.

81.     Plaintiff is informed and believes, and on that basis alleges, Coinbase has deliberately mispresented USD Coin to Mr. Dellone and to all Coinbase's customers, intentionally conflating "USD" and "USDC," intending to confuse and, in fact confusing, many Coinbase customers, including and especially average retail investors and consumers like Mr. Dellone.

82.     Mr. Dellone was confused by the distinction between USD and USDC, and through no fault of his own, Mr. Dellone was almost completely unaware of the profound risks with respect to USDC transactions and online USDC "accounts" managed by Coinbase. Among these risks,

---

[8] Coinbase, *USD Coin*, https://www.coinbase.com/usdc (accessed Mar. 2023).

COMPLAINT

1    the risk that Coinbase can, at any time, at its sole discretion, refuse to exchange USDC for USD,

2    by, for instance, locking a customer who owns USDC out of his Coinbase accounts for virtually

3    any reason Coinbase decides.

4    83.    USDC is not legal tender.

5    84.    Coinbase has intended to circulate "USDC" as money, or else has intended that USDC

6    be received or used in lieu of lawful money of the United States, in violation of federal law.

7                    **2.    Tezos Security Tokens are Investment Contracts**

8    85.    Mr. Dellone used the Coinbase Platform to invest in a Security Token called "Tezos"

9    ("XTZ").

10   86.    Coinbase has not recognized XTZ tokens as investment contracts regulated by U.S.

11   securities laws. Therefore, Coinbase does not consider itself required to abide by the consumer-

12   protection provisions of the Securities Exchange Act (15 U.S.C. §§ 77-78c. et seq.) with respect

13   to Coinbase's activities involving the XTZ Security Tokens.

14   87.    In early 2021, Mr. Dellone purchased 92.336053 XTZ for $350. In so doing, Mr. Dellone

15   exchanged money or digital assets for XTZ tokens, and he paid Coinbase fees for executing those

16   transactions. Mr. Dellone then "staked" (or "baked") his XTZs by leaving his XTZs in his

17   Coinbase account. As opposed to selling or exchanging his XTZs for profit, Mr. Dellone earned

18   XTZ "reward payments" for staking his XTZs with Coinbase.

19   88.    Mr. Dellone's "reward payments" began accruing in May 2021, and those rewards

20   accrued, and would have continued accruing to date, absent Coinbase's wrongful acts as further

21   described herein.

22   89.    By purchasing XTZs, Mr. Dellone invested his money in the Coinbase Platform and in

23   the Tezos blockchain, expecting that he would passively earn profit from staking (or baking) his

24   XTZs to earn "rewards," without any work on his part, resulting solely from the increase in the

25   value of his XTZs, and from the accrual of his staking rewards over time.

26   90.    Mr. Dellone has been deprived of his XTZ tokens and rewards because, in or around

27   December 2021, Defendants exchanged most if not all his XTZs, for bitcoins; and because

28   Coinbase has interfered with his right to receive his XTZ staking rewards.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

12

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

91.     When Mr. Dellone invested in XTZ tokens—which were made available to him by Coinbase—Mr. Dellone helped fund both Coinbase, and the Tezos blockchain.

92.     Mr. Dellone earned measurable profits, which were reflected in his Coinbase-issued XTZ wallet, and which resulted solely from the efforts of Coinbase.

93.     The XTZs formerly held in Mr. Dellone's Coinbase-issued Tezos (XTZ) wallet, including the XTZ rewards he earned through the Coinbase Platform, are investment contracts and securities under the Securities Exchange Act.

94.     Coinbase caused Mr. Dellone to lose his XTZs when Coinbase converted all or substantially all his XTZs to BTC on December 14, 2021.

95.     Since December 14, 2021, Coinbase has intentionally and unreasonably deprived Mr. Dellone of the XTZ tokens that accrued in, and were stored in his Coinbase account prior to the fraudulent transactions that occurred on his Coinbase account.

96.     Coinbase has inequitably retained the Tezos-specific benefits it received from Mr. Dellone's investment in XTZs, and Mr. Dellone has been harmed by Coinbase's conscious business decision to impose substantial risks on Mr. Dellone, by proceeding to carelessly offer, broker, and facilitate his Security Token transactions on its Platform while ignoring applicable securities laws aimed at protecting Mr. Dellone as an average retail investor.

**B.      Coinbase is a "Custodial Wallet Service Provider"**

97.     The permanent loss of a Wallet's private key can, and almost always does result in the irrevocable loss of all crypto-assets in or associated with that Wallet.

98.     Coinbase has advertised the "custodial" (or "hosted") Wallet services it purportedly provides, as a solution to consumers' worries regarding inadvertent, irreversible losses of crypto-assets. See Coinbase, *How to set up a crypto wallet*, https://www.coinbase.com/learn/tips-and-tutorials/how-to-set-up-a-crypto-wallet (accessed June 12, 2023) ("It's called hosted because a third party keeps your crypto for you, similar to how a bank keeps your money in a checking or savings account. You may have heard of people 'losing their keys' or 'losing their USB wallet' but with a hosted wallet you don't have to worry about any of that.").

99.     The type of custodial Wallet services Coinbase has advertised are typically offered by

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

centralized, sufficiently-capitalized[9], and insurable for-profit corporations, because hosted Wallet providers, including Coinbase, assume custody, and therefore possession and a significant degree of control of their customers' valuable digital assets.

100.    By contrast, "non-custodial" Wallet service providers are commonly decentralized, distributed, and sometimes not-for-profit organizations, as non-custodial Wallet providers merely present customers with easier ways to create, hold, and directly transact with Wallets in the customer's—not the service provider's—custody. Non-custodial Wallet providers, by definition, cannot assert or take custody of their customers' crypto-assets. Accordingly, customers of non-custodial Wallet service providers take full responsibility for maintaining and securing their own private keys and crypto-assets.

101.    Coinbase is a "custodial Wallet service provider" because Coinbase: **(a)** requires that its customers maintain and use electronic financial accounts hosted by Coinbase, in order to access their crypto and other digital assets they own; **(b)** assumes custody of its customers' private keys and the crypto-assets owned by its customers; and **(c)** can unilaterally permit access to and prevent transfers of customer-owned crypto-assets in its custody.

102.    Coinbase has promoted and advertised its unilateral ability to authorize changes to Coinbase account credentials as a security, or account protection, feature that most if not all custodial Wallet service providers in the crypto-economy offer. See, *e.g.*, ("The main benefit of keeping your crypto in a hosted wallet is if you forget your password, you won't lose your crypto [because a custodial Wallet service provider can reset its customers' passwords].")[10]

103.    Coinbase has advertised the services it provided Mr. Dellone as including benefits and protections that "non-custodial" Wallet providers do not, and by definition, cannot provide. See Coindesk.com, *Custodial wallets vs. non-custodial wallets* (with custodial Wallet service providers, "[t]he individual user is not responsible for protecting the private key to the wallet and therefore places trust in the business [*i.e.*, Coinbase] keeping the private key safe. When a

---

[9] But see, *e.g.*, Commodity Futures Trading Commission, *CFTC Charges Sam Bankman-Fried, FTX Trading and Alameda with Fraud and Material Misrepresentations – Release Number 8638-22*, published December 13, 2022, https://www.cftc.gov/PressRoom/PressReleases/8638-22 (accessed April 24, 2023).

[10] Coinbase, *How to set up a crypto wallet*, https://www.coinbase.com/learn/tips-and-tutorials/how-to-set-up-a-crypto-wallet (accessed June 12, 2023).

14

user wishes to send coins out of a custodial wallet, they simply log in to the platform with a username and password, input the public key of the location to where they wish to send coins, and the business is responsible for inputting the private key to complete the transaction.").[11]

104.    As a custodial Wallet service provider, Coinbase intentionally bargained for, and has received benefits from misrepresenting the quality and features of the custodial services it purports to provide. Coinbase has unjustly received and retained these benefits as a result of misrepresenting its willingness and ability to comply with the higher standards of care applicable to all regulated custodial Wallet service providers serving the crypto-economy and California retail financial consumer customers, like Mr. Dellone.

### C. Coinbase's Claims It Uses Its Customers' Data for "Security" Purposes

105.    Coinbase collected and maintains various categories of data from and about its customers, and Coinbase intended to, and did, convince Mr. Dellone that his money and property, which he had entrusted to Coinbase's custody, were reasonably secured by Coinbase's use of the data he (and other Coinbase customers) shared with Coinbase and consistently permitted Coinbase to collect from and about him, by nature of his relationship with Coinbase.

106.    Coinbase assured Mr. Dellone that Coinbase and its Affiliates were prepared to (and at times, did) take appropriate actions based on the data Coinbase collected from and about Mr. Dellone.  In October 2021, for example, and on numerous other occasions prior, Coinbase represented to Mr. Dellone that Coinbase uses the data it collects from and about him, and other Coinbase customers, to prevent and respond to unauthorized and fraudulent activity on the Coinbase Platform, and to identify Mr. Dellone as a Coinbase customer. [12] These representations were false, and Coinbase knew that when it made the representations.

### 1. Coinbase Collected Troves of Identification Data from Mr. Dellone

107.    Along with other cyber-identification data, Coinbase collected the following information from and about Mr. Dellone, and to some extent, from and about the Doe Defendants who wrongfully accessed Mr. Dellone's Coinbase account: **(i)** Device IDs; **(ii)** IP Addresses; **(iii)** data

---

[11] https://www.coindesk.com/learn/custodial-wallets-vs-non-custodial-crypto-wallets/ (accessed Nov. 14, 2022).
[12] See User Agreement, Privacy Policy, <u>Exhibit A</u> (Privacy Policy begins at p. 19).

**COMPLAINT**

T H E   L A W   O F F I C E   O F   E T H A N   M O R A
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

from Cookies; **(iv)** Behavioral Analytics; and **(v)** Personally Identifiable Information ("PII").

108.    Device IDs are hardware-specific identification numbers, like IMEI numbers and MAC addresses. An "IMEI" number (or International Mobile Equipment Identity number) is a wireless device's (*e.g.*, a cellular mobile phone's) unique 15-digit serial number. A "MAC Address" (or Media Access Control address; sometimes called a "hardware address") is a unique, 12-character alphanumeric attribute used to identify individual electronic devices on a digital network.

109.    An IP address, or an Internet Protocol address, is a unique address, for example "107.77.213.27," that identifies a device on the internet or on a local network. An IP address serves two main functions: it identifies the host (the digital representation of a device) on a network; and it provides the geographic location of the computer or other device connected to a network.

110.    IP addresses can be disguised by using proxy networks, like a Virtual Private Network (or "VPN"). A VPN conceals the true IP address used by a device by redirecting the device's network connection through a proxy server run by a VPN host, which essentially assigns the device a new IP address.[13]

111.    Cookies are information saved by a web browser when a person uses the web browser to visit a website. Cookies are used to recognize a person, or a person's device, in future online interactions. Flash Cookies, also known as "Local Shared Objects" (or "super-cookies")[14], are a Cookie-variant that collects and stores information about *how* a person uses a website's services.

112.    Coinbase has explicitly represented that it uses Flash Cookies for fraud prevention.[15]

113.    Behavioral Analytics is the process of collecting and analyzing data from actions performed by users of a digital product. In general, companies that use Behavioral Analytics (including Coinbase), analyze various forms of digital user data to assess exactly how users

---

[13] See Kaspersky, *What is VPN? How It Works, Types of VPN*, https://www.kaspersky.com/resource-center/definitions/what-is-a-vpn (accessed March 14, 2023) ("A VPN hides your IP address by letting the network redirect it through a specially configured remote server run by a VPN host.").

[14] The Electronic Frontier Foundation has described Flash Cookies as a "threat." Electronic Frontier Foundation, *Online Behavioral Tracking*, https://www.eff.org/issues/online-behavioral-tracking (accessed Apr. 17, 2023) ("***New threats include* 'super-cookies' like Adobe's '*Local Shared Objects*'** . . . . [and] semi-legal data-sharing agreements between Internet service providers and data warehouses . . . . [which] include social networking websites that allow advertisers too much access to their users' behavior and data.") (emphasis added).

[15] See User Agreement, Cookie Policy, Exhibit A (Cookie Policy, begins at p. 29).

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

interact with digital products (*e.g.*, the Coinbase Platform), and in order to make decisions about how to improve their products in the future.

114.   Personally Identifiable Information ("PII") includes a person's name and contact details (*e.g.*, phone number; email address), usernames, gender, locale/language, location, birthdate, user-authenticated virtual documents, and may include device types and other cyber-identification data used by a company to control access to the company's services.

115.   Personally Identifiable Information has significant value to criminals, researchers, advertisers, Coinbase's Affiliates, internet and cellular service providers, political campaigns, and consumers.

116.   To many consumers, PII can be just as important as financial data. To some consumers, and to some criminals, PII can be even more valuable than a Social Security Number or bank account information.

117.   Personally Identifiable Information, including the PII Mr. Dellone shared with Coinbase, which Coinbase has collected and retained for nearly a decade, has significant value to Coinbase.

118.   Coinbase had sufficient information about Mr. Dellone, his access devices, his locations, and his online behaviors, which Coinbase's employees, representatives, and agents could have, but did not use to prevent unauthorized access to, and fraudulent transactions on Mr. Dellone's Coinbase account.

119.   Based on the information Coinbase had in its possession in December 2021, no person or custodial Wallet service provider in Coinbase's position could have reasonably concluded that Mr. Dellone initiated the unlawful transactions that ultimately decimated his Coinbase account.

## 2.   Coinbase Misrepresents the Reasons It Collects and Stores Consumer Data

120.   On numerous occasions prior to December 2021, Coinbase specifically represented to all Coinbase customers that Coinbase engages in the routine monitoring of IP addresses, as part of Coinbase's "reasonable risk-based program" aimed at complying with Anti-Money Laundering and Know Your Customer (AML/KYC) regulations.[16]

---

[16] See, *e.g.*, *Coinbase SEC Form S-1*, *supra*, n. 1. See also, Coinbase, *FAQ – Password Resets*, https://help.coinbase.com/en/coinbase/privacy-and-security/other/why-will-my-password-reset-require-24-hours-to-process (accessed October 2022).

121.   Additionally, Coinbase has advertised that it only allows customers to "reset their passwords from devices they have previously verified, or from locations they have previously logged in from."[17]

122.   Mr. Dellone reasonably believed that Coinbase was, for security purposes, persistently collecting the geolocations and other device and network data associated with every person and/or device that requested access to his Coinbase account.

123.   Mr. Dellone saw and reasonably believed the following statement, or a substantively similar statement, posted on Coinbase's website: "if you [a customer] reset your password from a new device, you won't be able to send crypto from your account for up to 48 hours." Coinbase promoted this feature as one that would help protect its customers from fraud and theft affecting their Coinbase accounts, by helping "safeguard against attempts to illegitimately reset [the Coinbase customer's] password."[18] For over eight years, Mr. Dellone believed that Coinbase provided this feature consistently with respect to critical actions (*e.g.*, password resets; credential changes; irreversible transfers of cryptocurrency) taken on Mr. Dellone's Coinbase account.

124.   Mr. Dellone allowed Coinbase to retain custody of his digital assets, including his valuable private and sensitive data, because he believed that when he, or when anyone, attempted to engage in activity involving his Coinbase account, Coinbase would take reasonably appropriate precautions to ensure that every action—or, at the very least, every critical account change request and irreversible P2P transaction—has been legitimately requested by him, *before* approving or effectuating those actions.[19]

125.   Coinbase's statements regarding its use of customer data convinced Mr. Dellone that Coinbase's services were of a particular quality that would have mitigated or prevented the losses and harms Mr. Dellone sustained as a result of Coinbase's repeated failures to provide Mr. Dellone the services and products Coinbase had advertised.

---

[17] Coinbase, *Password requirements and troubleshooting*, https://help.coinbase.com/en/coinbase/privacy-and-security/avoiding-phishing-and-scams/password-requirements (accessed October 2022).

[18] Coinbase, *Reset my password*, https://help.coinbase.com/en/coinbase/managing-my-account/get-back-into-my-account/reset-my-password (accessed October 2022).

[19] See, *e.g.*, Coinbase, *Scaled compliance solutions from Coinbase*, https://www.coinbase.com/compliance (accessed April 17, 2023) (showing Coinbase offers various crypto "compliance" services for governments, financial institutions, and crypto businesses).

The Law Office of Ethan Mora
1040 E. Herndon Ave., Suite 202
Fresno, CA  93720

18

II.   **Coinbase Facilitates Dozens Of Unauthorized Transfers And Critical Account Changes—Then Demands Mr. Dellone Reimburse Coinbase For Fraudulent Transactions Coinbase Perpetrated Using Mr. Dellone's Account**

126.   On December 14, 2021, Coinbase facilitated numerous unauthorized and exceptionally uncharacteristic transactions, and approved multiple critical account changes on Mr. Dellone's Coinbase account, despite Coinbase collecting real-time data, which clearly showed that: **(a)** the devices used to access Mr. Dellone's account (and initiate an unprecedented flurry of transactions) had Device IDs that had never previously accessed Mr. Dellone's account; **(b)** the access devices were connected to VPNs, which were provided by a European-based company, called "M247"; and **(c)** the geolocations of the VPN-masked IP addresses were connected to servers in Florida and New York.

127.   Since he opened his Coinbase account in October 2013, Mr. Dellone has consistently accessed his Coinbase account from California, always using the same network and Internet Service Providers to access his account.

128.   Over an eight-year-period Mr. Dellone consistently used familiar, pre-authorized access devices (*e.g.*, computers, mobile phones) to access the Coinbase Platform.

129.   In all his time as a Coinbase customer, Mr. Dellone never once used a VPN to disguise his IP address when logging into his Coinbase account.

130.   Despite the years of PII, behavioral analytics, and other cyber-identification information Coinbase had collected from Mr. Dellone, supposedly for security purposes, Coinbase did not merely grant DOES 1-50 unfettered access to Mr. Dellone's Coinbase account—Coinbase allowed DOES 1-50 to retain, and later renew, and then regain access to his account, even, shockingly, to Mr. Dellone's express exclusion.

131.   The actions and omissions of CBI, its agents, executives, employees, and/or its "Affiliates," and the conscious and unethical business decisions made by Coinbase Global, have caused Mr. Dellone significant harms, for which Mr. Dellone is now entitled to recover.

A.   **Defendants Plunder Mr. Dellone's Coinbase Account, Robbing Him of $100,000 in Cryptocurrencies and Exposing His Valuable, Private Data**

19

**The Law Office of Ethan Mora**
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

132.    Around 3:30 p.m. PST on December 14, 2021, Mr. Dellone's Coinbase account was breached by DOES 1-50 while Mr. Dellone was asleep.

133.    Immediately upon gaining access to Mr. Dellone's account, DOES 1-50 initiated twenty-five (25) consecutive transactions, twenty-three (23) of which were initiated in the span of less than ten minutes. Coinbase approved and promptly facilitated each of these transactions.  In the first set of rapid-fire transactions, Defendants converted twenty-two (22) unique crypto-assets belonging to Mr. Dellone, into U.S. dollar-denominated financial assets (USD and/or USDC); then, along with approximately $17,000 that was already in Mr. Dellone's Coinbase-issued "U.S. Dollar Wallet" (and/or his "USDC Wallet") prior to the breach, Defendants purchased over $70,000 worth of Bitcoin on the Coinbase Platform.

134.    Coinbase credited the newly-purchased BTC to Mr. Dellone's Bitcoin Wallet, which, prior to the breach of his account, already contained approximately 0.5 bitcoins.

135.    Coinbase also permitted, and inherently assisted DOES 1-50 in purchasing about $1,000 worth of Bitcoin using Mr. Dellone's bank account, which was connected to, and accessible via the Coinbase Platform. Coinbase credited these bitcoins to Mr. Dellone's Bitcoin Wallet as well.

136.    Then, at the behest of Doe Defendants, Coinbase transferred the entire balance of Mr. Dellone's BTC Wallet (more than 2.0569 bitcoins) to an "off-Platform" Bitcoin Wallet (a Wallet not hosted by Coinbase on the Coinbase Platform) that had never been associated with Mr. Dellone or his Coinbase account in any way whatsoever—all in a single, irreversible electronic fund transfer.

137.    In other words, after Coinbase swiftly facilitated dozens of unprecedented and clearly fraudulent transactions on Mr. Dellone's Coinbase account, Coinbase sent nearly the entire consolidated balance of Mr. Dellone's account (which, at the time, was worth around $100,000) off the Coinbase Platform, to a completely pseudonymous Bitcoin Wallet, all in one, irrevocable financial transaction, without even so much as sending a confirmatory "test" transaction to the off-Platform Wallet prior to transferring the six-figure lump sum.

138.    Unlike reversible "on-Platform" transactions, which can only be effectuated using Coinbase-issued credentials associated with Coinbase-issued digital wallets, "off-Platform"

20

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

T H E  L A W  O F F I C E  O F  E T H A N  M O R A
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

1   transactions are generally irreversible and require the use of the private key associated with the

2   "spending" Wallet.

3   139.   The transfer of Mr. Dellone's 2.0569 bitcoins from his BTC Wallet required Coinbase to

4   use the private key associated with Mr. Dellone's Bitcoin Wallet.

5   140.   Coinbase's transfer of Mr. Dellone's Bitcoin to the off-Platform Wallet is the digital

6   equivalent of a bank teller dropping a $100,000 bag of cash, representing a bank customer's

7   entire bank account balance, behind a random dumpster located nowhere near the bank, purely

8   at the behest of someone who called the bank ten minutes prior, claiming to be the account

9   holder.

10   141.   By 3:50 p.m. PST on December 14, 2021, about twenty minutes after Coinbase first

11   approved the initial unauthorized log-in request on Mr. Dellone's Coinbase account, Mr.

12   Dellone's account was virtually empty.

13   **1.   Coinbase Facilitates Even More Fraud on Mr. Dellone's Account**

14   142.   Somehow, despite all odds Coinbase ever intended to prevent, mitigate, or rectify the

15   financial devastation Coinbase and Doe Defendants caused Mr. Dellone, the pillaging of Mr.

16   Dellone's Coinbase account continued.

17   143.   Apparently blind to the copious and unmistakable tell-tale hallmarks of fraud on its

18   Platform, Coinbase approved the following actions, initiated by one or more Doe Defendants,

19   seeking to: **(a)** change the email address associated with Mr. Dellone's Coinbase account; **(b)**

20   change the 2FA settings for Mr. Dellone's account; **(c)** add a new phone number—a Voice-Over-

21   Internet-Protocol (or "VOIP")[20] phone number, with a Montana area code—to Mr. Dellone's

22   account; **(d)** verify the VOIP number as the primary mobile phone number for Mr. Dellone's

23   account; **(e)** link a new 2FA authentication mechanism to Mr. Dellone's account; and **(f)**

24   disassociate Mr. Dellone's email address and phone number from his account.

25   144.   Any reasonable person in Coinbase's position would have recognized that Mr. Dellone

26   _____

27   [20] See, *e.g.*, Federal Communications Commission, *Voice Over Internet Protocol (VOIP)*,
https://www.fcc.gov/general/voice-over-internet-protocol-voip (accessed April 17, 2023)  ("Voice over Internet

28   Protocol (VoIP), is a technology that allows you to make voice calls using a broadband Internet connection instead
of a regular (or analog) phone line. . . . VoIP can allow you to make a call directly from a computer, a special VoIP
phone, or a traditional phone connected to a special adapter.")

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

was not attempting to hastily change his phone number, his email address, and his 2FA settings, all at once, for the first and only time in eight years, using previously-unauthorized access devices (including an iPhone multiple generations older than his previously-authorized mobile access device, which was also an iPhone) by connecting to a foreign-hosted VPN, using IP addresses connected to servers in states across the country from where Mr. Dellone has consistently accessed the Coinbase Platform.

145.    Considering the grave and foreseeable harms to Mr. Dellone, including the irrevocable loss of his PII and other valuable data, no reasonable person in Coinbase's position would have approved the changes Doe Defendants requested. Coinbase, on the other hand, promptly approved the changes, defying its own unambiguous promises and legal obligations to Mr. Dellone.

146.    Coinbase then proceeded to facilitate additional financial transactions. In one transaction, Coinbase sent a cryptocurrency called "BSV"—for which Coinbase only facilitates "off-Platform" exchanges—from Mr. Dellone's BSV Wallet (hosted by Coinbase), to an off-Platform BSV Wallet that (like the off-Platform BTC Wallet) had never been associated with Mr. Dellone.

147.    Coinbase then facilitated another transaction, which was initiated by a device using a New York IP address issued by the same VPN provider (M247) that had issued the Florida IP address responsible for the previous instances of fraud detailed above. In this transaction, Coinbase allowed DOES 1-50 to, once again, use Mr. Dellone's bank account to purchase approximately $200 more in Bitcoin. Coinbase again deposited the BTC to Mr. Dellone's Bitcoin Wallet before transferring the BTC from his Wallet to the Doe Defendants' off-Platform Wallet.

148.    When Mr. Dellone later informed his bank that the Bitcoin purchases executed on the Coinbase Platform were fraud, Mr. Dellone's bank reversed the charges.

## 2.    Summary of Mr. Dellone's Cryptocurrency Losses

149.    "*Table A*" *(Summary of Converted Assets)*, set forth below, lists the crypto-assets converted and/or stolen from Mr. Dellone by Defendants on December 14, 2021:

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

| | | Table A (Summary of Converted Assets) | |
|---|---|---|---|
| | | **Token** | **Number of Tokens** |
| 1 | | ETH | 6.60611257 |
| 2 | | LTC | 88.59916563 |
| 3 | | ETC | 170.5156815 |
| 4 | | CTSI | 1,931.78 |
| 5 | | ADA | 637.4547 |
| 6 | | ZRX | 804.0188919 |
| 7 | | LINK | 122.1935986 |
| 8 | | ANKR | 6,215.40 |
| 9 | | LCX | 3,254.52 |
| 10 | | SUKU | 4,161.78 |
| 11 | | XTZ | 93.53412 |
| 12 | | SHIB | 37,479,605.75 |
| 13 | | EOS | 102.3689 |
| 14 | | XLM | 1,021.82 |
| 15 | | DNT | 1,955.06 |
| 16 | | ASM | 2,750.43 |
| 17 | | MATIC | 199.0150769 |
| 18 | | BAT | 143.7168994 |
| 19 | | OMG | 1.17787025 |
| 20 | | TRAC | 204.2707539 |
| 21 | | CVC | 346.1700191 |
| 22 | | USD-BTC | 1.50871977 |
| 23 | | BTC Buy | 0.02081577 |
| 24 | | USD-BTC | 0.00405624 |
| 25 | | BTC Transfer Off-Platform | 2.05698427 |
| 26 | | BSV Transfer Off-Platform | 1.72706484 |

**COMPLAINT**

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

**B.  Mr. Dellone Immediately Reports Fraud to Coinbase**

150.    When Mr. Dellone woke up to get ready for work, around 5:30 p.m. PST on December 14, 2021, he opened the Coinbase mobile application (which he had installed on his iPhone). To his dismay, he saw his account had a $241 balance. Mr. Dellone immediately called Coinbase and reported the fraud.

151.    Although Coinbase had apparently sent automated notices regarding the unauthorized account activities to Mr. Dellone's listed points of contact, these notices arrived either while Mr. Dellone was unable access his mobile device and/or his email account, or after Coinbase had already approved or effectuated the actions and transfers DOES 1-50 had initiated.

152.    In response to Mr. Dellone's call reporting the unauthorized activity, Coinbase opened a "support ticket." Coinbase also automatically sent Mr. Dellone an email (the "Recovery Email")[21] explaining how to disable authenticator apps and restore SMS 2FA on his account. The Recovery Email advised that Mr. Dellone must observe a 24-hour waiting period before his access to his Coinbase account would be restored.

153.    Coinbase then locked Mr. Dellone out of his Coinbase account.

154.    On information and belief, Coinbase sent a copy of the Recovery Email to one or more of DOES 1-50, and Coinbase directly and exclusively communicated with devices controlled by DOES 1-50, or with DOES 1-50, about Mr. Dellone's Coinbase account, for several hours, unbeknownst to Mr. Dellone.

155.    Notwithstanding Mr. Dellone's timely and good faith efforts to have Coinbase halt and reverse the blatantly unauthorized transactions and account changes on his Coinbase account— which only Coinbase can do—Coinbase provided DOES 1-50 with exclusive access to Mr. Dellone's assets during crucial periods of time: while Mr. Dellone was commuting to work, while he was at work, and while Mr. Dellone was sleeping.

156.    Mr. Dellone, like every human being, requires sleep. The notion that Mr. Dellone ought to have been monitoring his electronic devices 24 hours-a-day, 7 days-a-week, 365 days-a-year, and never miss a single text message or email from Coinbase is preposterous.

---

[21] See, Exhibit B – "Coinbase Email Correspondence with Plaintiff," at p. 13.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

157.   In December 2021, Mr. Dellone was working the nightshift in the ICU at a hospital, and during that time, COVID-19 cases were surging in California.

158.   Coinbase has advised Mr. Dellone that Coinbase accepts zero responsibility for the fraudulent transactions it facilitated on his Coinbase account; accordingly, Coinbase implies that Mr. Dellone should have been awake during the breach of his account and/or during the theft of his assets, or that he should have otherwise responded to the unauthorized activity quicker than he did.

159.   Within just the first twenty minutes of his account being breached, Coinbase had facilitated more fraudulent transactions for DOES 1-50 than Coinbase had facilitated for Mr. Dellone himself in the preceding several *months*, *combined*.

160.   And Coinbase profited handsomely from the unauthorized, notably fervent transactional activity, which, compared to Mr. Dellone's exceptionally conservative account transaction history, was entirely unprecedented.

161.   As a direct result of the unauthorized transactions on Mr. Dellone's account, Coinbase collected thousands of dollars' worth of fee-based transaction revenue, at a rate in excess of $300 *per minute*. Those fees were taken directly from Mr. Dellone, while he was asleep, without his knowledge, consent, or permission, and through no fault of his own.

162.   Coinbase's misconduct, negligence, incredible ignorance, and sickening greed—and not the fact that Mr. Dellone sleeps, or is gainfully employed—caused Mr. Dellone to lose his valuable personal property, and his valuable, and in some instances invaluable, irrecoverable, or irreplaceable data, including his PII.

163.   In light of the incredibly suspicious cyber-identification data associated with the transactions initiated or requested by Doe Defendants, any reasonable person in Coinbase's position would have pegged the belligerent, uncharacteristic activity on Mr. Dellone's account as fraud, either as or before approving those transactions, and certainly before facilitating the single transaction that, in one fell swoop, obliterated Mr. Dellone's eight-year-old financial account and all the valuable property he had acquired over the course of nearly a decade.

164.   Mr. Dellone had never transferred any crypto-assets off the Coinbase Platform, and on

T H E   L A W   O F F I C E   O F   E T H A N   M O R A
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

December 14, 2021, Coinbase had absolutely no reason to believe he would. Quite the contrary.

165.    No reasonable person, and certainly no regulatorily compliant custodial Wallet service provider or crypto exchange in Coinbase's position would have approved, let alone immediately facilitated the unprecedented (for Mr. Dellone) request to irreversibly transfer six-figures worth of virtual cash to a pseudonymous account, without first confirming the identity of the person requesting the transfer. Coinbase's conduct was unreasonable and grossly negligent.

### III.    Coinbase's Abysmal Customer Service Obstructs Mr. Dellone's Recovery Efforts And Investigation

166.    Following the 24-hour "waiting period" Coinbase imposed on Mr. Dellone, Coinbase restored Mr. Dellone's access to his account, but not for long.

167.    On information and belief, during and after the 24-hour "waiting period," while Mr. Dellone was still locked out of his Coinbase account, DOES 1-50 retained and enjoyed unfettered access to Mr. Dellone's account.

168.    On information and belief, when Coinbase finally kicked Doe Defendants' out of Mr. Dellone's Coinbase account, Coinbase sent an email notification regarding Mr. Dellones account to Doe Defendants; this communication caused and exacerbated Mr. Dellone's damages.

169.    Two days after his account was breached, on December 16, 2021, Coinbase sent Mr. Dellone a substantive (not automated) email. The email read, in part: "Our team has been able to successfully transfer the balance from your old account to your new one. You should be able to access these funds immediately."[22]

170.    Confused and justifiably concerned by this email, given that, to his knowledge, Mr. Dellone does not have a "new" Coinbase account, Mr. Dellone replied to the email seeking clarity. When Coinbase did not respond to Mr. Dellone's email request for clarification in a reasonably timely manner given the circumstances, Mr. Dellone submitted another support ticket via Coinbase's website.

171.    Mr. Dellone was not able to submit a support ticket using his Coinbase account because

---

[22] Exhibit B – "Coinbase Email Correspondence with Plaintiff, at p. 2 (*Email from Coinbase to Ryan Dellone*, dated December 16, 2021, at 10:21 PM).

**COMPLAINT**

1    he did not (and he still does not) have access to his account.

2    172.   In response to Mr. Dellone's second support ticket, Coinbase (more specifically,

3    Coinbase's software) automatically sent Mr. Dellone a classically generic email that merely

4    confirmed Coinbase's generation of another support ticket. The entire email read as follows:

5    "Hello, Thanks for submitting your request to Coinbase Support. We're here to help and will be

6    in touch as soon as possible. In the meantime, you can find answers to many of your questions

7    by visiting our Help Center [hyperlink to URL omitted]. Regards, Coinbase Support."

8    173.   Mr. Dellone visited Coinbase's "Help Center," but he found no answers to his questions.

9          **A. Coinbase's "Support Team" Attempts to Cover Up Coinbase's Egregious**

10             **Misconduct and Swindle Mr. Dellone Out of $1,225**

11   174.   On December 17, 2021, three days after Mr. Dellone's account had been drained,

12   Coinbase sent Mr. Dellone an email, which in substantive part, read:

13          Your Coinbase account is currently restricted due to an owed balance caused by an

14          unsuccessful payment for a transaction that was credited to your Coinbase Digital Wallet.

15          Per the terms of the User Agreement, you are responsible for the owed balance in your

16          Coinbase account.

17   175.   Mr. Dellone promptly replied to Coinbase's December 17 email, explaining that the latest

18   transactions on his Coinbase account were fraudulent, and that Coinbase had already opened a

19   support ticket related to the fraud. He also explained that, despite Coinbase's previous claim to

20   have transferred a balance of funds to his account, he had never seen any amount credited to his

21   account. *See* Exhibit B, at pp. 3, 6, and 7.

22   176.   One of Coinbase's so-called "support" agents replied to Mr. Dellone via email. The

23   support agent's email explicitly acknowledged that Mr. Dellone's account "may have been

24   compromised and unauthorized activity occurred." Nevertheless, the email advised Mr. Dellone

25   that Coinbase had revoked his account access "due to reversed transactions with your [Mr.

26   Dellone's] bank and an outstanding balance owed to Coinbase." The support agent's email

27   specified that Coinbase would not "reimburse or credit" Mr. Dellone for "this outstanding

28   balance owed to Coinbase," and further that, until he "first resolve[s] the outstanding balance

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

27

**THE LAW OFFICE OF ETHAN MORA**
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

1   owed to Coinbase," Coinbase will not even consider restoring his account access. Id. at 5, 6.

2   177.   Mr. Dellone was then locked out of his Coinbase account again, and to this day, Mr.

3   Dellone remains unable to access his account.

4   178.   For over a year, Mr. Dellone has diligently attempted to regain access to his Coinbase

5   account by communicating with Coinbase, taking steps to prove his identity, and by using

6   Coinbase's "support ticket" system, all to no avail.

7   179.   Due to Mr. Dellone's persistence, Coinbase eventually contacted Mr. Dellone with what

8   Coinbase purported to be instructions for regaining access to his account. Coinbase's instructions

9   advised Mr. Dellone to submit an "ID Selfie", in order to verify his identity with Coinbase.

10   Coinbase's so-called "ID Selfie" procedure required that Mr. Dellone: first, take a digital picture

11   of himself showing his face and him holding one of his government ID cards, along with a piece

12   of paper that includes the day's date and reads "For Coinbase Verification"; then, access the

13   SendSafely portal (a third-party web-based application) by using the same email address he used

14   to submit his "support ticket"; and finally, upload his "ID selfie" through the "SendSafely"

15   portal, using the link included in Coinbase's email containing the ID Selfie instructions.

16   180.   Mr. Dellone followed Coinbase's ID Selfie procedure, per Coinbase's instructions. He

17   then followed up with Coinbase to advise that he had completed the ID Selfie procedure.

18   181.   Considering the data that had already been exposed to DOES 1-50 through their

19   unauthorized access to Mr. Dellone's Coinbase account, a more appropriate manner of

20   confirming Mr. Dellone's identity than Coinbase's "ID Selfie" procedure—as opposed to

21   uploading his PII to a third-party portal accessible only via an emailed hyperlink—would have

22   been presenting his government ID card directly to Coinbase while communicating directly with

23   a live Coinbase employee.

24   182.   Coinbase's "ID Selfie" procedure has, on information and belief, exposed Mr. Dellone,

25   to grave privacy violations.

26   183.   Coinbase never followed up with Mr. Dellone regarding his "ID Selfie." Instead,

27   Coinbase eventually emailed Mr. Dellone with an ambiguous request for "additional

28   information," which Coinbase implied was yet another prerequisite, in addition to the ID Selfie

procedure, that Mr. Dellone must satisfy "before [Coinbase] can resolve this case." Mr. Dellone emailed Coinbase to ask what "additional information" Coinbase required.

184.    More than two weeks after Mr. Dellone's account had been breached, on December 30, 2021, Coinbase replied to Mr. Dellone's email, inviting Mr. Dellone to respond, in writing (via email), to a series of questions, purportedly constituting Coinbase's "security review by email" process.

185.    Coinbase sent its "security review by email" questions to Mr. Dellone after Coinbase had already asserted, erroneously, that he was responsible for the unauthorized activity on his account. Evidently, Coinbase's "security review by email" questions were aimed, not at resolving Mr. Dellone's immediate concerns, nor at verifying Mr. Dellone's identity, but at baiting Mr. Dellone—a layperson under substantial financial and emotional distress—into hastily and unintentionally providing inaccurate or inadequately informed responses to Coinbase's leading, inherently unclear inquiries. For example, Coinbase asked, "Was **the device** in your **possession** during the unauthorized activity?" This inquiry, lodged without any context, does not specify which "device" the inquiry concerns, and it inherently suggests undue significance to "possession," as opposed to "control," of a device. Coinbase also asked, "Can you provide **any further information** about how your credentials **could** have been compromised?" This question encouraged heedless speculation as to any possible reasons Coinbase might later try and trod out as part of its unscrupulous scheme to slither out of liability for its obvious misconduct.

186.    When Coinbase sent its "security review by email" questions to Mr. Dellone, Coinbase was well-aware of the fraud on Mr. Dellone's account, and by that point, Coinbase knew or should have known exactly how DOES 1-50 had breached his account.

187.    Coinbase maintains and controls virtually all relevant information concerning the breach of Mr. Dellone's Coinbase account, including data and information about DOES 1-50.

188.    Mr. Dellone has demanded, on numerous occasions, that Coinbase share his account information with him. In response, Coinbase has provided Mr. Dellone with records that Mr. Dellone has subsequently discovered to be incomplete. For example, the user profile records for Mr. Dellone's Coinbase account, as initially produced by Coinbase, omit the email address and

**THE LAW OFFICE OF ETHAN MORA**
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

1  phone number, which DOES 1-50 used to retain control of his account.

2  189.   The exclusion of certain account information, and of all relevant information to which

3  Mr. Dellone, as a California consumer, is entitled, whether intentionally or negligently withheld

4  by Coinbase from Mr. Dellone, has caused Mr. Dellone to incur additional and needless

5  expenses and harms.

6  **IV.   Coinbase Breached Its Duties To Mr. Dellone**

7  190.   As a unique business that offers unique products and services, Coinbase is subject to

8  unique duties and heightened standards of care, namely concerning the electronic fund transfers

9  Coinbase facilitates, as well as with respect to its user-authentication and customer data-handling

10  practices.

11  191.   Among digital service providers and online retailers generally, companies (including

12  Coinbase) that collect and exploit their users' data, are subject to heightened standards of care

13  regarding how the companies manage and store their customers' personal and private

14  information.

15  192.   Unlike most conventional consumer financial institutions, Coinbase provides exclusively

16  online services, in addition to conventional online "banking" -type services. Coinbase offers

17  services related to crypto-assets, including digital asset custodial services, and services by which

18  Coinbase facilitates peer-to-peer (P2P) digital asset transfers for its customers.

19  193.   Although Coinbase offers non- "traditional" online banking services, Coinbase remains

20  bound by broader categorical duties and standards applicable to traditional retail consumer

21  financial institutions, like banks. Because Coinbase facilitates electronic fund transfers,

22  Coinbase is required to use the customer data it collects and maintains to help prevent and

23  address unauthorized activity and fraud on the Coinbase Platform.

24  194.   Moreover, Coinbase is not only a "decentralized" and "remote first" company, Coinbase

25  is also a publicly-traded consumer retail financial institution with zero brick-and-mortar branch

26  locations, and ostensibly no in-person or live telephone support services for its retail customers.

27  195.   Given the emerging nature of crypto-assets, and Coinbase's unique "remote-first,"

28  "decentralized" business operations, Coinbase's standards of care and duties are heightened, and

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

in many ways, are more exacting than traditional financial institutions.

196.     As a custodial Wallet service provider and online crypto exchange that routinely manages and facilitates both online banking and crypto-asset transactions, Coinbase is subject to heightened standards of care, specifically with respect to its user authentication practices.

197.     The standards of care and duties Coinbase owed Mr. Dellone are reflected in banking, privacy, and securities laws aimed at protecting consumers, retail investors, and the public.

198.     Coinbase was and is required to comply with financial services and consumer protection laws, including the strict obligations imposed by the Bank Secrecy Act. See 31 U.S.C. § 5311; 12 C.F.R. § 208.63. The Bank Secrecy Act's obligations are reinforced by the USA Patriot Act of 2001 (the "Patriot Act"), which underscores the importance of implementing robust internal systems to detect and report money laundering and other suspicious activities.

199.      At a minimum, the Bank Secrecy Act and the Patriot Act require that Coinbase form and maintain records and reports, and implement procedures for a "Customer Identification Program" aimed at reasonably ascertaining the true identities of the people for whom it facilitates transactions. *See* 31 CFR § 1020.220(a)(2).

200.     Coinbase was and is also subject to the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693 *et seq.* ("EFTA") and its corresponding regulations implemented by the Consumer Financial Protection Bureau ("CFPB"), see 12 C.F.R. § 1005.1, *et seq.*

201.     Congress designed the EFTA with the "primary objective" of "the provision of individual consumer rights." 15 U.S.C. § 1693; 12 C.F.R. § 1005.1(b) (the "primary objective of the act and this part is the protection of individual consumers engaging in electronic fund transfers and remittance transfers.").

202.     The Bank Secrecy Act, the Patriot Act, and the EFTA require that traditional financial institutions, and crypto exchanges that provide custodial Wallet services, including Coinbase, take steps to protect consumers by complying with clear, common-sense standards applicable to regulated entities. For instance, to properly verify a customer's identity, a traditional bank with physical branch locations might ask its customer to visit a branch office, and present one of the bank's employees with the customer's government identification card, *in person*. Of course, a

31

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

"decentralized" institution, like Coinbase, with no physical branch locations, would be unable verify its customer's identity in the same manner; still, Coinbase is required to employ its customer identity authentication procedures in a fashion reasonably consistent within the spirit of these laws.

203.     Coinbase has repeatedly touted itself as a regulated, fully-compliant cryptocurrency exchange service provider, registered as a Money Services Business with the United States Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN").

204.     Before the breach of Mr. Dellone's Coinbase account, Mr. Dellone reasonably relied on Coinbase's representations that Coinbase had been operating in compliance with financial and banking regulations, and consistent with consumer data management and cybersecurity standards applicable to all regulated custodial Wallet service providers.

205.     Coinbase was or should have been aware, prior to December 2021, that its duties concerning the policies, procedures, and practices Coinbase had in place to protect its customers, must be based on Coinbase's "reasonable" assessment of relevant risks, considering: **(i)** Coinbase's size, location, and customer base; **(ii)** the various types of accounts maintained by Coinbase; **(iii)** the various types of identifying information available to Coinbase; and **(iv)** the various methods of opening Coinbase accounts.

206.     Contrary to the interests of keeping its customers' accounts secure, Coinbase failed to provide Mr. Dellone with the security features it advertised and was legally required to provide.

207.     Coinbase failed to protect and restore, or otherwise reimburse Mr. Dellone for the fraudulent conversion of his assets, despite representing that it would safeguard its customers' assets in a manner consistent with the security and diligence commonly provided by other financial institutions and digital asset custodians, such as Coinbase's competitors.

208.     Coinbase granted unknown parties (DOES 1-50) access to Mr. Dellone's Coinbase account, and authorized and facilitated the exchange and unlawful transfer of every single digital asset Mr. Dellone had entrusted to Coinbase's custody, in flagrant violation of anti-money laundering and consumer protection laws.

209.     Mr. Dellone's assets were stolen from his Coinbase account because Coinbase did not

have the customary security and user authentication systems in place to detect and prevent the criminal and tortious conduct that resulted in Mr. Dellone's injuries.

210.    Further, Coinbase's "ID Selfie" procedure was not consistent with the obligations imposed by the BSA or the EFTA.

**A. Coinbase Leaked Its Customers' Credentials, Ignored Addressable Security Flaws, and Equipped Hackers with Tools to Loot Customer Accounts**

211.    The credentials necessary to log into a Coinbase account include an email address, a password, and "multi-factor authentication" or "two-factor authentication" ("2FA") mechanism.

212.    Coinbase enabled and used SMS text messages as a form of 2FA for many of its customers' accounts,[23] including for Mr. Dellone's account—doing so benefitted Coinbase financially, as Coinbase is a publicly-traded company that, in 2021, generated an overwhelming proportion of its multi-billion-dollar revenue from transactions fees.

213.    In the years leading up to the breach of Mr. Dellone's account, Coinbase exposed its unknowing customers to profuse cyber-attack vectors, by repeatedly leaking its customers' account credentials, publicly, in plain-text form.

214.    Coinbase, further, emboldened countless malicious actors—ranging from marketing companies to scammers and hackers—with software tools, which bad actors used, along with the "user credentials" Coinbase publicly disclosed, in order to target and swiftly exploit Coinbase's customers while generating obscene amounts of revenue for Coinbase.

**1. Coinbase Publicly Exposed Customer "Credentials" In Plain-Text Form**

215.    Between 2013 and 2023, Coinbase exposed the specific email addresses its customers use when logging into their Coinbase accounts. Coinbase exposed this data by negligently programming its webpage response forms to respond to "sign up," "forgot email," and/or "forgot password" submission requests, by indiscriminately confirming whether the email address submitted to Coinbase's webpages were already being used as a customer's Coinbase-specific "credential."

---

[23] See Coinbase Blog, *Coinbase now offers two-factor authentication*, https://coinbase.tumblr.com/post/25677574019/coinbase-now-offers-two-factor-authentication (June 22, 2012).

**COMPLAINT**

The Law Office of Ethan Mora
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

216.    Before April 2021, Coinbase knew or should have known that confirming whether an existing customer uses a particular email address to log into his or her Coinbase account presents grave and unacceptable risks to its customers, and to its customers' privacy and property.

217.    For years, Coinbase inexcusably exposed many of its customers' account login and authentication credentials, in plain-text form, publicly, in innumerable variations.

218.    Prior to April 2021, no significant barriers could have reasonably prevented Coinbase from fixing its faulty webpage response forms, which were leaking Coinbase user "credentials" from the Coinbase Platform. Coinbase's executives, agents, Affiliates, and/or employees chose not to fix these leaky webpages.

219.    Before December 2021, Coinbase could have easily reprogrammed its vulnerable webpage forms so that the responses were consistent with commonly accepted industry standards, which do not confirm or expose, in plain-text form, its users' account-specific user "credentials." For instance, Coinbase could have programmed its webpages to respond with, "Please check your email for further instructions," or "We sent a text message to the phone number linked to that email."

220.    Additionally, by using the same webpage response form vulnerability that would confirm and identify Coinbase customers' email addresses, bad actors were also able to use the disclosed email addresses to request password resets for Coinbase accounts associated with those emails. In some instances, this allowed the bad actors to verify or confirm, directly with Coinbase, the final digits of the phone numbers used by Coinbase and its customers to "secure" Coinbase accounts associated with the email addresses leaked by Coinbase.

221.    Prior to May 2021, Coinbase knew that the email addresses it had leaked were being exploited to identify, confirm, and wrongfully assert control over mobile phone numbers and telecommunications services its customers, and Coinbase, used to secure Coinbase customers' accounts.

222.    For years, the vulnerable webpage forms on Coinbase's Platform leaked Coinbase's customers' data, including Mr. Dellone's data, and although Coinbase had ample opportunities to adequately disclose and fix these webpage security bugs, and thus eliminate the exceptionally

34

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

1  dangerous attack vectors Coinbase left open on its Platform, Coinbase did not seize any of the

2  opportunities it had to rectify these problems.

3  223.    Coinbase and its employees and agents repeatedly ignored glaring cyber-attack vectors,

4  and wantonly exposed its unsuspecting and otherwise defenseless customers to easily-

5  preventable risks of loss and harm, apparently for no good reason.

6  224.    Taking the appropriate steps to correct, or to at least account for Coinbase's data leaks,

7  would have protected many unnecessarily vulnerable Coinbase customers, including Mr.

8  Dellone, from devastating losses and harms, both emotional and financial.

9        **2.   Despite the Alarming Increase in "SIM Swap" Attacks, Coinbase Failed to Take**

10          **Actions Necessary to Address Security Vulnerabilities on Its Platform**

11  225.    An unauthorized SIM Swap (or "SIM Swap attack") refers to an unlawful SIM card

12  change.

13  226.    A SIM (or, "Subscriber Identity Module") card is a small, removable chip that allows a

14  mobile phone to communicate with the phone's mobile carrier network. The connection between

15  a mobile phone and its SIM card is made by the telecommunications carrier, which associates

16  each SIM card with a physical phone's IMEI number. The SIM card allows the "carrier"

17  telecommunications company (*i.e.*, cellular network service provider) to determine which

18  subscriber's account is associated with a particular mobile phone.

19  227.    SIM Swap attacks exploit SMS 2FA mechanisms by compromising a trusted connection

20  (the cellular network service provider), unbeknownst to one or more parties who rely on the

21  compromised connection.

22  228.    Mr. Dellone's mobile phone service "carrier" was one of the major branded U.S.

23  telecommunications network providers.

24  229.    During a SIM Swap attack, a SIM card number associated with a victim's mobile phone

25  account is switched from the victim's phone, to a phone in the possession of a third-party (an

26  attacker), thus re-routing the victim's mobile phone service (including incoming data, texts, and

27  phone calls associated with the victim's phone) from the victim's physical phone (still in the

28  victim's possession), to a physical phone controlled by the attacker. The attacker then receives

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

1   all the text messages and phone calls intended for the victim. Meanwhile, the victim's phone

2   loses its ability to connect to the carrier network.

3   230.   In a SIM Swap attack, once a third-party obtains control over a victim's phone number,

4   the third-party can use that control to access and take control of the victim's online accounts by,

5   for example, exploiting password reset links and 2FA codes sent via text message to the victim's

6   phone, using the victim's phone number controlled by the third-party.

7   231.   Since at least 2018, Coinbase knew that "man-in-the-middle" attacks, and SIM Swap

8   attacks in particular, are relatively easy to accomplish and were increasingly becoming prevalent

9   in the crypto-economy.

10   232.   Before December 2021, Coinbase knew that SIM Swap attacks present uniquely severe

11   risks of harm to its customers.

12   233.   In and before December 2021, Coinbase knew or should have been able to quickly

13   recognize the hallmarks of a SIM Swap attack, as SIM Swap attacks affecting Coinbase

14   customers were, by that point, not at all uncommon.

15   234.   Coinbase could have taken, but did not take reasonable steps to prevent, detect, and

16   address SIM Swap activity affecting customer accounts on the Coinbase Platform. Coinbase, for

17   example, did not require that Mr. Dellone use application-based (or another form of) multi-factor

18   authentication, rather than SMS-based 2FA, which could have assisted Coinbase in preventing

19   the harms Mr. Dellone experienced as a result of Coinbase's data leaks and other security

20   vulnerabilities.

21   **3.   Coinbase Allows Its Users to Abuse VOIP Phone Numbers**

22   235.   VOIP phone numbers do not connect to, or make use of, cellular telecommunications

23   networks. Instead, VOIP numbers use internet connections to make voice phone calls and send

24   and receive text messages from mobile device phone numbers.

25   236.   Unlike cellular network phone service providers, VOIP service providers issue phone

26   numbers without the existence of a physical phone, which would otherwise link the phone

27   numbers to physical mobile devices with IMEI numbers.

28   237.   VOIP services can be used with various kinds of internet-connected hardware devices,

1   such as laptop or desktop computers.

2   238.   VOIP numbers can be used in conjunction with VPNs to disguise the location of the

3   device using the VOIP phone number.

4   239.   VOIP numbers can be exceptionally difficult to associate with a user's identity,

5   especially when proxy services (like VPNs) are used to intentionally disguise the geolocations

6   of devices and mask the association between a device and the user's identity.

7   240.   As early as 2019, Coinbase knew or should have known that bad actors use VOIP phone

8   numbers to make themselves harder to track when committing unlawful acts, like, for example,

9   money laundering through online financial accounts secured by SMS 2FA.

10   241.   Coinbase has claimed it does not allow its customers to use VOIP phone numbers on its

11   Platform. See, *e.g.*, Coinbase, *Set up two-step verification – Add a Phone Number*,

12   https://www.coinbase.com/setup/phone ("For your security, Coinbase does not accept VOIP

13   phone numbers.").

14   242.   Because Coinbase has represented that it does not allow the use of VOIP numbers with

15   Coinbase customer accounts, Coinbase customers face severe cybersecurity risks when VOIP

16   numbers are used by users of the Coinbase Platform. By permitting the use of VOIP numbers,

17   Coinbase provided DOES 1-50 with an effective means to clandestinely exploit Coinbase's SMS

18   2FA procedures and capitalize on the attack vectors left open by Coinbase. Absent Coinbase's

19   negligence in this regard, breaching Mr. Dellone's Coinbase account would have been more

20   difficult, less enticing, and likely impossible for one or more of DOES 1-50.

21   243.   Coinbase negligently, carelessly, and recklessly permitted Coinbase accounts to be

22   created and used with VOIP phone numbers, without implementing or enforcing reasonable

23   measures for addressing the inherent risks to Coinbase customers' assets imposed thereby.

24   244.   Coinbase either programmed and continued to maintain seriously flawed automated

25   software systems, or instructed its employees to approve the utterly absurd requests made by

26   DOES 1-50, which, in this case, changed Mr. Dellone's email address and phone number to the

27   hackers' email address and VOIP phone number (with a Montana area code). As a result, Mr.

28   Dellone's prospects of identifying DOES 1-50 are drastically lower than they otherwise would

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

1  have been, had Coinbase banned the use of VOIP numbers, as Coinbase had represented it had,

2  prior to the breach of Mr. Dellone's Coinbase account.

3  **B. Before April 2021, Coinbase Global Knew CBI Had Failed to Address Imminent**

4  **Cyber-Threats to Coinbase's Customers**

5  245.    Coinbase collected, exploited, and profited from Mr. Dellone's sensitive personal and

6  confidential data, while needlessly exposing Mr. Dellone to cyber-threats that Coinbase caused,

7  ignored, deceitfully downplayed, and failed to address.

8  246.    Since at least 2017, Coinbase has known that bad actors, including criminal hackers,

9  money launderers, and scammers, seek out and utilize leaked Coinbase customer data to obtain

10  or verify consumer online account credentials and account assets.

11  247.    Between 2018 and 2022, Coinbase observed a dramatic increase in unauthorized

12  electronic fund transfers resulting from SIM Swap attacks. This problem was well-documented

13  by Coinbase users and the media.[24]

14  248.    Between 2018 and 2022, CBI's cybersecurity and customer data management practices

15  and procedures were not reasonable for a consumer financial service provider and custodian of

16  consumer digital assets and data.

17  249.    Since at least 2019, Coinbase Global knew or should have known that many of

18  Coinbase's customers were being targeted by criminal hackers seeking to abuse leaked Coinbase

19  customer data, in order to steal cryptocurrencies on the Coinbase Platform.

20  250.    Before December 2021, Coinbase knew that some Coinbase users had their Coinbase

21  "access tokens" compromised in a data breach.[25]

22  251.    Coinbase's indifference to the risks posed by SIM Swap attacks, which Coinbase foisted

23  on Mr. Dellone and its other unsuspecting retail customers, contributed substantially to Mr.

24  Dellone becoming, and potentially becoming a target of unsolicited and harmful online

25  intrusions, including highly-specific and unwanted advertisements, online account breaches,

---

26

27  [24] TechCrunch, *Coinbase vulnerability is a good reminder that SMS-based 2FA can wreak havoc*, https://techcrunch.com/2017/09/18/ss7-coinbase-bitcoin-hack-2fa-vulnerable/ (published Sept. 17, 2018).

28  [25] See, *e.g.*, ZDNet, *Coinbase sends out breach notification letters after 6,000 accounts had cryptocurrency stolen*, https://www.zdnet.com/article/coinbase-sends-out-breach-notification-letters-after-6000-accounts-had-funds-stolen/ (published October 1, 2021).

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

phishing attempts, data exfiltration, complete account takeovers, and other privacy violations and data and personal property losses Mr. Dellone has sustained, or which he now remains at persistent risk of sustaining in the future.

252.    In spite of simple, cost-effective measures readily available to Coinbase, which would have prevented the harms and losses Mr. Dellone has sustained, Coinbase failed to take reasonable steps to improve its substandard customer authentication and credential management practices.

253.    Despite the harms Defendants inflicted on Mr. Dellone, Coinbase's employees or agents obstructed, and intentionally or negligently delayed Mr. Dellone's investigation of his claims, by withholding relevant transaction and account data, thereby assisting DOES 1-50 in their efforts to remain anonymous.

254.    Coinbase's cybersecurity and consumer-protection features were not provided to Mr. Dellone as advertised, nor were they proportional to the serious threats posed by the increasingly abundant SIM Swap activity on the Coinbase Platform, which Coinbase Global knew was directed at Coinbase customers.

255.    For months, if not for more than a year after the theft of Mr. Dellone's crypto-assets, Coinbase was required to, but did not take, and has not taken, reasonable steps to remedy its flawed security and authentication practices, as herein alleged.

256.    Prior to and during the commission of the herein alleged theft and fraud, CBI ignored Mr. Dellone's cyber-identification data, or failed to use said data to secure his Coinbase account and his digital assets in Coinbase's custody.

257.    On information and belief, CBI implemented policies that prevented or discouraged its employees and its Affiliates from taking timely actions that would have prevented, mitigated, or reduced Mr. Dellone's damages.

258.    Coinbase Global recognized thousands of dollars in unearned transaction fees from the fraudulent transactions Coinbase effectuated using Mr. Dellone's Coinbase account. Those fees were paid using Mr. Dellone's funds and assets; and those fees have directly benefitted Coinbase, and not Mr. Dellone.

**COMPLAINT**

259.    For years, Coinbase has enjoyed undeserved customer loyalty resulting from its false representations, including, for example, its claims that it has "never lost" customer funds due to a breach of its Platform. Coinbase has been unjustly enriched, both financially and reputationally, at Mr. Dellone's direct expense.

**C. Coinbase Emboldened DOES 1-50 by Persistently Disregarding Open Attack Vectors on Its Platform**

260.    For nearly a decade, Coinbase failed to address various, heavily-abused weaknesses on its Platform, and in addition, enforced ineffective "rate limits" on log-ins attempts, transaction requests, and other actions on the Coinbase Platform, particularly in Coinbase's "developer" environment.

261.    Absent Coinbase's misconduct, criminal hackers and scammers could not have compiled lists of Coinbase account credentials and other customer-specific data (*e.g.*, account balances) verified directly by Coinbase itself.

262.    On information and belief, before December 14, 2021, DOES 1-50 used data leaked by Coinbase to determine that Mr. Dellone's Coinbase account was worth attempting to breach.

263.    On information and belief, at least one of DOES 1-50 submitted Mr. Dellone's email address to Coinbase's webpage, purporting to "sign up," or "log in" to Mr. Dellone's Coinbase account; Coinbase automatically responded to the request by confirming that Mr. Dellone used his specific email address as a Coinbase credential.

264.    On information and belief, DOES 1-50 attempted to reset the password for Mr. Dellone's Coinbase account using the email address DOES 1-50 had previously verified with Coinbase; Coinbase responded to Doe Defendants' requests by confirming that Mr. Dellone used SMS 2FA to secure his Coinbase account, and by disclosing or verifying the final digits of Mr. Dellone's mobile cell phone number.

265.    On information and belief, the last two digits of Mr. Dellone's phone number allowed DOES 1-50 to confirm the full phone number Mr. Dellone and Coinbase used to secure his Coinbase account with SMS 2FA.

266.    On information and belief, prior to breaching Mr. Dellone's Coinbase account, DOES 1-

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

1    50 used Coinbase's "developer tools" to verify Mr. Dellone's Coinbase account data, and check

2    the balance of funds stored in (or associated with) Mr. Dellone's Coinbase account.

3    267.    On information and belief, after obtaining Mr. Dellone's email address, Doe Defendants

4    utilized Coinbase's "developer tools" and ineffective rate limits to attempt to brute force Mr.

5    Dellone's Coinbase account password, and/or to engage in credential stuffing for the same

6    purpose.

7    268.    On December 14, 2021, DOES 1-50 unsuccessfully attempted to log into Mr. Dellone's

8    Coinbase account over forty (40) different times, including from devices connected to networks

9    in Russia, Belarus, and Kazakhstan, among other locations.

10    269.    Even with this context, when DOES 1-50 initiated the series of transactions that

11    liquidated the assets in Mr. Dellone's account, Coinbase failed to detect, and then continuously

12    permitted Doe Defendants to use automated software and/or Coinbase's developer tools to target,

13    breach, and decimate Mr. Dellone's Coinbase account.

14    270.    On information and belief, DOES 1-50 accomplished an unauthorized SIM Swap of Mr.

15    Dellone's cellular phone service, with the aim of gaining access to his Coinbase account.

16    271.    On information and belief, DOES 1-50 would not have been motivated to SIM Swap Mr.

17    Dellone, had Coinbase not already confirmed or provided one or more of DOES 1-50 with Mr.

18    Dellone's email address and the final digits of his phone number, which Coinbase confirmed for

19    Doe Defendants as valid "credentials" used to access the Coinbase Platform.

20    272.    The SIM Swap attack on Mr. Dellone's account did not impact Coinbase's ability to

21    prevent or adequately address the financial harms Mr. Dellone sustained before, as, or after Mr.

22    Dellone sustained his harms.

23    273.    Had Coinbase prevented users of the Coinbase Platform from using VOIP numbers,

24    Coinbase could have quickly identified the source of Mr. Dellone's account breach, simply by

25    recognizing the unauthorized IMEI number, which likely would have allowed Coinbase to

26    determine the location and identity of DOES 1-50.

27    **V.    Coinbase's User Agreement Is Unconscionable, Void, And Unenforceable**

28    274.    Mr. Dellone and Coinbase were parties to various versions of Coinbase's user agreement.

275.    Mr. Dellone complied with the terms and conditions set out and implied in the various agreements between Mr. Dellone and Coinbase.

276.    Coinbase's user agreement, dated December 6, 2021 (the "User Agreement"), was the latest during the relevant time period. The User Agreement incorporated the Coinbase Global Privacy Policy, dated October 8, 2021 (the "Privacy Policy"), and Coinbase's Cookie Policy, dated October 1, 2021 (the "Cookie Policy"). The User Agreement, Privacy Policy, and Cookie Policy are attached to this Complaint as "Exhibit A".

277.    The User Agreement was a "clickwrap agreement" (or "browsewrap agreement"), drafted by Coinbase, which Coinbase presented to Mr. Dellone on a "take it or leave it" basis.

278.    Although the User Agreement contains an arbitration provision, there are several cumbersome conditions precedent to seeking arbitration, which Coinbase customers must satisfy before seeking to arbitrate their disputes with Coinbase. These conditions are inextricable from the User Agreement's "delegation clause," which, as further alleged below, unfairly benefits Coinbase and harms Mr. Dellone.

279.    Coinbase has always been aware that time is of the essence in responding to cyber-attacks on the Coinbase Platform.

280.    According to the User Agreement, in the event a "dispute" arises between Mr. Dellone and Coinbase, Mr. Dellone (the customer) must first attempt to resolve his dispute with Coinbase's "support team"; only if Coinbase's support team fails to resolve the dispute, can Mr. Dellone then initiate Coinbase's so-called "Formal Complaint Process" ("FCP"), which is described in the User Agreement.

281.    Per the User Agreement, Coinbase has a self-imposed obligation to resolve customer disputes raised through the FCP, by no later than 35 days after the customer initiates the FCP (by submitting his or her FCP complaint form). *See* User Agreement, §§ 8.2.1, 8.2.2, Exhibit A.

282.    According to the User Agreement, Mr. Dellone may exercise his right to demand arbitration, only if he completes Coinbase's time-consuming and one-sided FCP.

283.    The User Agreement's delegation clause delegates decisions concerning the arbitrability of disputes between Mr. Dellone and Coinbase, to Coinbase.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

42

COMPLAINT

284. The delegation clause requires that Coinbase customers delay their demands to arbitrate potential claims against Coinbase until the conclusion of the FCP, which, subject to Coinbase's sole discretion, can leave its customers waiting for a resolution for well over a month after a dispute first arises, as was the case here.

285. Unlike Coinbase's customers, Coinbase benefits from the FCP because Coinbase is not subject to any burdensome pre-arbitration processes or conditions precedent to demanding arbitration against Mr. Dellone.

286. Along with the other pre-FCP waiting periods (*e.g.*, attempting to resolve "disputes" with Coinbase's "support team") and the myriad formal and informal barriers Coinbase set in front Mr. Dellone (*e.g.*, locking Mr. Dellone out of his account; demanding that Mr. Dellone reimburse Coinbase), the waiting period imposed by the FCP is beneficial to Coinbase, convenient for DOES 1-50, and severely prejudicial to Mr. Dellone and Coinbase's other retail customers facing time-sensitive circumstances similar to Mr. Dellone's.

287. Before December 2021, Coinbase knew that its "phone agents" would not be available to appropriately handle support calls, including calls pertaining to urgent and important customer inquiries and requests, such as situations where, as here, a customer (Mr. Dellone) has timely reported unauthorized activity on his Coinbase account and is attempting to verify his identity and protect his assets from irrevocable loss.[26]

288. The unavailability of qualified, adequately-trained Coinbase phone agents and employees significantly delayed Mr. Dellone's initiation of the FCP by further delaying the preconditional "support team" phase of the "dispute resolution" process, which he, as a Coinbase customer, was required to complete prior to initiating the FCP (the FCP, itself, then being another up-to-35-day process).

289. When Coinbase presented Mr. Dellone with the User Agreement, Coinbase knew or

---

[26] *Compare*, Coinbase, *How Can I Contact Coinbase Support?*, https://help.coinbase.com/en/coinbase/getting-started/other/how-can-i-contact-coinbase-support ("**Please be aware that we currently do not offer any phone support with a live agent**" (emphasis in original), *with* https://help.coinbase.com/en/coinbase/privacy-and-security/account-compromised/my-account-was-compromised ("Call Coinbase Support to lock your account yourself using our automated system **or to get help from a live agent**") (emphasis added), *and* ("**Speak directly to someone on our support team** to get answers about your account, crypto purchases, or payments.") (emphasis added).

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

should have known that Coinbase did not have adequate staffing, and did not have in place the appropriate policies, practices, or procedures necessary for Coinbase to comply with the pre-arbitration dispute resolution process Coinbase itself had devised.

290.    Coinbase entered into the User Agreement knowing that, should Mr. Dellone ever initiate the FCP, Coinbase would likely breach, or become in breach, of its obligations under the terms of the User Agreement. Coinbase, for example, knew that its employees, representatives, and agents responsible for responding to its customers' "support tickets" were ill-equipped, underprepared, or completely incapable of timely responding to the urgent issues Mr. Dellone subsequently raised in his FCP complaint.

291.    The pre-arbitration dispute resolution process is incorporated into and has served as a prerequisite for Coinbase customers to invoke their contractual rights, as set out in the "arbitration agreement" of the User Agreement.

292.    On numerous occasions between October 2013 and December 2021, Coinbase misrepresented its ability to comply with its own arbitration procedures, and Coinbase therefore fraudulently induced Mr. Dellone to accept and comply with the FCP, knowing that the FCP and Coinbase's own unscrupulous antics would unfairly prejudice Mr. Dellone's prospects of recovering his stolen assets.

293.    The User Agreement is grossly unfair because the delegation clause specifies that Coinbase customers, but not Coinbase, must wait up to 35 days before demanding arbitration— but whether arbitration is, in fact, appropriate (*e.g.*, whether the preconditions have been satisfied) is a determination Coinbase has reserved exclusively for Coinbase, per the User Agreement.

294.    The User Agreement is unconscionable and unenforceable because the obligations to initiate and engage in futile correspondence with Coinbase's "support team," submit "ID Selfies" through third-party online portals, and comply with the one-sided "arbitration" provision and unconscionable "delegation" clause set out in the User Agreement, apply only to claims Mr. Dellone has or would initiate against Coinbase. Coinbase, on the other hand, is subject to no such obstacles or conditions precedent with respect to claims it might initiate against Mr. Dellone.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

295.    Coinbase has never been limited by the User Agreement with respect to its ability to pursue claims against Mr. Dellone, by whatever means Coinbase deems necessary. For instance, when Coinbase disputed its liability for the unauthorized Bitcoin purchases made using Mr. Dellone's bank account (which were reversed by Mr. Dellone's bank), Coinbase resolved its "dispute"—not by demanding arbitration—but by simply exploiting Coinbase's unilateral ability to prevent Mr. Dellone from regaining access to his Coinbase account, pending his remittance of the alleged reimbursement amounts Coinbase has demanded from him. Mr. Dellone never paid Coinbase the bogus reimbursement amounts Coinbase claimed he owes, and thus, Coinbase never restored Plaintiff's account access.

296.    On March 11, 2022, after completing the conditions precedent to initiating the FCP, Mr. Dellone completed and submitted the FCP complaint form, thereby initiating the FCP.

297.    Coinbase failed to engage in the FCP and the dispute resolution process in good faith.

298.    Coinbase did not respond to Mr. Dellone's FCP complaint form by May 2, 2022, over 35 days after Mr. Dellone sent his complaint form to Coinbase.

\*\*\*

**FIRST CLAIM FOR RELIEF**

**VIOLATION OF THE ELECTRONIC FUND TRANSFER ACT ("EFTA"), 15 U.S.C. SECTION 1693 ET SEQ. (AGAINST COINBASE)**

299.    Plaintiff realleges and incorporates each of the above paragraphs 1 – 298, as though fully set forth in this cause of action.

300.    The actions and omissions of Coinbase, as alleged herein, violate obligations imposed by the Electronic Fund Transfer Act, 15 U.S.C. §§1693 *et seq.* ("EFTA") and Regulation E, including, 12 C.F.R. § 1005.7.

301.    Coinbase provides users with hosted "Digital Currency" wallets for holding "Digital Currencies," and a hosted U.S. Dollars wallet for holding U.S. Dollar-denominated obligations.

302.    Coinbase is a "financial institution" as defined by the EFTA because it is a corporation that holds accounts belonging to consumers, including Plaintiff's Coinbase account and digital Coinbase-issued wallets.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

303.   Plaintiff is a "consumer" as defined by the EFTA because he is a natural person.

304.   Plaintiff's Coinbase account is an "account" as defined by the EFTA and/or Regulation E because it is an asset account held directly by Coinbase and established primarily for personal, family, or household purposes.

305.   Plaintiff and Coinbase established Plaintiff's Coinbase account, and Plaintiff used his Coinbase account for personal purposes and not for business purposes.

306.   The primary purpose of the unauthorized transfers alleged herein was not the purchase or sale of securities or commodities, but rather for the purpose of stealing or laundering securities or commodities.

307.   The electronic fund transfers at issue were each an "unauthorized electronic fund transfer" because they were initiated by a person other than Plaintiff, by fraud, without actual authority to initiate those transfers, and from which Plaintiff has received no benefit.

308.   According to 15 U.S.C § 1693c and Regulation E, 12 C.F.R. § 1005.7, all financial institutions are required to make the disclosures set forth in § 1005.7(b), *before* the first electronic fund transfer is made involving a consumer's account.

309.   Coinbase was required to take steps to monitor Plaintiff's account for fraudulent and unauthorized transfers.

310.   Coinbase has violated Regulation E by failing to provide appropriate initial disclosures to Plaintiff, including: **(i)** a summary of Plaintiff's liability under 12 CFR § 1005.6 or under state or other applicable law or agreement, for the unauthorized electronic fund transfers; **(ii)** the telephone number and address of the person or office to be notified when Plaintiff believes that an unauthorized electronic fund transfer has been or may have been made; and **(iii)** Coinbase's business days.

311.   Coinbase has also violated Regulation E by failing to provide adequate disclosures to Plaintiff concerning: **(iv)** the type of electronic fund transfers that Plaintiff may make, and any limitations on the frequency and dollar amount of transfers; and **(v)** any fees imposed by Coinbase for electronic fund transfers, or for the right to make such transfers.

312.   Coinbase has also violated Regulation E by failing to provide Plaintiff: **(vi)** a summary

46

of Plaintiff's right to receipts and periodic statements, as provided in 12 CFR § 1005.9, and notices regarding preauthorized transfers as provided in 12 CFR § 1005.10(a) and (d); **(vii)** a summary of Plaintiff's right to stop payment of a preauthorized electronic fund transfer and the procedure for placing a stop-payment order, as provided in 12 CFR § 1005.10(c); and **(viii)** a summary of Coinbase's liability to Plaintiff under section 910 of the Act for failure to make or to stop certain transfers.

313.    Coinbase has also violated Regulation E by failing to provide Plaintiff: **(ix)** a notice that is substantially similar to Model Form A-3 as set out in appendix A of 12 CFR 1005.1, et seq., concerning error resolution; and **(x)** a notice that a fee may be imposed by an automated teller machine operator (as defined in 12 CFR § 1005.16(a)), when a Plaintiff initiates an electronic fund transfer or makes a balance inquiry, and by any network used to complete the transaction.

314.    Coinbase failed to undertake its responsibilities to remedy the unauthorized electronic fund transfers under the EFTA and Regulation E by failing to timely credit and/or provisionally recredit Plaintiff's Coinbase account pending Coinbase's investigation.

315.    Coinbase users have repeatedly implored Coinbase to help them rectify unauthorized transfers related to SIM Swap attacks involving customer accounts on the Coinbase Platform; Coinbase has consistently ignored its customers' requests, and instead, has relied on automated responses that frequently fail to address Coinbase users' concerns.

316.    For many months, and continuing today, Coinbase has turned a blind eye to multiple systemic security issues affecting customer accounts on its Platform, which has directly harmed Coinbase customers, including Plaintiff, and has further advanced the false notion that victimized customers are without any legitimate recourse to ever see those issues corrected.

317.    Before Coinbase participated in the fraudulent transfers of Plaintiff's funds and assets, Coinbase knew or should have known of the repeated breaches of its Platform, and of the illicit exploitations of its software tools.

318.    Coinbase was or should have been aware of, but was not prepared to handle, time-sensitive inquiries concerning unauthorized electronic fund transfers on its customers' accounts.

319.    Coinbase failed to provide its customers, including Plaintiff, with timely, appropriate

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

1  customer support, and the requisite disclosures, notices, and information, as required by the

2  EFTA and Regulation E.

3  320.   Plaintiff has provided Coinbase timely actual and/or constructive notice of the

4  unauthorized electronic transfers on his Coinbase account and affecting his bank account and

5  Crypto Wallets.

6  321.   Coinbase has never provided Plaintiff with disclosures compliant with 12 C.F.R. §

7  1005.7(b). Therefore, under 15 U.S.C. § 1693g and/or 12 C.F.R. § 1005.6, Plaintiff has no

8  liability for the unauthorized electronic fund transfers.

9  322.   Coinbase failed to timely and in good faith investigate the unauthorized electronic fund

10 transfers from Plaintiff's Coinbase account, as required by 15 U.S.C. § 1693f(a)(3) and 15 U.S.C.

11 § 1693f(d), when Coinbase failed to conduct a timely and reasonable review of its own records

12 as, or when the first twenty-two (22) unauthorized transactions on Plaintiff's Coinbase account

13 occurred, and as or when the 2.05 BTC was transferred from Plaintiff's BTC Wallet hosted on

14 the Coinbase Platform, to the Doe Defendants' off-Platform BTC Wallet. See 12 C.F.R. §

15 205.11(c)(4); see also Supp. I to § 205 at 11(c)(4)–5.

16 323.   Adequate and timely investigations would have led Coinbase to the conclusion that fraud

17 was occurring and had occurred on Plaintiff's Coinbase account, given that Plaintiff had not

18 authorized the transfers at issue, and considering that these kinds of fraudulent transfers were

19 previously and widely reported by other Coinbase users who had experienced SIM Swap attacks.

20 324.   Plaintiff is entitled to compensatory damages, attorneys' fees, and costs for Coinbase's

21 inadequate investigation, pursuant to 15 U.S.C. § 1693m(a).

22 325.   Because Coinbase has failed to timely correct the "errors" (statutorily defined to include

23 "unauthorized electronic fund transfers") on Plaintiff's account, by failing to timely credit or

24 provisionally recredit Plaintiff's account after Plaintiff's account had been breached and drained

25 of funds (see 15 U.S. Code § 1693f(b)-(c)), this failure, separately, results in compensatory

26 damages owed to Plaintiff, pursuant to 15 U.S.C. § 1693m(a).

27 326.   Because Coinbase has failed to conduct timely, good faith investigations into the

28 fraudulent transactions that Plaintiff actually or constructively reported to Coinbase, and has, as

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

48

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

1  a result, failed to provide Plaintiff reasonable and effective notice based on any such reasonable,

2  good faith investigation of the unauthorized electronic fund transfers, Coinbase is liable for treble

3  damages under the EFTA.

4  327.    Coinbase has failed to use the resources and procedures needed to timely resolve the

5  fraud that occurred on Plaintiff's Coinbase account, thus demonstrating Coinbase's persistent

6  inability or unwillingness to timely form a reasonable basis for believing Plaintiff's account was

7  not in "error."

8  328.    To the extent Coinbase has concluded that Plaintiff's account was not in "error,"

9  Coinbase has knowingly and willfully reached that conclusion when that conclusion could not

10  reasonably have been drawn from the evidence available to Coinbase at the time of any

11  investigation conducted by Coinbase.

12  329.    Plaintiff is entitled to compensatory damages, attorneys' fees, and costs under 15 U.S.C.

13  § 1693m, as well as treble damages under 15 U.S.C. § 1693f(e).

14  330.    Coinbase is liable for treble damages under the EFTA because it has not had any

15  reasonable basis for believing Plaintiff's account was not in "error."

16  **SECOND CLAIM FOR RELIEF**

17  **COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030) ("CFAA") (AGAINST ALL**

18  **DEFENDANTS)**

19  331.    Plaintiff realleges and incorporates each of the above paragraphs 1 – 330, as though fully

20  set forth in this cause of action.

21  332.    Plaintiff's mobile device is capable of connecting to the Internet.

22  333.    Plaintiff's BTC and BSV Wallets are capable of connecting to the Bitcoin network.

23  334.    Defendants intentionally accessed Plaintiff's BTC and BSV Wallets, without Plaintiff's

24  authorization, in order to assist or benefit from the theft, exchange, or sale of Plaintiff's

25  valuable digital assets.

26  335.    Defendants intentionally accessed Plaintiff's mobile device without Plaintiff's

27  authorization, in order to assist or benefit from the theft, exchange, or sale of Plaintiff's

28  valuable digital assets.

**COMPLAINT**

336.    Defendants, including their agents and employees, took these actions knowing that they would cause damage to Plaintiff's mobile device, as well as damage to the information located on his mobile device.

337.    Defendants, including their agents and employees, took these actions knowing that they would cause damage to Plaintiff's BTC and BSV Wallets, as well as damage to the cryptocurrencies in those Wallets.

338.    Defendants caused Plaintiff's mobile device and certain valuable data on it, specifically text messages sent to his device by or because of Coinbase, to be unusable to him.

339.    Defendants caused Plaintiff's BTC and BSV Wallets and certain valuable assets in them, specifically bitcoins and BSV, to be unusable to him.

340.    As a direct and proximate result of the Defendants' actions, Plaintiff has suffered damage to his mobile device, and damage to or loss of information on his mobile device, which Plaintiff was unable to access for critical period of time.

341.    As a direct and proximate result of the Defendants' actions, Plaintiff has suffered damage to his BTC and BSV Wallets, and damage to or loss of cryptocurrencies, which Plaintiff has been unable to access for over a year.

342.    The act of performing an unauthorized SIM Swap of Plaintiff's mobile SIM card was in the scope of work for the employees and agents of DOES 1-50.

343.    The act of authorizing access devices associated with Coinbase customer accounts was in the scope of work for the employees and agents of Coinbase.

344.    Plaintiff spent approximately $5,000 investigating who accessed and/or damaged, interfered with, or wrongfully used Plaintiff's mobile device and/or damaged information on it; as well as who accessed and/or damaged, interfered with, or wrongfully used Plaintiff's BTC and BSV Wallets and/or damaged the assets in them.

## THIRD CLAIM FOR RELIEF

## VIOLATIONS OF CALIFORNIA CONSUMER PRIVACY ACT OF 2018 ("CCPA") – CAL. CIV. CODE §§ 1798.100 ET SEQ. (AGAINST COINBASE AND DOES 1 – 10)

345.    Plaintiff realleges and incorporates each of the above paragraphs 1 – 344, as though fully

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

1    set forth in this cause of action.

2    346.   Civil Code section 1798.150, subdivision (a)(1), provides,

3        Any consumer whose nonencrypted and nonredacted personal information is subject to

4        an unauthorized access and exfiltration, theft, or disclosure as a result of the business's

5        violation of the duty to implement and maintain reasonable security procedures and

6        practices appropriate to the nature of the information to protect the personal information

7        may institute a civil action for any of the following: [**(i)** statutory damages or actual

8        damages, whichever is greater; **(ii)** injunctive or declaratory relief; and **(iii)** any other

9        relief the court deems proper.]

10   See Cal. Civ. Code. §1798.150.

11   347.   Plaintiff is a "consumer" within the meaning of Cal. Civ. Code § 1798.140(g).

12   348.   Defendants are "businesses" within the meaning of Cal. Civ. Code § 1798. 140(0).

13   349.   Plaintiff has provided Coinbase and DOES 1-10 "personal information" within the

14   meaning of Cal. Civ. Code § 1798. 140(V).

15   350.   From 2013 to the present, Defendants were aware of the confidential and sensitive nature

16   of the personal and financial information Plaintiff provided Defendants.

17   351.   Defendants violated Cal. Civ. Code §§ 1798.100 *et seq.* ("CCPA") by subjecting

18   Plaintiff's nonencrypted personal and sensitive information to unauthorized access, exfiltration,

19   theft, and disclosure as a result of Defendants' violations of their duties to implement and

20   maintain security procedures and practices appropriate for the nature and sensitivity of that

21   information, in violation of Cal. Civ. Code § 1798.150(a).

22   352.   Plaintiff has suffered injuries stemming from Defendants' loss and unauthorized

23   exposure of Plaintiff's valuable and confidential digital assets, including: **(i)** the lost or

24   diminished value of his digital identification data—for instance, whereas legitimate buyers of

25   digital consumer data compensate consumers with contracted-for services in exchange for

26   personal information, now, as a result of Defendants' disclosures of Plaintiff's data to

27   unauthorized individuals and companies, third-parties (including marketing companies,

28   salespeople, scammers, and hackers) can now obtain this information for free; **(ii)** out-of-pocket

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

51

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

expenses associated with the prevention, detection, and recovery from potential identity theft, tax fraud, and unauthorized use of Plaintiff's PII; **(iii)** lost opportunity costs associated with efforts expended, and Plaintiff's loss of productivity in attempting to mitigate the consequences of Defendants' actions and omissions, including but not limited to Plaintiff's lost time, at an estimated average loss of $125 per hour in lost labor hours, which he has spent and will spend mitigating his potential and realized losses; as well as restoring the ability to log into and completely recover his Coinbase account; dealing with impersonation activities, including phishing emails; reviewing his credit reports; scrutinizing his financial information; detecting identity theft; and changing his passwords; **(iv)** continued risks to Plaintiff's PII, to the extent it is still in Defendants' respective possessions and subject to further unauthorized disclosures, for as long Defendants fail to protect his PII; and **(v)** future costs in terms of loss of time, effort, and money that will be expended to monitor, prevent, detect, contest, and repair the impact of the cyber-identification data compromised and altered as a result of Defendants' actions and omissions, for the remainder of Plaintiff's life.

353.   Pursuant to Cal. Civ. Code § 1798.150(b), prior to the filing of this Complaint, on April 20, 2023, counsel for Plaintiff served Coinbase with notice of the alleged CCPA violations by certified mail, return receipt requested, and by email. See ***Notice of CCPA Violations***, copy attached hereto as "Exhibit C" (without attachments; with copy of return receipt attached). Coinbase has not responded.

354.   Cures to Coinbase's violations are possible. Coinbase has failed to cure these violations, or if it has, Coinbase has failed to provide Plaintiff with an express written statement that the violations have been cured.

355.   Plaintiff is entitled to actual, punitive, and statutory damages, disgorgement, restitution, and other relief available under Cal. Civ. Code § 1798.150(a).

356.   Plaintiff seeks injunctive relief in the form of an order enjoining Coinbase from continuing to violate the CCPA because, unless and until Coinbase is restrained by order of this Court, Coinbase will continue causing injuries, including irreprable harm to Plaintiff and to other similarly situated Coinbase customers.

**FOURTH CLAIM FOR RELIEF**

**VIOLATIONS OF CALIFORNIA'S SHINE THE LIGHT LAW – CAL. CIV. CODE §§ 1798.83 ET SEQ. (AGAINST COINBASE)**

357.   Plaintiff realleges and incorporates each of the above paragraphs 1 – 356, as though fully set forth in this cause of action.

358.   Plaintiff is a "customer" of Coinbase, as defined by Cal. Civ. Code § 1798.83(e)(1).

359.   Plaintiff and Coinbase were engaged in an ongoing "established business relationship," as defined by Cal. Civ. Code § 1798.83(e)(5).

360.   Coinbase did not provide the legally required privacy disclosures to Mr. Dellone pursuant to Cal. Civ. Code § 1798.83(b)(1).

361.   Plaintiff requested his account data from Coinbase in January 2022, February 2022, and April 2023, and on each occasion Coinbase failed to provide him with complete, accurate, and timely disclosures in response to Plaintiff's account data disclosure requests, in violation of Cal. Civ. Code § 1798.83(a).

362.   Plaintiff's personal information has monetary value and can be sold for a profit or exchanged for services.

363.   Coinbase's failure to comply with Cal. Civ. Code § 1798.83(b)(1) diluted the value of Plaintiff's personal information.

364.   Because Coinbase has deprived Mr. Dellone of the opportunity to sell his personal information for financial or personal gain in the future, Plaintiff has not received the full value of the services for which he paid Coinbase.

365.   Coinbase's failure to comply with Cal. Civ. Code § 1798.83(b)(1) prevented Plaintiff from mitigating his ongoing injuries caused by the breaches of his Coinbase account.

366.   Coinbase's failure to provide the proper section 1798.83(b)(1) disclosures has deprived Plaintiff of value, and caused him economic harm. Plaintiff has sustained, and continues to sustain monetary injuries as a direct and proximate cause of Coinbase's violations.

367.   Plaintiff is entitled to civil penalties pursuant to Cal. Civ. Code § 1798.84(c).

368.   Plaintiff requests that this Court enjoin Coinbase's unlawful conduct, including

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

**THE LAW OFFICE OF ETHAN MORA**
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

Coinbase's ongoing exploitation of Plaintiff's data and information, in all forms, pursuant to Cal. Civ. Code § 1798.84(e).

### FIFTH CLAIM FOR RELIEF

### VIOLATION OF CALIFORNIA PENAL CODE § 496 (AGAINST COINBASE)

369.    Plaintiff realleges and incorporates each of the above paragraphs 1 – 368, as though fully set forth in this cause of action.

370.    California Penal Code § 496(a) prohibits any person from buying or receiving "any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained."

371.    Coinbase is a "person," as that term is used in Cal. Pen. Code § 496.

372.    Coinbase violated California Penal Code § 496 by obtaining personal property (crypto-assets and digital U.S. Dollar-denominated financial obligations), belonging to Plaintiff, by theft, and by knowingly withholding said property from Plaintiff.

373.    Coinbase violated California Penal Code § 496 by aiding in obtaining and withholding the crypto-assets and "digital dollars" belonging to Plaintiff, which Coinbase knew to be stolen.

374.    Plaintiff has been injured by Coinbase's violation of California Penal Code § 496.

375.    Pursuant to California Penal Code § 496(c), Plaintiff is entitled to three times the amount of his actual damages, to be proven at trial, but in any event, in an amount not less than $303,000, plus cost of suit, and reasonable attorneys' fees.

### SIXTH CLAIM FOR RELIEF

### CONVERSION (AGAINST ALL DEFENDANTS)

376.    Plaintiff realleges and incorporates each of the above paragraphs 1 – 375, as though fully set forth in this cause of action.

377.    In California, " ' "[c]onversion is a strict liability tort," ' . . . . Financial institutions can be liable to their depositors for transferring money out of their accounts on forged instruments." *Fong v. East West Bank*, 19 Cal.App.5th 224, 235 (2018) (internal citation omitted).

54

378.    Plaintiff owns and has the right to possess the private key(s) for the Bitcoin Wallet(s) hosted by Coinbase for Mr. Dellone, which were or are associated with 2.05698427 bitcoins formerly in Mr. Dellone's Coinbase account.

379.    The private key(s) and Bitcoin Wallets, and/or the 2.05698427 BTC stolen from Plaintiff, have measurable valuable.

380.    Defendants were not authorized to obtain, retain, or exercise control, dominion, or ownership over Plaintiff's bitcoins.

381.    Defendants knowingly obtained, retained, and exercised control and dominion over Plaintiff's 2.05 bitcoins, to Plaintiff's exclusion.

382.    Defendants intended to permanently deprive Plaintiff of his 2.05 bitcoins.

383.    Plaintiff has been deprived of the possession and use of his crypto-assets, digital dollars, fiat currency-denominated financial instruments, and the 2.05 BTC representing the sum of those assets, since December 14, 2021.

384.    Plaintiff has demanded the return of his bitcoins from Coinbase.

385.    Plaintiff will demand the return of his bitcoins from the appropriate DOES 1-50 when he learns their true identities, or as soon as otherwise practicable.

386.    Plaintiff has suffered actual injury and damages of compensable value stemming from the conversion of his digital assets and 2.05 BTC, in an amount to be proved at time of trial.

### SEVENTH CLAIM FOR RELIEF

### TRESPASS TO CHATTELS (AGAINST DOES 1-50)

387.    Plaintiff realleges and incorporates each of the above paragraphs 1 – 386, as though fully set forth in this cause of action.

388.    On December 14, 2021, DOES 1-50 deprived Plaintiff of the use of his mobile phone for several hours.

389.    Plaintiff's mobile phone was in his possession when Defendants intentionally interfered with the physical condition of his phone, and with Plaintiff's use of it.

390.    Defendants interfered with Plaintiff's rights to his personal property by depriving him of his use of his mobile phone, without his permission.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

55

391.    Plaintiff did not consent to Defendants' interference with his use of his mobile phone.

392.    Plaintiff was harmed by Defendants' interference with his use of his mobile phone.

393.    Defendants' interference with Plaintiff's mobile phone and cellular service were substantial factors resulting in Plaintiff's harms.

394.    As a proximate and legal result of Defendants' interference with Plaintiff's property and his use of it, Plaintiff has been damaged in an amount according to proof at time of trial.

395.    Defendants' respective trespasses to Plaintiff's personal property were each oppressive, fraudulent, or malicious. Accordingly, Defendants are subject to exemplary damages, in favor of Plaintiff.

## EIGHTH CLAIM FOR RELIEF

## TRESPASS TO CHATTELS (AGAINST COINBASE)

396.    Plaintiff realleges and incorporates each of the above paragraphs 1 – 395, as though fully set forth in this cause of action.

397.    Plaintiff owned and had a right to possess the crypto-assets associated with his Coinbase account, which Defendants converted into Bitcoin on December 14, 2021.

398.    Plaintiff owned and had a right to possess the "Digital Currencies," U.S. Dollars, and "USD Coin" in his Coinbase-issued wallets, which Defendants converted to BTC on December 14, 2021.

399.    Coinbase interfered with the physical condition of Plaintiff's crypto-assets, and with his possession of his private keys or Crypto Wallets, by exchanging his crypto-assets for "digital dollars," without Plaintiff's knowledge or express permission.

400.    Coinbase intentionally interfered with the physical condition of Plaintiff's U.S. Dollars and USDC, and his possession of those assets, by exchanging those assets for Bitcoin without Plaintiff's knowledge or express permission.

401.    Plaintiff was harmed by Coinbase's interferences with his crypto-assets, U.S. Dollars, and USDC, and Coinbase's conversion of those assets to Bitcoin was a substantial factor in causing Plaintiff's harms.

402.    Plaintiff did not consent to Coinbase's interference with his possession and use of

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

$17,100 in "digital dollars," or with any of the crypto-assets or Wallets he had stored on the Coinbase Platform.

403.   Plaintiff has been deprived of his possession and his use of his digital dollars and his valuable and priceless crypto-assets for more than a year.

404.   Coinbase's conduct has prevented Plaintiff from exercising dominion and ownership over his personal property by interfering with his ability to move his funds and assets off the Coinbase Platform to a more secure location.

405.   Coinbase's conduct was a substantial factor in causing Plaintiff's losses, irreparable harms, and the injuries sustained by Plaintiff.

406.   As a proximate and legal result of Coinbase's wrongful interferences, Plaintiff has suffered personal property damages and losses exceeding $101,000.

<u>**NINTH CLAIM FOR RELIEF**</u>

<u>**NEGLIGENCE (AGAINST COINBASE)**</u>

407.   Plaintiff realleges and incorporates each of the above paragraphs 1 – 406, as though fully set forth in this cause of action.

408.    Coinbase owed a duty to Plaintiff to exercise reasonable care in safeguarding his sensitive personal information. This duty included designing, maintaining, monitoring, and testing Coinbase's, and its agents', partners', Affiliates', and independent contractors' systems, protocols, or practices (as applicable), in order to help safeguard Plaintiff's digital assets and prevent unauthorized transfers on and from the Coinbase Platform.

409.   Coinbase's duties arose from the sensitivity of Plaintiff's Coinbase account data and the foreseeability of harms to Plaintiff should Coinbase fail to safeguard and protect his data.

410.   Coinbase owed a duty to Plaintiff to take reasonable steps to protect his sensitive customer account information from unauthorized use, access, and disclosure.

411.   Coinbase had a duty to ensure that Plaintiff's personally identifiable information (PII) was only used, accessed, and disclosed with Plaintiff's proper authorized consent.

412.   Coinbase had a duty to Plaintiff to implement a security system reasonably designed to prevent and detect unauthorized transfers from Plaintiff's Coinbase account, in a reasonably

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

timely manner, as Coinbase had represented it would, and as was required of Coinbase by the Bank Secrecy Act.

413.    Coinbase owed a duty to Plaintiff to disclose the material fact that its data security practices were inadequate to prevent Plaintiff's Coinbase account information from being improperly accessed and exfiltrated by unauthorized third-parties, and from misuse and misappropriation of his PII resulting from unauthorized access by Coinbase's employees, agents, Affiliates, and individuals and computer programs subject to Coinbase's control.

414.    Coinbase owed Plaintiff a duty to adequately disclose its inability to prevent Plaintiff's confidential account information from unauthorized dissemination, as of, and after December 14, 2021.

415.    Coinbase owed a duty to Plaintiff to exercise due care in designing a reasonably secure website and Platform for its customers' use.

416.    Coinbase owed Plaintiff a duty to safeguard his Coinbase account by employing industry standard cybersecurity measures reasonably designed to protect his digital assets against unauthorized transfers.

417.    Plaintiff's willingness to contract with Coinbase and entrust his confidential and sensitive data to Coinbase was predicated on his reasonable belief that Coinbase would implement statutorily-recognized electronic fund transfer procedures and customer-authentication protocols required of regulated consumer financial institutions subject to FinCEN regulations.

418.    Coinbase knew or should have known, in December 2021, that its cybersecurity practices and customer dispute resolution policies, as then implemented, were inadequate for a financial technology company dealing with cryptocurrency and digital P2P financial asset exchanges.

419.    Coinbase was uniquely positioned to provide material information to Plaintiff regarding the features and quality of Coinbase's cybersecurity, but Coinbase failed to do so.

420.    On December 14, 2021, Coinbase approved blatantly fraudulent financial transactions and plainly unauthorized account profile-change requests, and changed the email address and phone number associated with Plaintiff's Coinbase account, without Plaintiff's knowledge, consent, or permission, through no fault of Plaintiff.

421.     Coinbase's negligence, wanton disregard for Plaintiff's privacy and property, and recklessness with respect to digital asset transfers on and off its Platform, are exemplified by Coinbase's failures to: **(i)** establish adequate user-authentication measures consistent with industry standards, governmental regulations, and its own promises; **(ii)** implement reasonable cybersecurity protocols consistent with industry standards, governmental regulations, and its own internal policies; **(iii)** enforce or follow Coinbase's own purported security procedures, including Coinbase's self-imposed obligation to ensure that a 2FA code is input as a condition precedent to executing transfers of cryptocurrencies from Mr. Dellone's account or Wallets, to another person's Coinbase account or Wallets; **(iv)** properly respond to, address, and monitor customer complaints concerning hackers and scammers targeting Coinbase users for the users' personal and confidential data, despite knowing these issues were prevalent on the Coinbase Platform; **(v)** abide by its own purported security policies, which required the input of a 2FA code sent to a phone number connected to a physical mobile device, before executing any transfer of funds off the Coinbase Platform; and **(vi)** provide the security protections Coinbase promised, before executing irrevocable transfers affecting Plaintiff's Coinbase account.

422.     Coinbase, as a custodial Wallet services provider, breached its duties to Plaintiff by failing to: **(vii)** implement and maintain appropriate security procedures necessary to safeguard Plaintiff's Coinbase account and data, including his PII, from unauthorized access and misuse; **(viii)** detect unauthorized account breaches on its Platform in a timely manner; **(ix)** appropriately and timely disclose that Coinbase's data security practices were inadequate to protect Plaintiff's assets; **(x)** adequately supervise its employees and software to prevent improper access to Plaintiff's Coinbase account or unlawful utilization of his account information and data without authorization or current proof of valid user identification; and **(xi)** provide adequate and timely notices of unauthorized access involving Plaintiff's Coinbase account.

423.     Coinbase breached its duty to exercise reasonable care in safeguarding Plaintiff's Coinbase account and the digital assets stored therein, by failing to implement reasonable security measures designed to prevent unauthorized SIM Swap attacks, even though such attacks had been widely recognized as likely to result in unauthorized transactions and losses of various

digital assets that Coinbase's retail customers, including Plaintiff, entrusted to Coinbase's custody.

424.    Between December 14, 2021 and December 17, 2021, Coinbase breached its duty to provide Plaintiff a reasonable means to contact an appropriately authorized and sufficiently trained Coinbase employee, representative, or agent, without undue delay.

425.    Plaintiff's harms, losses, and property damages, as well as the imminent, substantial, and impending harms to his mental health, online privacy, and personal property, have been directly and proximately caused by Coinbase's breaches of its duties to Plaintiff.

426.    Coinbase's derogations of its legal duties caused Plaintiff to lose his valuable personal information and digital assets, and his control of his Coinbase account, as well as his sensitive and confidential financial information and data accessible from his Coinbase account.

427.    Coinbase's breaches of its duties to Plaintiff have resulted in reasonably foreseeable damages that were actually and proximately caused by Coinbase's failures to use Plaintiff's data to secure his account and assets, mitigate harms, and avoid irrecoverable losses.

428.    Plaintiff did not contribute to the insufficient measures Coinbase used to ineffectively safeguard his digital property and privacy rights.

429.    Plaintiff has been significantly harmed as a legal result of Coinbase's negligent conduct.

430.    Plaintiff continues to suffer increased risks of future online account compromises and fraud to this day.

431.    The increased risks of future digital interferences make Plaintiff's expenditure of time and resources aimed at monitoring and mitigating harms to his digital and personal life reasonably necessary.

432.    Monitoring and mitigation tools exist that make early detection, prevention, and mitigation of future harms to Plaintiff possible and beneficial.

433.    Plaintiff seeks compensatory damages for the harms he sustained, and for the damages to his property, in an amount sufficient to compensate him for his actual harms and losses, and to restore him to his original position, prior to Coinbase's unauthorized disclosure of his Coinbase account credentials and the breach of his Coinbase account, considering: **(a)** the

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

1  difference between the current value of his lost and damaged assets and the value of those assets

2  had the harms not been done; **(b)** the costs of repair or restoration of his property; **(c)** the

3  emotional and potential future harms sustained by Plaintiff; **(d)** Coinbase's need for and

4  development of an adequate loss mitigation and refund or reimbursement plan, consistent with

5  industry standard online financial business practices, as an element of damages; and **(e)** the

6  actual, consequential, and nominal damages flowing from Coinbase's negligence, to the extent

7  those damages are the natural and proximate result of Coinbase' conduct as herein alleged.

8  434.   Plaintiff is entitled to compensatory damages, with pre-and post-judgment interest, costs

9  of suit, attorneys' fees, and other relief as this Court deems just and proper, in an amount to be

10  determined at trial.

11  **TENTH CLAIM FOR RELIEF**

12  **BREACH OF IMPLIED CONTRACT (AGAINST COINBASE)**

13  435.   Plaintiff realleges and incorporates each of the above paragraphs 1 – 434, as though fully

14  set forth in this cause of action.

15  436.   Plaintiff owned the cryptocurrencies and PII in and associated with his Coinbase account.

16  437.   A bailment is the delivery of a thing, to another, for some special object or purpose, on a

17  contract, express or implied, to conform to objects or purposes of the delivery. The California

18  Civil Code refers to bailments as "deposits," however, case law often employs the common law

19  term, "bailment," as well as the terms "bailor" and "bailee." A breach of bailment contract may

20  be asserted by the bailor when the bailee fails to return that which was bailed.

21  438.   Plaintiff bailed his digital assets to Coinbase according to a bailment-for-hire agreement

22  on the following terms: **(i)** upon Coinbase's requests, Plaintiff provides his cyber-identification

23  data, and his Personally Identifiable Information (PII), to Coinbase; **(ii)** Plaintiff allows Coinbase

24  to use his PII and digital assets for business purposes not related to security; **(iii)**   Coinbase

25  promises to use Plaintiff's PII and data for security purposes, including to affirmatively take

26  steps to prevent and reasonably delay irreversible losses of the digital assets Plaintiff bails to, or

27  deposits with Coinbase.

28  439.   When Coinbase transferred Plaintiff's bitcoins to the off-Platform Bitcoin Wallet and

**THE LAW OFFICE OF ETHAN MORA**
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

61

permitted unauthorized changes to his Coinbase account profile data, Coinbase did not exercise the degree of care that an ordinarily prudent bailee, or an ordinarily prudent custodial Wallet service provider in Coinbase's position, would exercise with respect to its own digital assets.

440.    Plaintiff has demanded that Coinbase return his digital assets to him. Coinbase has not returned Plaintiff's digital assets, or any portions thereof, to Plaintiff, nor has Coinbase allowed Plaintiff to access his assets (to the extent still possible), thereby breaching the terms of Coinbase's and Plaintiff's implied bailment contract.

441.    As a proximate result of Coinbase's breach, Plaintiff has suffered economic loss in an amount to be proved but no less than 2.05698427 BTC, plus the reasonable or fair market value of all Plaintiff's data collected by Coinbase and its Affiliates as a result of the implied contract.

## ELEVENTH CLAIM FOR RELIEF

## BREACH OF GOOD FAITH AND FAIR DEALING (AGAINST COINBASE)

442.    Plaintiff realleges and incorporates each of the above paragraphs 1 – 441, as though fully set forth in this cause of action.

443.    In or around December 6, 2021, the Parties entered into a contract with implied provisions. The terms of the contract were found in Sections 5, 10, and 11 of Coinbase's Privacy Policy, and Section 2.6.2 of the User Agreement. Attached hereto and incorporated herein as Exhibit A is a true and correct copy of the User Agreement, including Coinbase's Privacy Policy.

444.    Coinbase stated that it collects confidential and private cyber-identification data about Plaintiff to recognize him and maintain information about his access devices, in order to mitigate risk, help prevent fraud, and promote trust and safety on the Coinbase Platform.

445.    Plaintiff agreed to provide Coinbase with his sensitive, personal, financial, and confidential data, including his PII, because Coinbase agreed to monitor and take reasonable steps secure Plaintiff's Coinbase account using the data Coinbase collected from and about Plaintiff, as well as take actions including but not limited to implementing effectively-enforced waiting periods on his Coinbase account if, or in the event that highly-suspicious account activity occurs on his Coinbase account.

446.    Coinbase breached its contractual obligations to Plaintiff by misusing the data it collected

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

62

from and about Plaintiff, and by failing to utilize said data to detect and make the proportionally-necessary efforts required to prevent SIM Swap attacks and related fraud on Plaintiff's Coinbase account.

447.     Coinbase breached the contractual obligations it owed Plaintiff by failing to use the data it collected from and about Plaintiff to mitigate the harms and losses caused by reasonably detectable fraud on the Coinbase Platform, including fraud accomplished by exploitations of well-known attack vectors persistently left open for multiple years on the Coinbase Platform, which Coinbase was exclusively or best positioned to address and prevent.

448.     Plaintiff has performed all covenants and conditions required by the implied provisions of the contract, or has been excused from doing so by Coinbase's breach.

449.     As a proximate result of Coinbase's breach, Plaintiff has suffered economic loss.

450.     Coinbase's breach has resulted in damages sustained by Plaintiff in an amount exceeding $210,000, plus additional amounts according to proof at trial.

## TWELFTH CLAIM FOR RELIEF

## INTENTIONAL MISREPRESENTATION (AGAINST COINBASE)

### [As An Alternative To Breach Of Good Faith And Fair Dealing]

451.     Plaintiff realleges and incorporates each of the above paragraphs 1 – 450, as though fully set forth in this cause of action.

452.     On December 6, 2021, and at various times from October 2013 to December 14, 2021, Coinbase intentionally represented to Plaintiff that Coinbase would make available to Plaintiff a reasonable means for him to prevent, delay, and recover assets lost or adversely impacted as a result of Coinbase's improper authorization and facilitation fraudulent financial transactions on Plaintiff's Coinbase account.

453.     Coinbase knew its representations—including those representations found in Sections 5, 10, and 11 of Coinbase's Privacy Policy; in Coinbase's Cookie Policy (concerning its use of Flash Cookies); on Coinbase's website (concerning its compliance with AML/KYC regulations); and in Coinbase's email correspondence with Plaintiff (concerning Plaintiff's liability for unauthorized transactions)—were false when Coinbase made those representations.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

COMPLAINT

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

454.    In some instances, Coinbase made its representations, intentionally, for the purpose of deceiving Plaintiff, or to actively conceal information from Plaintiff, as herein alleged.

455.    To the extent Coinbase made its misrepresentations inadvertently or unintentionally, Coinbase did do with reckless disregard for the truth.

456.    As a result of Plaintiff's reliance on Coinbase's intentional misrepresentations, Plaintiff became exceptionally vulnerable to financially devastating cyber-attacks that were reasonably foreseeable to, and preventable exclusively by Coinbase.

457.    Plaintiff's reliance on Coinbase's intentional misrepresentations was a substantial factor in causing Plaintiff's harms.

458.    Plaintiff was harmed by his reliance on Coinbase's misrepresentations, in an amount to be proved at time of trial, but in any event, in an amount exceeding Plaintiff's investigation fees and costs, attorney's fees, and costs of this suit.

459.    Plaintiff is entitled to punitive damages under California Civil Code § 3294(a) because Coinbase made its representations with fraud, oppression, or malice.

## THIRTEENTH CLAIM FOR RELIEF

## GROSS NEGLIGENCE (AGAINST COINBASE)

460.    Plaintiff realleges and incorporates each of the above paragraphs 1 – 459, as though fully set forth in this cause of action.

461.    Coinbase owed a duty to Plaintiff, as a Coinbase customer, to provide security consistent with applicable laws, regulations, its own internal policies, and the promises Coinbase made to Plaintiff. This duty required Coinbase to ensure that its computer systems, software, and its personnel, are programmed or adequately trained to take actions necessary to protect the financial information of Coinbase's users, and avoid assisting in unlawful exploitations of its customers' data. This duty also required Coinbase to take reasonable, common-sense steps to ensure Plaintiff's Coinbase account profile data would not be continuously exposed to the public in unencrypted, plain-text form.

462.    Coinbase owed a special duty of care to Plaintiff because Plaintiff was a retail consumer customer of Coinbase for over eight years, and on that basis, he was a reasonably foreseeable

1   and likely target for bad actors engaged in, or seeking to carry out SIM Swap attacks using the

2   data Coinbase collected and leaked to the public.

3   463.   Coinbase owed a special duty to Plaintiff to take reasonable steps to actively detect and

4   prevent SIM Swap attacks targeting consumer financial accounts with up to $250,000 in assets

5   hosted by Coinbase on the Coinbase Platform. This duty arose from Coinbase's unique position

6   as a regulated and insured consumer financial account provider and digital asset custodian.

7   464.   Plaintiff reasonably believed and relied upon Coinbase's representations that Coinbase

8   securely locks its customers' accounts whenever potentially fraudulent or suspicious behavior is

9   reported or detected on a Coinbase customer's account.

10   465.   Plaintiff reasonably believed and relied upon Coinbase's representations that Coinbase

11   requires sufficient proof of customer identification prior to approving and facilitating critical

12   account actions and irreversible transfers initiated or requested on a Coinbase customer account

13   by one or more previously-unauthorized devices.

14   466.   Given the procession of increasingly common and consistently devastating SIM Swap

15   attacks on many Coinbase customers over a period of several years, Coinbase was acutely aware

16   and should have reasonably foreseen that the cyber and operational security it was providing for

17   its customers between January 1, 2021 and December 14, 2021, was likely to expose Plaintiff,

18   its unsuspecting and longstanding retail consumer customer, to significantly greater risk of

19   becoming targeted and victimized by a SIM Swap activity.

20   467.   Between 2013 and 2022, Coinbase users' accounts were subject to hundreds, if not

21   thousands of unauthorized SIM Swap attacks, which Coinbase failed to prevent, and which have

22   resulted in countless retail consumers losing vast amounts of valuable digital assets, including,

23   as here, tens of thousands of dollars' worth of long-term investment assets and digital

24   heirlooms—notably, Plaintiff's 0.5 BTC, which Plaintiff had been saving for nearly decade, and

25   which he had intended, one day (likely decades from now), to pass down to his children. This

26   duty arose from Coinbase's recognition that many of its customers use their Coinbase accounts

27   to store and secure digital assets—including non-fungible assets—that, in some instances, may

28   be priceless to Coinbase's customers and/or have significant personal value, independent of the

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

65

1  fair market value of those assets.

2  468.    Coinbase owed a special duty to Plaintiff to actively stop and address SIM Swap attacks

3  involving consumer financial accounts hosted by Coinbase on the Coinbase Platform.

4  469.    Coinbase recklessly destroyed eight-years' worth of Plaintiff's hard-earned savings and

5  all of his financially and sentimentally valuable crypto-assets, within a span of mere hours; then

6  Coinbase insistently blamed the devastation on Plaintiff, in a repulsive and audacious effort to

7  avoid all accountability for Coinbase's own egregiously wrongful conduct.

8  470.    Coinbase breached its special duties of care to Plaintiff by deliberately determining that

9  the economic risk of admitting any responsibility for the fraud on Plaintiff's account was not

10  outweighed by the economic harm of disgorging transaction revenues it had recognized in its

11  first year as a publicly-traded company.

12  471.    As a direct and proximate result of Coinbase's grossly negligent conduct—including

13  Coinbase's false statements that Plaintiff owes Coinbase "reimbursement" monies to

14  compensate Coinbase for its own senseless neglect and wanton misrepresentations—Plaintiff

15  has suffered injury and is entitled to punitive damages, in an amount to be proved at time of trial.

16  **FOURTEENTH CLAIM FOR RELIEF**

17  **CALIFORNIA CONSUMER LEGAL REMEDIES ACT ("CLRA") – UNFAIR AND**

18  **DECEPTIVE PRACTICES, CAL. CIV.CODE §§ 1770, ET SEQ.**

19  **(AGAINST COINBASE)**

20  472.    Plaintiff realleges and incorporates each of the above paragraphs 1 – 471, as though fully

21  set forth in this cause of action.

22  473.    The California Civil Code section 1750, *et seq.*, also known as the Consumers Legal

23  Remedies Act ("CLRA"), prohibits various "unfair methods of competition and unfair or

24  deceptive acts or practices undertaken by any person in a transaction intended to result or which

25  results in the sale or lease of goods or services to any consumer."

26  474.    Plaintiff sought and acquired services from Coinbase for his personal, family and

27  household purposes.

28  475.    As a Coinbase customer, Plaintiff engaged in transactions with Coinbase concerning

66

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

1    services related to the security and custodianship of his private keys.

2    476.    Coinbase's actions, as alleged above, either violated, or continue to violate the CLRA,

3    including: section 1770(a)(5), for making representations that its services have characteristics,

4    uses, or benefits which they do not; section 1770(a)(7), for making representations that its

5    services are of a particular quality, which they are not; and section 1770(a)(9), for advertising

6    services with intent not to sell them as advertised. Plaintiff has been harmed by, and as a direct

7    consequence of Coinbase's violations of the CLRA.

8    477.    Coinbase's acts and practices were intended to result in the sale of services, including

9    services involving Coinbase's processing of valuable data Coinbase claimed to require as a

10   condition precedent to facilitating transactions on Mr. Dellone's Coinbase account.

11   478.    Regarding Coinbase's use of the data it collected from and about its retail customers,

12   Coinbase specifically made the following representations, in violation of section1770(a)(5):

13   Coinbase claimed it used Cookies "to recognize" its customers and "to collect information about

14   your [the Coinbase customer's] computer or other access device *to mitigate risk, help prevent*

15   *fraud, and promote trust and safety*." User Agreement, <u>Exhibit A</u> at p. 29 (emphasis added); and

16   Coinbase stated that it engages in the "monitoring of IP addresses" as part of what it believes is

17   a "reasonable risk-based program" aimed at complying with Anti-Money Laundering and Know

18   Your Customer regulations.

19   479.    In violation of section1770(a)(5), Coinbase represented that its custodial services

20   included reasonable, competent customer support services, including adequately trained and

21   sufficiently authorized live agents who can respond to urgent customer phone calls and take

22   necessary actions involving Coinbase customer accounts. Coinbase did not, in fact, provide

23   services with those characteristics and benefits.

24   480.    In violation of section1770(a)(7), Coinbase represented that USD Coins, which are not

25   legal tender, are superior to or essentially the same as US Dollars.

26   481.    Coinbase also made the following statements, in violation of section1770(a)(7), which

27   indicate that Coinbase's cybersecurity was of a particular quality, which it was not: Coinbase

28   claimed that no customer assets had ever been lost due to a breach of the Coinbase Platform; and

67

Case 1:23-cv-01408-ADA-HBK   Document 1   Filed 09/26/23   Page 69 of 87

Coinbase represented that VOIP numbers are not allowed on the Coinbase Platform for use with Coinbase accounts.

482.   When Coinbase made these statements, Coinbase knew that it was collecting IP addresses, device IDs, and PII, and was installing Cookies, Flash Cookies, and Web Beacons on Plaintiff's devices, and was collecting and profiting from the resulting information, primarily for purposes *not* related to security.

483.   In violation of section1770(a)(9), Coinbase advertised, without the intent to sell its services, as including a means by which its customers can resolve their "disputes" with Coinbase, including disputes concerning fraudulent financial transactions (*e.g.*, refunded bank transactions) in a fair and reasonably timely manner.

484.   In violation of section1770(a)(9), Coinbase advertised, without the intent to sell its services, as including a means by which Coinbase customers can limit their liability for unauthorized transactions and stolen cryptocurrencies, by timely reporting the unauthorized transactions to Coinbase.

485.   Coinbase's representations concerning the safeguards it employs to protect consumer financial accounts, and concerning its willingness to fully participate in the dispute resolution processes, are likely to mislead reasonable consumers.

486.   Plaintiff seeks equitable relief, pursuant to Cal. Civ. Code § 1782(a)(2), in the form of an injunction prohibiting Coinbase, individually and through its agents, servants, employees, and all persons acting under, in concert with, or at the direction of Coinbase, from continuing to collect customer cyber-identification data that Coinbase does not use to help Coinbase detect fraud, prevent theft and money laundering, or timely address and resolve issues concerning foreseeable Platform breaches, including breaches of accounts hosted on the Coinbase Platform.

487.   Plaintiff seeks equitable relief, pursuant to Cal. Civ. Code § 1782(a)(2), in the form of an injunction prohibiting Coinbase from continuing to circulate both USD and USDC on its Platform simultaneously, as doing so constitutes a deceptive act or practice undertaken by Coinbase in transactions with its consumers, which are intended to result, and have resulted, in the sale or lease of goods (USDC) or services (custodial services) to Mr. Dellone (a consumer).

COMPLAINT

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

488.    Plaintiff seeks equitable relief, pursuant to Cal. Civ. Code § 1782(a)(2), in the form of an injunction prohibiting Coinbase from continuing to allow VOIP numbers on its Platform; or in the form of an order instructing Coinbase to take steps reasonably necessary to account for the risks presented by undetected VOIP numbers used as "credentials" on its Platform.

489.    Plaintiff seeks equitable relief, pursuant to Cal. Civ. Code § 1782(a)(2), in the form of an injunction prohibiting Coinbase from continuing to make public statements indicating that no customer assets have ever been lost due to breach of the Coinbase Platform.

490.    Plaintiff requests restitution in the amount of his stolen property, plus court costs and attorney's fees, punitive damages, and any other relief this Court deems just and proper in accordance with Cal. Civ. Code § 1780(a).

## FIFTEENTH CLAIM FOR RELIEF

## CALIFORNIA UNFAIR COMPETITION LAW ("UCL"), BUSINESS & PROFESSIONAL CODE § 17200 ET SEQ. – UNFAIR BUSINESS PRACTICE (AGAINST COINBASE)

491.    Plaintiff realleges and incorporates each of the above paragraphs 1 – 490, as though fully set forth in this cause of action.

492.    California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice."

493.    A business act is "unfair" where it is immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious, contrary to legislatively declared public policy, and the harm it caused to consumers outweighed its utility.

494.    Coinbase is a "person" as defined by Cal. Bus. & Prof Code § 17200.

495.    Coinbase's conduct, as alleged in this Complaint, was unfair under the UCL.

496.    Coinbase's "unfair" acts and practices include Coinbase's collection of transaction revenue and Coinbase's misleading statements made to Plaintiff, despite Coinbase's: **(i)** failure to implement and maintain security measures reasonably designed to protect Plaintiff's financial and cyber-identification data from consecutive and substantial unauthorized disclosures, data breaches, interferences, and conversions; **(ii)** failure to identify foreseeable cybersecurity risks,

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

69

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

namely SIM Swap attacks, and remediate data leaks and security flaws identified by Coinbase and Coinbase customers following numerous security incidents experienced by Coinbase, resulting from SIM Swap attacks; **(iii)** failure to implement and maintain reasonable security measures, contrary to legislatively-declared public policy that seeks to protect consumer data and ensure entities entrusted with such sensitive financial and personal information use appropriate, statutorily described security measures—these public policies are reflected in the FTC Act (15 U.S.C. § 45), the CCPA (Cal. Civ. Code §§ 1798.100 et seq.), the Bank Secrecy Act, (31 U.S.C. § 5311), and the California Customer Records Act (Cal. Civ. Code §§ 1798.80, et seq.) (which requires businesses to ensure that personal information about California residents is protected); and **(iv)** failure to implement and enforce reasonable online account breach response procedures that are not substantially injurious to its consumers.

497.   Coinbase's acts, as alleged above, have caused substantial injuries to Plaintiff, and to similarly situated Coinbase customers, in a manner that does not outweigh any countervailing benefits to California consumers or emerging financial sector competition.

498.   In the course of conducting its business, Coinbase also engaged in "unfair" business acts and practices within the meaning of the UCL, by: **(v)** improperly and unreasonably preventing Plaintiff from accessing his Coinbase account and funds, either for extended periods of time or permanently; **(vi)** failing to timely respond to Plaintiff's requests for appropriate customer support, despite promising to do so; **(vii)** failing to preserve and safeguard customer funds, including Plaintiff's funds, as Coinbase had specifically represented it would; and **(viii)** refusing to compensate its customers, including Plaintiff, for harms caused by Coinbase's egregious misconduct and for monetary losses caused by Coinbase's own wrongful conduct.

499.   Electronic fund transfers from users' Coinbase accounts are virtually instant on the Coinbase Platform; therefore, when there is an account breach on the Coinbase Platform, the breaching persons may obtain unfettered access to a Coinbase users' digital assets and funds for as long as the customer does not receive actual or constructive notice of the breach.

500.   Coinbase did not implement a reasonable means to protect against, and provide adequate and timely notice of instances of unauthorized asset exfiltration relating to unnoticed and/or

70

software-assisted breaches on its Platform that can occur and had occurred while its customers were sleeping or otherwise physically unable to receive or respond to said breaches.

501.    Coinbase did not institute a waiting-time requirement for highly-suspicious, irreversible transfers of assets from or off the Coinbase Platform, even though other custodial cryptocurrency exchanges enforce a waiting period for such transfers.

502.    Because many consumers lack critical knowledge concerning Coinbase's inadequate cybersecurity practices, consumers, including Plaintiff, have been obstructed by Coinbase from making reasonably informed decisions regarding how to effectively minimize risks of losing property and funds, and how they (customers) can take steps to address harms like those sustained by Plaintiff.

503.    As a result of Coinbase's unfair business acts and practices, Plaintiff is entitled to relief, including restitution, and declaratory relief and/or a permanent injunction enjoining Coinbase from continuing its unfair practices, along with reasonable attorneys' fees and costs.

504.    Plaintiff seeks equitable relief in the form of an order by this Court instructing Coinbase to disclose the dollar amount and the percentage (as a fraction of all revenue) of Coinbase's "transaction revenue," reported by Coinbase in the years 2021, 2022, and 2023, which was or may have been connected to SIM Swap attacks.

## SIXTEENTH CLAIM FOR RELIEF

## CALIFORNIA UNFAIR COMPETITION LAW ("UCL"), BUSINESS & PROFESSIONAL CODE § 17200 ET SEQ. – UNLAWFUL BUSINESS PRACTICE (AGAINST COINBASE)

505.    Plaintiff realleges and incorporates each of the above paragraphs 1 – 504, as though fully set forth in this cause of action.

506.    California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice."

507.    A business act or practice is "unlawful" when it is proscribed by some other statute, regulation or constitutional provision.

508.    Coinbase is a "person" as defined by Cal. Bus. & Prof Code § 17200.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

71

**COMPLAINT**

509.     Coinbase engaged in proscribed business acts or practices that required Coinbase to adhere to federal and state laws, including: the FTC Act (15 U.S.C. § 45), the California Customer Records Act (Cal. Civ. Code §§ 1798.80, et seq.), California Penal Code § 496, the CCPA (Cal. Civ. Code §§ 1798.100 et seq.), the Stamp Payments Act of 1862 (18 U.S.C. § 336), the Bank Secrecy Act, (31 U.S.C. § 5311), and the Securities Exchange Act of 1934 (15 U.S.C. § 78c).

510.     The Stamp Payments Act of 1862, 18 U.S.C. § 336, reads:

> Whoever makes, issues, circulates, or pays out any note, check, memorandum, token, or other obligation for a less sum than $1, intended to circulate as money or to be received or used in lieu of lawful money of the United States, shall be fined under this title or imprisoned not more than six months, or both.

511.     Coinbase makes, issues, pays out, and circulates USDC for sums less than $1.00, in violation of the Stamp Payments Act of 1862 (18 U.S.C. § 336).

512.     In violation of the Bank Secrecy Act, Coinbase failed to take the necessary steps to implement and enforce risk-based security and user-authentication measures.

513.     Coinbase had exclusive knowledge of material facts related to the fraudulent activity on Plaintiff's Coinbase account, and Coinbase maintains records that are highly relevant to the recovery of Plaintiff's property. Coinbase has withheld and prevented Plaintiff from obtaining pertinent, accurate, and complete records and information, for over a year.

514.     Coinbase failed to hire, train, and supervise its staff, employees, and Coinbase's "Affiliates," which has resulted in Coinbase's violations of the CCPA (Cal. Civ. Code §§ 1798.100 et seq.).

515.     According to Section 5(a) of the FTC Act, 15 U.S.C. §45(a), "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."

516.     Coinbase violated the FTC Act by issuing, circulating, and paying out digital currency deceptively branded as "U.S. Dollar Coin."

517.     Coinbase's circulation of "USDC," is an unfair method affecting commerce because

**THE LAW OFFICE OF ETHAN MORA**
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

72

Coinbase has tens of thousands of customers across the United States and around the world, and Coinbase has explicitly promoted USDC as a superior or alternative form of the U.S. dollar, which fundamentally challenges the integrity and value of government-backed legal tender.

518.   By failing to provide adequate notice of its failures to safeguard its customers' usernames, phone numbers, email addresses, and Coinbase-account access tokens, Coinbase violated California's Shine the Light Law (see Cal. Civ. Code § 1798.81.5).

519.   As a direct and proximate result of Coinbase's unlawful business acts and practices, Plaintiff has suffered injury, including losses of digital dollars, crypto-assets, and other digital currencies, his cyber-identification data, and his confidential consumer financial information.

520.   Plaintiff seeks declaratory or injunctive relief in the form of an order by this Court enjoining Coinbase from continuing to issue and circulate USDC and U.S. dollars, simultaneously, on its Platform.

521.   Under Federal Rule of Civil Procedure 23 and California Code of Civil Procedure § 1021.5, Plaintiff is entitled to relief, including attorneys' fees and costs, and restitution.

## SEVENTEENTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT (AGAINST COINBASE)

522.   Plaintiff realleges and incorporates each of the above paragraphs 1 – 521, as though fully set forth in this cause of action.

523.   Plaintiff paid Coinbase over two thousand dollars ($2,000) in transaction fees from October 2013 to the present, which, on information and belief, represent half the transaction fee revenue Coinbase collected on the transactions involving his account.

524.   Plaintiff conferred a direct benefit upon Coinbase when he deposited and stored his funds and digital assets on the Coinbase Platform.

525.   The funds and assets in Plaintiff's Coinbase account allowed Coinbase to generate revenue from investing, trading, selling, buying, loaning, or otherwise exchanging Plaintiff's funds and assets with third-parties, and with Coinbase's "Affiliates."

526.   Plaintiff conferred direct benefits upon Coinbase when he provided Coinbase with his private and sensitive digital data, including but not limited to his financial information and PII.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

527.   Over an eight-year period, Plaintiff directly conferred benefits upon Coinbase by providing fees and data to Coinbase, in exchange for Coinbase maintaining and providing Plaintiff access to, and conducting electronic fund transfers on his Coinbase account.

528.   Coinbase has unjustly restricted Plaintiff's access to, and has failed to conduct secure transactions on, his Coinbase account.

529.   Coinbase knew of the benefits Plaintiff conferred upon it, and Coinbase has unjustly retained those benefits, and has enriched itself by its deceitful conduct, at Plaintiff's expense. Coinbase, for example, promised Plaintiff that it would take reasonable efforts to protect Plaintiff's data, but instead, Coinbase collected thousands of dollars in transaction fees from facilitating indisputably unauthorized transactions on Plaintiff's Coinbase account.

530.   Coinbase has been unjustly enriched by its misappropriation of Plaintiff's transaction fees and his digital account data, and as a direct result, Coinbase has received and retained benefits that it would not have received, but for its wrongful conduct.

531.   The circumstances under which Plaintiff conferred and Coinbase accepted the benefits Plaintiff provided, render Coinbase's retention of the benefits inequitable.

532.   Coinbase was unjustly enriched by its circulation of USDC tokens and Security Tokens on Coinbase's Platform, which conferred a direct benefit upon Coinbase, as Coinbase traded and leveraged those assets for several years, while ignoring and failing to comply with applicable statutes, regulations, and consumer protection laws.

533.   Coinbase deceived Plaintiff, causing him to into assume unnecessary risks inherent in trading or investing in USDC and Security Tokens on the Coinbase Platform, which were unknowable to Plaintiff before December 14, 2021.

534.   Plaintiff conferred a direct benefit upon Coinbase by providing Coinbase fees and data over an eight-year period, which, beginning in April 2021, Coinbase used exclusively for purposes other than safeguarding Plaintiff's Coinbase account and assets.

535.   Plaintiff has been harmed by Coinbase's sale and exploitation of Plaintiff's PII and cyber-identification data, and by the fraudulent cryptocurrency and money transactions Coinbase effectuated using Plaintiff's confidential information and data.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

74

536.    Under principles of equity and good conscience, Coinbase should not be permitted to retain the fees Coinbase collected on transactions initiated using Plaintiff's Coinbase account, from October 2013 to the present.

537.    Equity requires that Coinbase return to Plaintiff the benefits he conferred upon Coinbase.

538.    Plaintiff respectfully requests an order from this Court instructing Coinbase to disgorge the fees and rewards, including Security Token staking rewards, Coinbase has collected from transactions involving Plaintiff's Coinbase account, which Coinbase has inequitably retained, as well as the reasonable USD value of the revenues Coinbase collected from exploiting Plaintiff's data, from October 2013 to the present.

539.    Punitive damages are appropriate under this cause of action because Coinbase knew, or should have known about the security vulnerabilities in its products and services—*i.e.*, those that directly caused Plaintiff's Coinbase account to be drained—and Coinbase willfully disregarded those extreme yet preventable risks for its own exclusive economic and reputational benefit.

## EIGHTEENTH CLAIM FOR RELIEF

## DECLARATORY JUDGMENT – VOID AND UNCONSCIONABLE (USER AGREEMENT)

540.    Plaintiff realleges and incorporates each of the above paragraphs 1 – 539, as though fully set forth in this cause of action.

541.    Plaintiff brings this claim for declaratory relief under 28 U.S.C. § 2201, to have this Court declare the User Agreement (Coinbase's User Agreement, dated December 6, 2021, attached hereto as "Exhibit A") unconscionable, void against public policy, and unenforceable in its entirety.

542.    Coinbase's employees and agents have cited to the User Agreement, on multiple occasions, in support of: patently false statements related to Coinbase's purported contractual duties to Plaintiff; Coinbase's liability for fraud and unauthorized transactions on Plaintiff's Coinbase account, which Plaintiff timely reported to Coinbase; and the manner in which Coinbase responds to suspicious activity on the Coinbase Platform.

543.    Coinbase drafted the User Agreement.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

**THE LAW OFFICE OF ETHAN MORA**
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

544.    Plaintiff never had an opportunity to negotiate any term of the User Agreement.

545.    The User Agreement is a standard contract of adhesion, which was presented by Coinbase to Plaintiff on a strictly take-it-or-leave-it basis.

546.    Coinbase had virtually unchecked authority to insist upon any term its legal department could devise, regardless of whether Plaintiff or any of its customers were aware of those terms.

547.    Coinbase is a multi-billion-dollar, publicly-traded financial technology company comprising and supported by an army of attorneys, software engineers, and "support team" employees.

548.    Plaintiff is an individual consumer with virtually no bargaining power relative to Coinbase.

549.    The disparity in bargaining power between Coinbase and its customers is stark, and is significant to Plaintiff's and Coinbase's respective rights in equity and at law.

550.    The User Agreement is procedurally unconscionable because it imposes onerous, unfair, and unusual burdens on Plaintiff.

551.    The procedural unconscionability of the User Agreement is expressly incorporated in the User Agreement's "Delegation Clause," which allegedly affords Coinbase exclusive authority to "decides who decides" disputes raised by its customers.

552.    The Delegation Clause is found in Paragraph 8.2 of the User Agreement, and it reads:

> If you have a dispute with Coinbase (a "Complaint"), you agree to contact Coinbase through our support team to attempt to resolve any such dispute amicably. If we cannot resolve the dispute through the Coinbase support team, you and we agree to use the Formal Complaint Process set forth below. *You agree to use this process before filing any arbitration claim or small claims action*. If you do not follow the procedures set out in this Section before filing an arbitration claim or suit in small claims court, we shall have the right to ask the arbitrator or small claims court to dismiss your filing unless and until you complete the following steps.

(Emphasis added).

553.    The Delegation Clause refers only to disputes raised by Coinbase customers (*e.g.*, "If you

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

[Plaintiff] have a dispute," "<u>You</u> agree to use this process"). The Delegation Clause does not reference disputes raised by Coinbase. Accordingly, the Delegation Clause unfairly restricts Plaintiff's, and not Coinbase's, right to seek redress for harms and losses sustained during or as a result of Plaintiff's and Coinbase's relationship.

554.    The Delegation Clause also grants Coinbase an exclusive right to seek dismissal of claims filed by its customers against Coinbase, but not vice versa (*i.e.*, "If <u>you</u> [Plaintiff] do not follow the procedures set out in this Section," "<u>we</u> [Coinbase] shall have the right to ask the arbitrator or small claims court to dismiss your filing unless and until <u>you</u> complete the following steps.").

555.    The Delegation Clause forces Coinbase customers to overcome a gauntlet of time-consuming fool's errands devised by Coinbase, which, among other trivial and frustrating exercises, include initiating, and waiting until the conclusion of the one-sided "Formal Complaint Process."

556.    According to the Delegation Clause, the authority to decide whether a customer pursuing claims against Coinbase has complied with the terms of the User Agreement, rests solely with Coinbase.

557.    The User Agreement is unenforceable because the Delegation Clause affords Coinbase, but not Plaintiff, the exclusive right to decide whether Plaintiff has satisfied or complied with the conditions precedent to arbitrating Plaintiff's claims.

558.    The Delegation Clause indicates that the Formal Complaint Process can only be initiated by Coinbase's customers, not by Coinbase.

559.    Unlike Coinbase customers, Coinbase has no "Formal Complaint Process" that it must initiate in the event a dispute arises.

560.    The User Agreement's "Arbitration Provision" refers only to disputes that cannot be resolved by Coinbase through the Formal Complaint Process.

561.    In pertinent part, the Arbitration Provision reads:

**8.3. Arbitration; Waiver of Class Action. If we** [Coinbase] **cannot resolve the dispute through the Formal Complaint Process, you and we** [the Parties] **agree that any dispute arising out of or relating to this Agreement or the Coinbase Services,**

77

**The Law Office of Ethan Mora**
1040 E. Herndon Ave., Suite 202
Fresno, CA 93720

**including, without limitation, federal and state statutory claims, common law claims, and those based in contract, tort, fraud, misrepresentation, or any other legal theory, shall be resolved through binding arbitration, on an individual basis (the "Arbitration Agreement").**

(Bold in original; underlines added).

562.   A plain reading of the User Agreement indicates that the Arbitration Provision applies only to claims that Coinbase customers assert against Coinbase, and not the other way around. Accordingly, the Arbitration Provision does not apply to claims Coinbase might pursue against its customers, as those claims can be resolved absent the Formal Complaint Process entirely.

563.   The Delegation Clause and the Arbitration Provision are inextricable, which renders the Arbitration Provision, and the User Agreement in its entirety, unenforceable as against Plaintiff.

564.   The Arbitration Provision is unfair, lacks mutuality, and is void for unconscionability.

565.   Enforcement of the Arbitration Provision would unjustly require that Plaintiff forego seeking the full range of statutory remedies for Coinbase's fraud and negligence, including punitive damages and attorney fees, which are available to Plaintiff under his claims herein alleged, and which Plaintiff would otherwise be entitled to receive, should he prevail.

566.   The exculpatory provision in Paragraph 9.3 of the User Agreement ("Exculpatory Provision") contains numerous provisions that are contrary to public policy. These provisions exempt Coinbase from responsibility for its own gross negligence, fraud, and violations of statutory law.

567.   In pertinent part, the Exculpatory Provision reads:

IN NO EVENT SHALL COINBASE, ITS AFFILIATES AND SERVICE PROVIDERS, OR ANY OFTHEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, JOINT VENTURERS, EMPLOYEES OR REPRESENTATIVES, BE LIABLE (A) FOR ANY AMOUNT GREATER THAN THE VALUE OF THE SUPPORTED DIGITAL CURRENCY ON DEPOSIT IN YOUR COINBASE ACCOUNT(S) OR (B) FOR ANY LOST PROFITS, DIMINUTION IN VALUE OR BUSINESS OPPORTUNITY, ANY LOSS, DAMAGE, CORRUPTION OR BREACH OF DATA OR ANY OTHER

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

INTANGIBLE PROPERTY OR ANY SPECIAL, INCIDENTAL, INDIRECT, INTANGIBLE, OR CONSEQUENTIAL DAMAGES, WHETHER BASED IN CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, ARISING OUT OF OR IN CONNECTION WITH AUTHORIZED OR UNAUTHORIZED USE OF THE COINBASE SITE OR THE COINBASE SERVICES, OR THIS AGREEMENT, EVEN IF AN AUTHORIZED REPRESENTATIVE OF COINBASE HAS BEEN ADVISED OF OR KNEW OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE, EXCEPT TO THE EXTENT OF A FINAL JUDICIAL DETERMINATION THAT SUCH DAMAGES WERE A RESULT OF COINBASE'S GROSS NEGLIGENCE, FRAUD, WILLFUL MISCONDUCT OR INTENTIONAL VIOLATION OF LAW. THIS MEANS [. . .] THAT YOU MAY NOT RECOVER FOR LOST PROFITS, LOST BUSINESS OPPORTUNITIES, DIMINUTION IN VALUE OR OTHER TYPES OF SPECIAL, INCIDENTAL, INDIRECT, INTANGIBLE, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES IN EXCESS OF THE VALUE OF THE SUPPORTED DIGITAL CURRENCY AT ISSUE IN THE TRANSACTION.

568.    The Exculpatory Provision renders the entire User Agreement unenforceable on public policy grounds because it would exempt Coinbase from any damages resulting from its willful misconduct, including statutory violations and Coinbase's gross negligence, fraud, and specific violations of the EFTA, Regulation E, and the CFAA.

569.    The indemnity provision in Paragraph 9.2 of the User Agreement (the "Indemnity") requires that Plaintiff hold Coinbase harmless for Coinbase's negligence, deliberate misbehavior, gross negligence, statutory violations (including willful disclosure of confidential and sensitive personal information), and fraud, so long as the conduct is "in any way connected with" any dispute arising out of "any and all claims, demands and damages . . . of every kind and nature" that a Coinbase customer might have with any other users of its Platform, including

79

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

1   DOES 1-50.

2   570.   The Indemnity reads:

> If you have a dispute with one or more users of the Coinbase Services, you release Coinbase, its affiliates and service providers, and each of their respective officers, directors, agents, joint venturers, employees and representatives from any and all claims, demands and damages (actual and consequential) of every kind and nature arising out of or in any way connected with such disputes. You agree to indemnify and hold Coinbase, its affiliates and Service Providers, and each of its or their respective officers, directors, agents, joint venturers, employees and representatives, harmless from any claim or demand (including attorneys' fees and any fines, fees or penalties imposed by any regulatory authority) arising out of or related to your breach of this Agreement or your violation of any law, rule or regulation, or the rights of any third party.

571.   Coinbase is the largest cryptocurrency exchange company in the United States, yet the Indemnity purportedly exempts Coinbase from liability for all damages, including damages arising from its own deliberate, grossly negligent, and fraudulent acts, as well as for any unlawful acts of DOES 1-50.

572.   The allocation of risk among Plaintiff and Coinbase, as set out in the Indemnity, is objectively unreasonable.

573.   In a contract of adhesion, when the indemnity provision defeats the entire purpose of the contract by making it impossible for a consumer to bring claims against the company for the entire range of statutory rights to which the consumer is entitled, the entire agreement is rendered unconscionable and unenforceable on its face.

574.   The User Agreement is a contract of adhesion. The Indemnity defeats the entire purpose of the contract by making it impossible for Plaintiff to bring claims against Coinbase for the entire range of statutory rights to which Plaintiff is entitled. The User Agreement is, therefore, unconscionable and unenforceable on its face.

575.   The User Agreement, including the Exculpatory Provision, Damages Restriction, Indemnity, and Arbitration Provision, is unenforceable in its entirety, and is unconscionable, and

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

void against public policy, as it unfairly obstructs and seeks to prevent Coinbase's consumer customers, specifically Plaintiff, from seeking adequate redress from Coinbase, even in instances where, as here, Coinbase is alleged to have violated the CFAA, EFTA, CCPA, and California Penal Code § 496.

576.    The User Agreement is unenforceable because the central purpose of the Agreement is tainted with illegality such that the contract, as a whole, cannot be enforced.

577.    There is an actionable and justiciable controversy between Plaintiff and Coinbase.

578.    The Court's decision in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2010) did not abrogate the Federal Arbitration Act's savings clause, which provides that arbitration agreements may be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract," including "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Concepcion* at 339, quoting 9 U.S.C. § 2 and *Doctors Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). These defenses apply squarely to the User Agreement here.

579.    Plaintiff respectfully demands entry of a judgment against Coinbase, declaring the User Agreement, in its entirety, unenforceable as unconscionable; as against public policy; or, in the alternative, that the Delegation Clause is unenforceable and: **(a)** the Exculpatory Provision is unenforceable as against Plaintiff; **(b)** the Damages Restriction is unenforceable as against Plaintiff; **(c)** the Indemnity Provision is unenforceable as against Plaintiff; and **(d)** the Arbitration Provision is unenforceable as against Plaintiff.

## NINETEENTH CLAIM FOR RELIEF

## CONSTRUCTIVE TRUST

580.    Plaintiff realleges and incorporates each of the above paragraphs 1 – 579, as though fully set forth in this cause of action.

581.    Defendants obtained Plaintiff's cryptocurrency through actual fraud, misappropriation, conversion, theft, or by other unlawful or unethical means.

582.     In equity and good conscience, Defendants should not be permitted to retain Plaintiff's bitcoins and BSV.

583.    Coinbase took actions and made promises with the intent to defraud Plaintiff, and to

81

induce him to store, and continue storing and exchanging his digital assets on or using the Coinbase Platform.

584. DOES 1-50 stole, or intended to permanently deprive Plaintiff of his bitcoins and his BSV.

585. Coinbase caused DOES 1-50 to acquire and retain Plaintiff's property, and the proceeds thereof or the profits therefrom, for Defendants' respective benefits.

586. Plaintiff acted reasonably in relying on Coinbase's acts and promises.

587. Plaintiff would not have acted in reliance upon Coinbase's promises, had Plaintiff known of Coinbase's secret intention not to perform its duties as a regulated financial institution and custodial Wallet services provider.

588. The cryptocurrency assets for which Plaintiff seeks imposition of a constructive trust are specific, identifiable properties that can be traced to the Bitcoin public key address, *bc1qjp79ak6fxm4h7j0tsrwqx2n2k4tcqqveqxrvgm* (the *bc1 Wallet*); and to the BSV public key address, *14goHFL8GGyuKCvbFtGW9PqQ5Urspwn9uu*.

589. Plaintiff hereby demands the equitable imposition of a constructive trust over the property currently held in the *bc1 Wallet*, and in the BSV Wallet, *14goHFL8GGyuKCvbFtGW9PqQ5Urspwn9uuv*.

590. Plaintiff requests an order that all assets being held by Defendants in the *bc1 Wallet*, and in the *14goHFL8GGyuKCvbFtGW9PqQ5Urspwn9uu* BSV Wallet, be disgorged and held in trust for Plaintiff's benefit, as Defendants are not entitled to the benefit of misappropriated, converted, or stolen funds or assets.

## TWENTIETH CLAIM FOR RELIEF

## REPLEVIN AND DETINUE

591. Plaintiff realleges and incorporates each of the above paragraphs 1 – 590, as though fully set forth in this cause of action.

592. This is an action to recover possession of personal property.

593. The personal property at issue is 2.05698427 bitcoins (the "*res*").

594. As of the date of this filing, the *res* is believed to be stored in the Bitcoin Wallet with the

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

**THE LAW OFFICE OF ETHAN MORA**
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA  93720

1  public key address, ***bc1qjp79ak6fxm4h7j0tsrwqx2n2k4tcqqveqxrvgm*** (the ***bc1 Wallet***).

2  595.   The *res* was wrongfully taken from Plaintiff on December 14, 2021, and the *res* was

3  transferred from Plaintiff's Bitcoin Wallet to the ***bc1 Wallet***, without Plaintiff's knowledge,

4  permission, or consent, and through no fault of his own.

5  596.   Plaintiff owned and has the right to possess the *res*, and not just a mere right to payment

6  for the value of the *res*.

7  597.   Defendants have intentionally exercised control, and continue to exercise control, over

8  the bitcoins currently associated with the ***bc1 Wallet***, in a manner that excludes Plaintiff from

9  using or possessing the *res*.

10  598.   The *res* has not been taken for any tax assessment or fine pursuant to law, nor has the *res*

11  been taken under an execution or attachment against Plaintiff's property.

12  599.   The *res* is not exempt from execution.

13  600.   The *res* has been unlawfully detained by Defendants, and has not been returned to

14  Plaintiff as of the date of filing of this Complaint.

15  601.   Plaintiff seeks assistance from this Court to restore the *res* to Plaintiff.

16  602.   Plaintiff hereby demands a writ of replevin, and detinue of the bitcoins taken from him.

17  603.   Plaintiff demands a writ of detinue directing the United States Marshal in any district

18  where the *res* may be located, to repossess the *res* on behalf of Plaintiff, or to assist Plaintiff in

19  repossessing the *res*.

20                                                  ***

21         This Complaint is not being presented for an improper purpose, such as to harass, cause

22  unnecessary delay, or needlessly increase the cost of litigation.

23         This Complaint is supported by existing law or by a nonfrivolous argument for extending,

24  modifying, or reversing existing law.

25         The factual contentions in this Complaint have evidentiary support or, if alleged upon

26  information and belief, will likely have evidentiary support after a reasonable opportunity for

27  further investigation or discovery.

28         This Complaint complies with the requirements of Rule 11.

**COMPLAINT**

\*\*\*

**PRAYER FOR RELIEF**

**WHEREFORE, Plaintiff demands judgment against Defendants as follows:**

a.   Requiring Defendants to pay the actual damages sustained by Plaintiff by reason of the acts and transactions alleged herein, plus punitive damages;

b.   For general damages against Defendants, and each of them, jointly and severally, in an amount to be determined at trial in order to restore Plaintiff to the position he was in prior to the damage, but in no event less than $101,762.51 USD, or 2.05 BTC and 1.727 BSV;

c.   For an award of restitution, and an order for the disgorgement of all of Defendants' ill-gotten gains from the unlawful conduct alleged herein;

d.   For exemplary and punitive damages against Defendants, and each of them, in an amount to be determined at trial;

e.   For an order permanently and publicly enjoining Defendants from continuing to engage in the unlawful and unfair business acts and practices alleged herein;

f.   For a judgment declaring the Coinbase User Agreement (dated December 6, 2021) unenforceable in its entirety, as unconscionable, and as void against public policy; or, in the alternative that: (a) the Delegation Clause is unenforceable as against Plaintiff; (b) the Damages Restriction is unenforceable as against Plaintiff; (c) the Indemnity is unenforceable as against Plaintiff; and (d) the Arbitration Provision is unenforceable as against Plaintiff;

g.   For an order permanently and publicly restraining each and every person with possession of the private key(s) for the ***bc1 Wallet*** from taking any action that would, or reasonably could cause the 2.05647153 BTC presently in the ***bc1 Wallet***, to be transferred to another Bitcoin Wallet, or to otherwise become irrecoverable;

h.   For an order for a writ of detinue directing the United States Marshal in any district where the *res* may be located to repossess the *res* and/or the bitcoins in the ***bc1 Wallet***, on behalf of Plaintiff Ryan Dellone, or to otherwise assist Plaintiff in repossessing the *res*;

i.   For an order compelling Defendants to transfer to Plaintiff the control, legal title, and

T**HE** L**AW** O**FFICE OF** E**THAN** M**ORA**
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

84

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 202
FRESNO, CA 93720

1   possession of the 2.05698427 bitcoins located at the Bitcoin public key address,

2   ***bc1qjp79ak6fxm4h7j0tsrwqx2n2k4tcqqveqxrvgm***; and to do the same with the XTZs

3   and XTZ rewards earned through Plaintiff's Coinbase account, and the BSV at the BSV

4   public key address, ***14goHFL8GGyuKCvbFtGW9PqQ5Urspwn9uu***;

5   j.   For an order requiring Defendants to engage in necessary corrective actions, so that

6        customer accounts and customer funds and cryptocurrency assets can be secured,

7        accessed, and exchanged between Plaintiff and any persons or entities currently in

8        possession of those accounts, funds, and assets belonging to Plaintiff;

9   k.   Awarding Plaintiff prejudgment and post-judgment interest, as well as well as reasonable

10       attorneys' fees, expert fees and other costs and expenses of this litigation; and

11  l.   Awarding such other relief as the Court deems just and proper.

12                                          ***

13                   **DEMAND FOR TRIAL BY JURY**

14  Plaintiff hereby demands a trial by jury on all issues so triable.

15                                          ***

16

17  **DATED:**        September 26, 2023              THE LAW OFFICE OF ETHAN MORA

18

19                                        By: ___/s/  Ethan E. Mora___

20                                           Ethan E. Mora, Esq.

21                                           *Attorney for Plaintiff Ryan Dellone*

22

23

24

25

26

27

28

**COMPLAINT**