The Law Office of Ethan Mora
Ethan E. Mora (SBN 317937)
1040 E. Herndon Ave., Suite 105
Fresno, CA 93720
Telephone: (559) 370-1485

Attorney for Plaintiff RYAN DELLONE

**THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RYAN DELLONE, an individual,<br><br>Plaintiff,<br><br>v.<br><br>COINBASE, INC., AT&T MOBILITY, LLC, *2.05698427 BITCOINS*, and DOES 1-50,<br><br>Defendants. | Case no. 1:23-CV-01408<br><br>FIRST AMENDED COMPLAINT<br><br>**DEMAND FOR JURY TRIAL** |

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720
559-981-2588

**INTRODUCTION**

1. This case is about enforcing a retail consumer's fundamental privacy and personal property rights, and about holding the perpetrators and facilitators of egregious cyber-torts accountable for the harms and financial devastation they have caused.

2. Plaintiff Ryan Dellone is a retail consumer who had his digital identity stolen and his online financial account raided by seemingly unsophisticated individuals because his online financial account provider and his wireless phone company breached their duties, and engaged in acts constituting negligence, reckless and willful misconduct, and gross violations of law.

3. Defendant Coinbase is a financial services provider that operates a cryptocurrency exchange platform (the "Coinbase Platform"), and hosts online financial accounts and digital currency "wallets" used by tens of millions of retail consumers to buy, sell, and store various types of virtual currencies and digital assets supported by Coinbase on its Platform.

4. Defendant AT&T is a wireless telecommunications "common carrier" regulated by the Federal Communications Act for its provision of mobile phone services, which hundreds of millions of Americans, including consumers and companies, frequently use to communicate, access the internet, conduct business operations, and often, confirm or remotely verify their own or another person's identity.

5. Mr. Dellone has been an AT&T customer for more than two decades. In 2013, Mr. Dellone became a Coinbase customer when he opened his Coinbase account by providing Coinbase sensitive data, including real-time geolocation data associated with his mobile device and phone number, which Coinbase used to create a digital identity associated with Mr. Dellone on its Platform. Over the next eight years, he routinely used AT&T's services to access Coinbase's Platform and monitor various digital "wallets" associated with his digital identity, and to judiciously acquire, transact with, and store an array of financial assets on the Coinbase Platform. On average, Mr. Dellone initiated only around 37 transactions per year.

6. In December 2021, an AT&T employee unlawfully disconnected Mr. Dellone's phone number from his mobile device, and connected his number to a device controlled by one or more individual hackers and/or scammers (DOES 1-50; the "Doe Defendants"). The Doe Defendants

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

used their unauthorized control over Mr. Dellone's AT&T wireless service and phone number, along with valuable credential data and software tools provided by Coinbase, to breach Coinbase's faulty Platform security and rapidly initiate more than two dozen consecutive transactions using the Coinbase-hosted wallets comprising Mr. Dellone's Coinbase accounts and associated with Mr. Dellone's digital identity. Coinbase promptly approved, facilitated, and generated transaction fee revenue on each of these unauthorized transactions.

7. In less than ten minutes, Coinbase liquidated the assets Mr. Dellone had stored in more than twenty distinct Coinbase-hosted digital currency wallets, and deposited the "digital dollar" proceeds from those transactions into his Coinbase-hosted "U.S. Dollar wallet." At the behest of Doe Defendants, Coinbase then used the entire balance of Mr. Dellone's U.S. Dollar wallet (over $70,000) to purchase bitcoins on its Platform, and deposited the bitcoins in Mr. Dellone's Coinbase-hosted "Bitcoin wallet," which prior to the transfer, contained about 0.5 Bitcoin.

8. Coinbase then swiftly facilitated Doe Defendants' subsequent request to transfer all the bitcoins associated with Mr. Dellone's Coinbase account—representing virtually his entire Coinbase account balance, and approximately $100,000 worth of hard-earned savings and long-term investment assets Mr. Dellone had acquired over the better part of a decade—to an "off-Platform" Bitcoin Wallet (not hosted by Coinbase or accessible via the Coinbase Platform), which had never been associated with Mr. Dellone, or his account, in any way whatsoever. Off-Platform Bitcoin transactions, unlike the preceding "on-Platform" transactions Coinbase effectuated, are irreversible. Yet Coinbase facilitated the off-Platform Bitcoin transfer in one lump sum, as if it were routine, without reasonable safeguards to avert severe irreprable harm.

9. The highly-suspicious parade of requests to liquidate (*i.e.*, sell; exchange for "digital dollars") almost every asset in Mr. Dellone's diverse digital currency portfolio, and transfer all his Bitcoin off the Coinbase Platform, were not only entirely unprecedented activities on Mr. Dellone's account, the user data Coinbase collected from Doe Defendants on each of the fraudulent transactions were also rife with brazen hallmarks of a prolific form of phone-based fraud, called a "SIM Swap attack," that, for years, Coinbase and AT&T had recognized as a major problem and threat, particularly to their consumer customers.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

10. Coinbase has recognized the fraud, but denied all responsibility for the unauthorized transactions; instead, Coinbase presented Mr. Dellone with an audaciously deceptive and baseless ultimatum: either he can "reimburse" Coinbase for fraudulent transactions Coinbase facilitated, or he will remain locked out of his Coinbase account indefinitely, and thus unable to review and correct any bogus changes made to his digital identity data—which Coinbase stores and shares with its unspecified "Affiliates"—or close his account, or sell or transfer any assets remaining therein.

11. For years Coinbase has exploited technological and legal ambiguities, and wielded its grossly superior bargaining power as swords to riposte victimized, often financially-distressed consumers, like Mr. Dellone, by misinterpreting and enforcing one-sided contract terms, concealing and withholding material facts relating to Coinbase's liability, defying its customers' legitimate requests for their data and information, and frustrating its comparatively helpless customers with gauntlets of "customer support" quackery and fool's errands, disempowering and obstructing consumers from enjoying the rights and protections they are afforded under law, in order to avoid prosecution and retain its ill-gotten "transaction fee" revenue.

12. By this Complaint, Mr. Dellone intends to hold Coinbase accountable for its unethical and predatory business acts and practices, and the woefully inadequate cybersecurity policies through which Coinbase has been unjustly enriched. In seeking to recover for the excruciating financial and emotional devastation, costs, and substantial damages and losses to, or affecting his property, privacy, and digital identity, Mr. Dellone makes no exception for Coinbase's and AT&T's roles in, and acts to hinder his pursuit of all parties responsible for his injuries.

## THE PARTIES

13. Plaintiff Ryan Dellone is an individual citizen and a resident of Fresno, California.

14. Defendant Coinbase, Inc. ("CBI"), is a Delaware corporation, and a wholly-owned subsidiary of Coinbase Global, Inc. Coinbase Global, Inc. ("Coinbase Global") is a publicly-traded Delaware corporation involved in the business of cryptocurrency exchange, among other interrelated businesses. Coinbase Global has no formal physical headquarters, as it is a "decentralized" and "remote first" company.

15. CBI and Coinbase Global are operated as one corporation. Coinbase Global's SEC filings refer to CBI and Coinbase Global, together with subsidiaries of Coinbase Global, as "Coinbase." This Complaint does the same.

16. Defendant AT&T Mobility, LLC ("AT&T") is a Delaware limited liability company that lists its principal place of business in Brookhaven, Georgia. AT&T is a wholly-owned subsidiary of AT&T, Inc., a publicly-traded Delaware corporation.

17. Defendant *2.05698427 BITCOINS* is a Bitcoin Wallet and an item of personal property uniquely characterized by its receipt of "OP_RETURN" transactions containing text relating to this litigation, which is hosted on the publicly-accessible Bitcoin blockchain, and which is located at, and identifiable by the Bitcoin public key address, ***bc1qjp79ak6fxm4h7j0tsrwqx2n2k4tcqqveqxrvgm***.

18. The true names of the remaining defendants (DOES 1-50) are presently not known to Plaintiff. These "Doe Defendants" are cyber hackers and/or scammers, current or former AT&T employees, representatives, or agents, or persons for whom AT&T would not be liable, or entities affiliated with AT&T or Coinbase that may be held liable for the acts of the named Defendants. Plaintiff will amend this Complaint to allege the names of each of DOES 1-50 as soon as Plaintiff ascertains their true identities.

19. Plaintiff claims all rights and exclusive legal title to, and ownership of the bitcoins currently held in or associated with the Bitcoin public key Wallet address, ***bc1qjp79ak6fxm4h7j0tsrwqx2n2k4tcqqveqxrvgm***.

20. Plaintiff claims all rights and exclusive legal title to, and ownership of the BSV tokens currently held in or associated with the BSV public key Wallet address, ***14goHFL8GGyuKCvbFtGW9PqQ5Urspwn9uu***.

## JURISDICTION AND VENUE

21. This Court has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action is brought pursuant to the Computer Fraud and Abuse Act (18 U.S.C. § 1030, et seq.) and the Federal Communications Act (47 U.S.C. § 207).

22. This Court has diversity jurisdiction over this matter under 28 U.S.C. § 1332(a)(2)

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

because the amount in controversy exceeds $75,000, exclusive of costs and interest, and Plaintiff is completely diverse from all Defendants, as Plaintiff is a resident of California, Coinbase is a Delaware corporation, and AT&T is a Delaware limited liability company.

23. This Court has jurisdiction pursuant to section 1331, because this case presents fundamental questions pertaining to, or otherwise interpreting or applying the Computer Fraud and Abuse Act (18 U.S.C. § 1030), the Federal Communications Act of 1934 (47 U.S.C. § 151 *et seq.*), the Electronic Fund Transfer Act (15 U.S.C. §§ 1693 *et seq.*), the Bank Secrecy Act (31 U.S.C. § 5311), the Stamp Payments Act of 1862 (18 U.S.C. § 336), and the Securities Exchange Act (15 U.S.C. §§ 77-78c. et seq.).

24. This Court has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367, as those claims are derived from a common nucleus of operative facts.

25. This Court has personal jurisdiction over Defendants because Defendants transacted business, maintained substantial contacts, or committed overt acts in furtherance of their illegal schemes throughout the United States, including in this District. Defendants' conduct has been directed at, and has had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

26. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to the claims occurred in this District, and because Defendants transact business in, are found in, and have agents in this District, and have substantial and systematic contacts in this District.

## FACTUAL ALLEGATIONS

### I. Background

27. Coinbase operates the largest online cryptocurrency exchange platform in the United States (the "Coinbase Platform" or the "Platform").[1] Coinbase's customers can use their Coinbase-hosted virtual accounts and digital currency "wallets" to buy, sell, earn, store, and trade

[1] This Complaint refers to every Coinbase "platform" Mr. Dellone has used, collectively, as the "Coinbase Platform" (or the "Platform") because, although Coinbase operates multiple online "platforms" (*e.g.*, "Coinbase Pro," "Coinbase," "GDAX"), Coinbase (*i.e.*, CBI and/or Coinbase Global) often refers to itself as a "Platform," rather than as the business operating its Platform.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

over 100 different kinds of digital assets on the Coinbase Platform, including cryptocurrencies like Bitcoin, reward-generating virtual "tokens" like Tezos (or "XTZ")[2], and fiat currency-based financial products, like "digital dollars" and "USD Coin."[3]

28. Coinbase was founded in May 2012. By 2021, Coinbase was operating in over 100 countries, had over 4,000 employees, and claimed to support over 50 million "verified" users on its Platform.[4]

29. Coinbase's main source of revenue is "transaction revenue," which Coinbase generates primarily from the fees it collects for facilitating transactions on the Coinbase Platform.

30. Coinbase has claimed to be "one of the longest running crypto platforms where customers have not lost funds due to a security breach of the platform," *see*, *e.g.*, Coinbase Global, *SEC General Form for Registration of Securities (Form S-1)*, at p. 6, (available at https://www.sec.gov/Archives/edgar/data/1679788/000162828021003168/coinbaseglobalincs-1.htm) (Feb. 25, 2021), and has dubbed itself the "most trusted crypto exchange," *see*, *e.g.*, Coinbase, *Security*, https://www.coinbase.com/security (accessed March 14, 2023).

31. Coinbase has promoted its services to retail consumers as "the easiest solution" for those looking to "buy, sell, send, and receive crypto." Coinbase, *How to set up a crypto wallet*, https://www.coinbase.com/learn/tips-and-tutorials/how-to-set-up-a-crypto-wallet (accessed Mar. 2023) ("if all you want to do is buy, sell, send, and receive crypto, a hosted wallet is the easiest solution.").

32. Plaintiff Ryan Dellone opened his Coinbase account in October 2013. For at least eight years he was a customer of Coinbase, and a user of Coinbase's products and services.

---

[2] *See* Tezos, *How to get tez (XTZ)*, https://tezos.com/ ("Tez (XTZ) is the native token of the Tezos blockchain."); and, Tezos, *Bake (Validate)*, https://tezos.com/learn/bake/ ("Bakers are rewarded with additional tez for securing the network.") (accessed Dec. 12, 2023).

[3] USD Coin (or "USDC") is a digital asset that Coinbase has classified as a "stablecoin"—a digital currency or crypto-asset that derives its price from the price of a specific reference asset to which the currency or asset is pegged. *See*, Coinbase, *USD Coin*, https://www.coinbase.com/usdc (stating that Coinbase customers "can always redeem 1 USD Coin for US$1.00" from Coinbase; and "Each USDC is backed by one dollar or asset with equivalent fair value, which is held in accounts with US regulated financial institutions.") (accessed Mar. 2023).

[4] *See* Coinbase, Letter to SEC Re: Custody Rule and Digital Assets (May 25, 2021), https://www.sec.gov/files/coinbase-052521.pdf ("Coinbase was founded in 2012 as a consumer platform that makes it easy to purchase, sell, and transact in cryptocurrency. . . . We support over 56 million verified users across more than 100 countries who, in the last quarter, have traded over $330 billion in cryptocurrency on our platform.").

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

33. Coinbase provided Mr. Dellone with "custodial" (or "hosted") digital currency wallets, as well as services relating to the exchange and storage of online assets, including various cryptocurrencies and financial instruments supported or hosted by Coinbase on its Platform.

34. Mr. Dellone was a notably conservative user of the Coinbase Platform. Between 2013 and 2023, Mr. Dellone initiated fewer than 300 transactions on the Coinbase Platform, total.

35. Coinbase Global became a publicly-traded company in April 2021.

36. According to Coinbase Global's public financial disclosures, between January and March 2021 (Q1-2021), Coinbase facilitated over $330 billion in cryptocurrency transactions, and reported $1.5 billion in "transaction" revenue. In Q2-2021, Coinbase reported $1.9 billion in transaction revenue; and in Q3-2021, Coinbase reported transaction revenue of $1 billion.

37. Between October and December 2021 (Q4-2021) Coinbase reported $547 billion in cryptocurrency transactions, and reported an astonishing *$2.3 billion in transaction revenue*.

38. To put Coinbase's 2021 fourth quarter revenue into perspective, in Q4-2022, Coinbase reported $322 million in transaction revenue. In Q3-2023, Coinbase's reported $289 million in transaction revenue—an almost a 90% decrease in its transaction revenue from Q4-2021.

39. In December 2021, Coinbase had custody or control of approximately $100,000 worth of Mr. Dellone's crypto-assets and virtual currencies. When Coinbase facilitated the unauthorized exchanges and transfers that are the subject of this Complaint, Coinbase collected at least $4,000 in transaction fee revenue, in less than 30 minutes, from those transactions alone.

40. In January 2023, CBI agreed to pay $100 million to settle allegations by the New York State Department of Financial Services ("NYDFS") concerning Coinbase's cybersecurity lapses and its failure to comply with anti-money laundering guidelines that allowed criminals to use the Coinbase Platform for fraud, money laundering, and other illicit activities. According to the NYDFS's Consent Order against Coinbase (the "CBI Order")[5], CBI is required to pay $50 million (of the $100 million) as a penalty for violating New York banking law and the NYDFS's virtual currency, money transmitter, transaction monitoring and cybersecurity regulations.

[5] *In the Matter of Coinbase, Inc.*, N.Y. State Department of Financial Services, Consent Order (Jan. 4, 2023) (the "CBI Order"), available at https://www.dfs.ny.gov/system/files/documents/2023/01/ea20230104_coinbase.pdf (accessed January 20, 2024).

41. The CBI Order states that, by the end of 2021, Coinbase had an "unmanageable," monthslong backlog of more than 100,000 unreviewed transaction monitoring alerts, and more than 14,000 customers who required enhanced due diligence; but Coinbase had neither the personnel, nor the resources or tools to address these issues. "CBI Order," *supra*, n.5, at ¶ 11 ("Coinbase lacked sufficient personnel, resources, and tools needed to keep up with these alerts, and backlogs rapidly grew to unmanageable levels.").

42. During the NYDFS's examination and subsequent enforcement investigation, the agency found that Coinbase's customer onboarding requirements were merely a "simple check-the-box exercise," and Coinbase's Bank Secrecy Act and Anti-Money Laundering program, including its Know-Your-Customer, customer due diligence, transaction monitoring, suspicious activity reporting, and sanctions compliance systems, were "inadequate" for a financial services provider of Coinbase's size and complexity. *Id.* at ¶ 39.

43. Coinbase's uninvestigated monitoring alerts led to Coinbase routinely failing to investigate and report suspicious activity on its Platform as required by law.

**A. Coinbase is a Regulated "Custodial Wallet Service Provider"**

44. Coinbase has consistently represented itself as a regulated, fully-compliant financial institution registered as a Money Services Business with the United States Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN").

45. Coinbase is a "financial institution" subject to the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693 *et seq.* ("EFTA") and its corresponding regulations, as implemented by the Consumer Financial Protection Bureau ("CFPB"). *See* 12 C.F.R. § 1005.1, *et seq.*

46. Congress designed the EFTA with the "primary objective" of "the provision of individual consumer rights." 15 U.S.C. § 1693; 12 C.F.R. § 1005.1(b) (the "primary objective of the act and this part is the protection of individual consumers engaging in electronic fund transfers and remittance transfers.").

47. Coinbase is relatively unique type of financial service institution, commonly referred to as a "custodial wallet service provider." Coinbase is considered a "custodial Wallet service provider" for three main reasons: **(i)** Coinbase takes control and possession of its customers'

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA  93720

"private keys" (*i.e.*, the alphanumeric strings akin to a passwords, which are required to transfer cryptocurrencies from one cryptocurrency Wallet to another); **(ii)** in general, Coinbase customers must use their Coinbase account credentials, rather than their private keys, to transfer the cryptocurrencies in Coinbase's custody between cryptocurrency Wallets; and **(iii)** Coinbase has exclusive, unilateral authority to permit access to, approve, and prevent transfers of customer-owned funds and assets associated with customers' Coinbase-hosted wallets.

48.     The "Digital Currency Wallets" and "U.S. Dollar Wallets" (or digital currency "wallets") Coinbase hosts for its customers are essentially digital reflections of Coinbase's internal customer-owned asset ledger, or fictious representations of the customer-owned assets held in Coinbase's custody. Cryptocurrency "Wallets" and U.S. dollar accounts at other financial institutions hold the actual underlying financial assets (crypto-assets, U.S. dollars) reflected in Coinbase customers' Coinbase-hosted digital currency wallets.

49.     The custodial (or hosted) services Coinbase provides are similar to banking services provided by traditional retail banks. Coinbase's website states: "It's called *hosted* because a third party keeps your crypto for you, similar to how a bank keeps your money in a checking or savings account. You may have heard of people 'losing their [private] keys' or 'losing their USB wallet' but with a hosted wallet you don't have to worry about any of that.") Coinbase, *How to set up a crypto wallet*, https://www.coinbase.com/learn/tips-and-tutorials/how-to-set-up-a-crypto-wallet (accessed Jan. 24, 2024). Coinbase has advertised its custodial services as a solution to consumers' worries about inadvertently or irreversibly losing their cryptocurrencies.

50.     Coinbase has advertised its unilateral ability to authorize changes to its customers' account credentials as an account protection feature. *Id.* ("The main benefit of keeping your crypto in a hosted wallet is if you forget your password, you won't lose your crypto.").

51.     At all times relevant to the allegations stated herein, Coinbase was required to comply with financial services and consumer protection laws, including the strict obligations imposed by the Bank Secrecy Act. *See* 31 U.S.C. § 5311; 12 C.F.R. § 208.63. The Bank Secrecy Act's obligations are reinforced by the USA Patriot Act of 2001 (the "Patriot Act"), which underscores the importance of implementing robust internal systems to detect and report money laundering

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

and other suspicious activities.

52. At a minimum, the Bank Secrecy Act and the Patriot Act require that Coinbase form and maintain records and reports, and implement procedures for a "Customer Identification Program" aimed at reasonably ascertaining the true identities of the people for whom it facilitates transactions. *See* 31 CFR § 1020.220(a)(2).

53. Coinbase's duties concerning the policies, procedures, and practices it must implement to protect its customers are based on Coinbase's reasonable assessment of relevant risks, considering: **(a)** Coinbase's size, location, and customer base; **(b)** the various types of accounts maintained by Coinbase; **(c)** the various types of identifying information available to Coinbase; and **(d)** the various methods of opening Coinbase accounts.

54. Coinbase's registration with FinCEN, and the Bank Secrecy Act, the Patriot Act, and the EFTA subject Coinbase to heightened standards of care and special duties to its customers, which are reflected by the spirit of these laws and regulations and the explicit standards set out therein.

55. Mr. Dellone reasonably relied on Coinbase's representations that it operates in compliance with financial regulations applicable to Money Service Businesses and custodial Wallet providers, and consistent with such policies and standards aimed at protecting consumers.

**1. Coinbase Claims It Uses Customer Data for "Security" Purposes**

56. Coinbase collects the following information from and about users of its products and services: **(i)** Device IDs, including hardware identification numbers such as Media Access Control ("MAC") addresses and international mobile equipment identity ("IMEI") numbers; **(ii)** Internet Protocol ("IP") addresses; **(iii)** data from online Cookies; **(iv)** "Behavioral Analytics"; and **(v)** Personally Identifiable Information ("PII").

57. Personally Identifiable Information includes a person's name and contact details (*e.g.*, phone number and email address), usernames, gender, locale/language, location, birthdate, copies of government-issued identification documents, and may include device types and other identifying data used by a company to control access to the company's services.

58. Personally Identifiable Information is highly valuable to researchers, advertisers, political campaigns, criminals, and to Coinbase's "Affiliates" and customers, including Mr.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

Dellone. To some consumers, PII can be just as important as financial data. To some criminals, PII can be more valuable than a Social Security Number or bank account information.

59. Personally Identifiable Information—including the PII Mr. Dellone shared with Coinbase, and/or which Coinbase collected and has retained for over a decade—has significant value to Coinbase.

60. On numerous occasions prior to December 2021, Coinbase represented to Mr. Dellone, and to all Coinbase's customers and visitors of its website, that Coinbase engages in the "routine monitoring of IP addresses" as part of Coinbase's "reasonable risk-based program" aimed at complying with Anti-Money Laundering and Know Your Customer regulations.

61. Coinbase advertised its services as including various safeguards and security features, such as:

> When a customer attempts to reset their password, we take precautions to ensure that it is a legitimate request. This means that our customers may only reset their passwords from devices they have previously verified, or from locations they have previously signed in from. This requirement provides a safeguard against attempts to illegitimately reset your password.

Coinbase, *Password requirements and troubleshooting*, https://help.coinbase.com/en/coinbase/privacy-and-security/avoiding-phishing-and-scams/password-requirements (accessed October 2022).

62. Mr. Dellone reasonably believed that Coinbase collected the geolocations and other device and network data associated with his devices, and with any and every device requesting account access or initiating actions on his Coinbase account, for security purposes, including fraud prevention and detection of unauthorized activity on the Coinbase Platform.

63. Mr. Dellone reasonably believed the following statement (or a substantially similar statement), which he saw posted on Coinbase's website prior to December 2021: "if you reset your password from a new device, you won't be able to send crypto from your account for up to 48 hours." Coinbase promoted this feature as a service-quality characteristic that would help Coinbase protect its customers and its customers' assets against fraud and theft.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

64. Mr. Dellone allowed Coinbase to retain custody of his digital currencies and his valuable, private, sensitive, financial, and personal identification records and data because he believed that when he, or when anyone else, requested or initiated activity from his Coinbase account, Coinbase would use the information he allowed Coinbase to collect and share with its Affiliates, for security purposes; and would take reasonable steps based on that data to ensure that any activity—especially requests to make critical account changes and irreversibly transfer his assets off the Platform—is authorized by him *before* approving or facilitating the requested actions.

**B. AT&T is a "Common Carrier" Subject to the Federal Communications Act**

65. AT&T is one of the world's largest telecommunications company and mobile wireless phone services provider.

66. AT&T provides wireless mobile telephone services to consumers and wholesale and resale wireless subscribers located in the United States and in U.S. territories. AT&T markets and sells standardized wireless phone services through online channels, over the telephone, and at various retail locations across the United States.

67. AT&T is a "common carrier" under the Federal Communications Act of 1934 (as amended), 47 U.S.C. § 151 *et seq.* (the "Federal Communications Act" or the "FCA"). AT&T's acts and practices are governed by the FCA and corresponding regulations passed by the Federal Communications Commission ("FCC").

68. At all times relevant to the allegations stated in this Complaint, Mr. Dellone was a customer of AT&T and a "Plan Participant" subscribed to an AT&T "consumer wireless service" plan. Through his (his family's) AT&T wireless service plan, Mr. Dellone maintained a mobile phone and a mobile phone number associated with his family's AT&T wireless account.

69. Recognizing the sensitivity of the data collected by common carriers, including AT&T, Congress, through the FCA, requires AT&T to protect its customers' sensitive personal information. The FCC has recognized that "[a]bsent carriers' adoption of adequate security safeguards, consumers' sensitive information . . . can be disclosed to third parties without consumers' knowledge or consent."

70. Section 222 of the FCA requires that AT&T protect the privacy and security of

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

information AT&T maintains about its customers.

71. Section 201(b) of the FCA requires that AT&T's practices, specifically its practices related to the collection of information from and about its customers, be "just and reasonable." The FCA declares unlawful any such practice that is unjust or unreasonable.

72. Under the FCA, AT&T's most direct obligations to protect its customers' information and privacy concern a specific type of information called "Customer Proprietary Information and Other Customer Information" (known by the acronym "CPNI"). CPNI is defined as "information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and . . . information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier."

73. The FCC has promulgated rules to implement Section 222, "designed to ensure that telecommunications carriers establish effective safeguards to protect against unauthorized use or disclosure of CPNI." *See* 47 CFR § 64.2001 et seq. ("CPNI Rules"). The CPNI Rules limit AT&T's disclosure and use of CPNI without customer approval to certain limited circumstances (such as cooperation with law enforcement), none of which are applicable to the facts here. *See* 47 CFR § 64.2005.

74. The CPNI Rules require carriers to implement specific safeguards, including: **(i)** training personnel "as to when they are and are not authorized to use CPNI"; **(ii)** establishing "a supervisory review process regarding carrier compliance with the rules;" and **(iii)** filing annual compliance certificates with the FCC. 47 CFR § 64.2009(b), (d), and (e).

75. The CPNI Rules require that "carriers must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI." 47 CFR § 64.2010(a).

76. With respect to in-store access to CPNI, "[a] telecommunications carrier may disclose CPNI to a customer who, at a carrier's retail location, first presents to the telecommunications carrier or its agent a valid photo ID matching the customer's account information." 47 CFR § 64.2010(d). "Valid photo ID" is defined in 47 CFR § 64.2003(r) as "a government-issued means

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

of personal identification with a photograph such as a driver's license, passport, or comparable ID that is not expired."

77. Carriers are also required to implement a system by which the status of a customer's CPNI approval can be clearly established prior to the use of CPNI. *See* 47 C.F.R. § 64.2009(a).

78. AT&T is liable not only for its own violations of the FCA, but for FCA violations that it "cause[s] or permit[s]." *See* 47 U.S.C.A. § 206 (establishing that "[i]n case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter[.]").

79. In 2015, the FCC fined AT&T a record $25 million for violating Section 222 of the FCA by allowing its employees to furnish criminals with the CPNI of almost 280,000 AT&T customers. In addition to being forced to pay $25 million to the FCC, AT&T entered into a consent decree that requires AT&T to implement measures appropriate to protect CPNI from such unauthorized disclosures in the future. *See* FCC, *In the Matter of AT&T Services, Inc.*, 30 FCC Rcd. 2808 (April 8, 2015) (available at https://docs.fcc.gov/public/attachments/DA-15-399A1.pdf) (the "Consent Decree").

80. The Consent Decree and the FCC's relevant adopting order highlight AT&T's lax security practices, and AT&T's failures to supervise and monitor its employees as the prime causes of breaches of AT&T customers' information. The FCC's investigation, which culminated in the Consent Decree and related adopting order, revealed how AT&T employees were frequently paid by criminals to hand over AT&T customers' personal information, including customers' CPNI. *Id* at 2813-15.

81. The FCC found that numerous AT&T call center employees provided the CPNI of hundreds of thousands of customers—including customers' names, phone numbers, and Social Security Numbers—to unauthorized third-parties, who used that information to gain access to mobile phone unlock codes and, in some instances, commit a type of fraud now commonly

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

known as a "SIM Swap attack."

82. As further detailed below, AT&T perpetrated a SIM Swap attack on Mr. Dellone.

**1. AT&T Was Aware of Risks Presented by "SIM Swap Attacks"**

83. A "SIM Swap attack" refers to a relatively simple scheme where third-parties (hackers, scammers) take control of a victim's wireless service and mobile phone number, and use that control to exploit two-factor authentication processes that rely on the victim's phone number, or on the victim's control over his or her phone and wireless service.

84. Two-factor authentication ("2FA") is an identity and access management control mechanism that requires two forms of identification credentials to gain access to an account—often a password ("something you know"), and a physical device ("something you have") (*e.g.*, a mobile device with a wireless number connected to a carrier's cellular network).

85. In some instances, 2FA can be used to gain access to an online account for which the password (the "something you know" factor) is not known. For example, if a person forgets the password to his or her 2FA-secured email account, some email service providers allow the account password to be reset by confirming that a person (not necessarily the authorized person) has control of the mobile phone number linked to the email account, which is often done by sending a password reset code for the account holder's email account to the person's phone, without first checking the phone's IMEI number or other device information.

86. Most mobile phones have an internal subscriber identity module ("SIM") card, which is a small, removable computer chip that provides the mobile carrier (*e.g.*, AT&T) information about which of its subscribers' accounts is associated with a particular mobile phone. A SIM card allows a wireless device (*e.g.*, mobile phone) to communicate with the carrier's cellular telecommunications network.

87. A SIM card can store a limited amount of data, including a wireless subscriber's text messages, personal contacts, and certain carrier account information that can help identify a wireless subscriber on the carrier's network.

88. The connection between a mobile device and a SIM card is made through the carrier when the carrier associates the SIM card with a physical phone's unique IMEI number (akin to

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

the phone's serial number). Unless the carrier activates a SIM card and establishes an effective connection between the SIM card and a registered device's IMEI number, the phone typically cannot send or receive calls or text messages over the carrier's network.

89.     For a SIM card change to become effective, the carrier is required by law to authenticate that the change being requested is legitimate, before actualizing the change.

90.     AT&T allows its employees, representatives, and agents to conduct SIM card changes for its customers remotely, over the phone, and in-person in its retail stores across the country.

91.     AT&T's employees, representatives, and agents conduct SIM card changes numerous times daily, without adequate safeguards in place to prevent unauthorized SIM Swaps (SIM Swap attacks) from occurring.

92.     SIM Swap attacks generally involve multiple scammers or hackers—and always at least one telecommunications carrier employee or agent—who cooperate to breach a victim's online accounts, by using the victim's illegitimately ported wireless service, typically with the intent to steal the victim's digital property, funds, identity, or information.

93.     In a SIM Swap attack, the SIM card number associated with the victim's wireless account is switched from the victim's phone (which has a unique IMEI) to a hacker's phone (which has a different IMEI). The SIM card change re-routes the victim's phone service—including all incoming data, texts, and phone calls associated with the victim's phone—from the victim's phone to a device controlled by the hacker. The hacker's device then becomes the phone associated with the victim's phone number, and the hacker receives all text messages and calls intended for the victim. Meanwhile, the victim's phone loses connection to the carrier network.

94.     A SIM Swap attack cannot occur unless the carrier activates the SIM card in the hacker's device and associates the hacker's IMEI number with the phone number assigned to the victim's wireless account. When that occurs, the SIM card in the victim's phone is deactivated and loses service on the carrier network.

95.     Once hackers gain control over a victim's phone number, they can often use their control to obtain access to the victim's online accounts (*e.g.*, the victim's email and financial accounts) by exploiting the hackers' ability to make, send, and receive text messages and phone calls using

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

the victim's phone number. Often the hackers will request that third-party account providers send password reset links or 2FA codes to the victim's phone number via SMS text message. In some instances, third-party account providers will automatically assume that whoever controls the phone number is authorized to receive the reset links or authorization codes.

96. The U.S. Fair Trade Commission ("FTC") found that, in January 2013, there were 1,038 reported SIM Swap attacks per month in the United States; by January 2016, that number had increased to 2,658 per month—2.5 times as many. FTC, Lori Cranor (FTC Chief Technologist), *Your mobile phone account could be hijacked by an identity thief*, https://www.ftc.gov/news-events/blogs/techftc/2016/06/your-mobile-phone-account-could-behijacked-identity-thief (June 7, 2016) (the "FTC Report").

97. According to the FTC Report, in January 2016, SIM Swap attacks represented 6.3% of all identity thefts reported to the FTC and "involved all four of the major mobile carriers," including AT&T. Consequently, the FTC urged carriers to "adopt a multi-level approach to authenticating both existing and new customers and require their own employees as well as third-party retailers to use it for all transactions."

98. The FTC Report warned that, "due to text message password reset requests and two-factor authentication, SIM swapping puts subscribers at risk of financial loss and privacy violations." The FTC Report also explained that "mobile carriers are in a better position than their customers to prevent identity theft through mobile account hijacking."

99. In September 2017, AT&T acknowledged that AT&T subscribers with "valuable accounts that are accessible online" are likely to become targets of SIM Swap attacks. AT&T Cyber Aware (blog), *Secure Your Number to Reduce SIM Swap Scams*, available at https://about.att.com/pages/cyberaware/ni/blog/sim_swap.

100. In late 2021, most Americans had never heard of a SIM Swap attack, or many instances, lacked the resources, knowledge, or technical skills necessary to prevent identity theft by SIM Swap attacks. Even today, to the extent average American retail consumers have heard of SIM Swap attacks, many cannot fathom the dangers or risks SIM Swap attacks pose to them, individually, given that the pervasive use of wireless devices as a form of digital identity

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

documentation is common practice, even among the world's most prominent online service providers. For example, Facebook, Google (Gmail), Uber, and many banks offering mobile banking services require customers to authenticate their (the customers') identities using their mobile phones or phone numbers.

101. For at least four years prior to the breach of Mr. Dellone's Coinbase account, AT&T knew that millions of its customers enabled, allowed, and routinely used AT&T's services as a form of 2FA, and AT&T knew that many of its customers depend upon, and often have no other choice except to rely on the security of AT&T's SIM card change systems and policies.

102. Consumers who appreciate the risks associated with SIM Swap attacks generally have no practical alternative but to rely on wireless service providers or common carriers, like AT&T.

103. Consumers unwilling to assume the risks of SIM Swap attacks, or who otherwise do not want or cannot afford mobile devices with cellular service plans, face an exceedingly stark reality—one in which they are unable to directly receive timely, critical event notifications, such as Nationwide Emergency Alert text messages sent by FEMA; one where they cannot reasonably contact their loved ones or emergency services in the event of an emergency (especially when traveling or commuting); and one where they are essentially precluded from participating in the global digital economy, incapable of running a business, using mobile banking services, and engaging in basic activities that have come to define modern life (*e.g.*, engaging with social media, checking in at the doctor's office, hailing a ride, reading the menu at a restaurant, *etc.*).

104. AT&T's sales and marking materials state that, unless AT&T can verify a caller's identity through certain personal information, or a PIN, if requested by the customer, AT&T's policy is to not release any customer account information.

105. As described in this Complaint, AT&T failed to implement reasonable and appropriate security measures necessary to detect and prevent SIM Swap attacks and safeguard against unauthorized access to its customers' accounts. AT&T released Mr. Dellone's, and his family's, customer account information, including Mr. Dellone's CPNI, to unidentified scammers who did not provide, and could not have provided, the requisite PIN or valid identification information.

**II. Defendants Disclose And Abuse Plaintiff's Confidential Information To Pillage**

**His Coinbase Account, Robbing Him Of His Digital Privacy And Over $100,000**

106. Around 3:20 p.m. on December 14, 2021, while Mr. Dellone was asleep[6], one or more AT&T employees, representatives, or agents perpetrated a SIM Swap attack on Mr. Dellone.

107. In the SIM Swap attack, AT&T and/or DOES 1-50 (scammers): **(i)** obtained unauthorized access to Mr. Dellone's and his family's AT&T wireless services account; **(ii)** viewed Mr. Dellone's confidential and proprietary personal and customer information, including his CPNI, without his or his family's permission; **(iii)** changed the phone number associated with his mobile phone from his device to a device controlled by the DOES 1-50 (scammers and/or hackers); **(iv)** unlawfully seized and transferred control over his AT&T wireless mobile phone service; **(v)** aided and abetted the theft and fraud on Mr. Dellone, or conspired to commit theft and identity fraud on Mr. Dellone; and **(vi)** participated or assisted in the theft of Mr. Dellone's property, data, money, and information, in exchange for payment.

**A. Coinbase Facilitates Dozens of Unauthorized Transactions and Account Changes, Then Demands Plaintiff "Reimburse" Coinbase for Illicit Purchases**

108. Around 3:30 p.m. PST on December 14, 2021 (shortly after AT&T unlawfully swapped Mr. Dellone's SIM card), unidentified individuals (scammers/hackers; DOES 1-50) gained unauthorized access to Mr. Dellone's Coinbase account and the Coinbase Platform, without Mr. Dellone's knowledge, consent, or permission, and through no fault of his own.

109. Upon logging into Mr. Dellone's Coinbase account, the Doe Defendants (hackers) immediately initiated twenty-five (25) consecutive transactions, twenty-three (23) of which were initiated in a span of less than ten minutes. Coinbase swiftly approved and facilitated each of the fraudulent transactions initiated or requested by the hackers.

110. Initially, Coinbase converted twenty-one (21) of Mr. Dellone's unique crypto-assets into "digital dollars," which Coinbase deposited into Mr. Dellone's Coinbase-hosted "U.S. Dollar Wallet." Using the digital dollars, and approximately $17,000 that was already sitting in Mr. Dellone's "U.S. Dollar Wallet" prior to the breach, Coinbase then converted all of Mr. Dellone's digital dollars (over $70,000 worth) into Bitcoin ("BTC"). Coinbase credited the newly-

[6] Mr. Dellone routinely sleeps during daytime hours because he works the nightshift in an Intensive Care Unit.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

purchased BTC to Mr. Dellone's Coinbase-hosted "Bitcoin Wallet," which, before the breach, contained over 0.5 BTC.

111. Coinbase proceeded to allow the hackers to use Mr. Dellone's online bank account (or mobile bank card), which was accessible to Coinbase and connected to the Coinbase Platform, to purchase approximately $1,000 worth of BTC, which Coinbase credited to Mr. Dellone's Coinbase-hosted Bitcoin Wallet as well.

112. Within minutes of consolidating virtually all the assets in Mr. Dellone's Coinbase account into Bitcoin, Coinbase transferred the full balance of Mr. Dellone's Coinbase-hosted Bitcoin wallet (over 2.05 BTC, worth about $100,000 at the time) to a pseudonymous off-Platform Bitcoin Wallet (Defendant *2.05698427 BITCOINS*)—all in a single, irreversible, and unmistakably unauthorized electronic fund transfer.

113. The public key Wallet address for the off-Platform Bitcoin Wallet to which Mr. Dellone's BTC was transferred is: ***bc1qjp79ak6fxm4h7j0tsrwqx2n2k4tcqqveqxrvgm*** (the "***bc1 Wallet***").

114. Prior to receiving the BTC from Mr. Dellone's Coinbase account, the ***bc1 Wallet*** had no transaction history (*i.e.*, no transactions had ever been sent to, or from, that Wallet), and the ***bc1 Wallet*** had never been associated with Mr. Dellone, or his Coinbase account, in any way whatsoever.

115. According to the Bitcoin blockchain's publicly-accessible ledger, at 11:44 pm UTC (3:44 pm PST), the ***bc1 Wallet*** received bitcoins from a Bitcoin Wallet identifiable by the public key address, *3DcopM3iaoL2siD3BgGpGoENFwa5anJoKj* (hereafter, the "Hot Wallet"), in a transaction involving 91 recipient Bitcoin Wallets (including the ***bc1 Wallet***), which collectively received a total of 4.98976442 BTC. The transaction ID for this transaction is: *dbaba1aad772b7e62995668f69ddf73d4d20031f5fe15cd4d23a618e831c1fe1*.[7]

116. Coinbase controlled the Hot Wallet, which sent the ***bc1 Wallet*** the transaction that included Mr. Dellone's stolen BTC (*i.e.*, the transaction with the Bitcoin blockchain transaction ID: *dbaba1aad772b7e62995668f69ddf73d4d20031f5fe15cd4d23a618e831c1fe1*).

---

[7] See, *e.g.*, Blockchair.com (blockchain explorer), https://blockchair.com/bitcoin/transaction/dbaba1aad772b7e62995668f69ddf73d4d20031f5fe15cd4d23a618e831c1fe1

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

117.    When the Doe Defendants logged into to Mr. Dellone's account and initiated each of the unauthorized digital currency exchanges on the Coinbase Platform, Coinbase collected user data, in real-time, associated with the fraudulent activity, including data showing: **(i)** the devices used to access Mr. Dellone's Coinbase account had Device IDs that had never previously accessed his account, including an iPhone 6—a device six generations older than Mr. Dellone's iPhone 12, which Coinbase had previously authenticated, and which Mr. Dellone had been consistently using to access his Coinbase account for almost a year prior to the breach; **(ii)** the hackers' access devices were connected to a virtual private network ("VPN")[8] hosted by a European-based network service provider, "M247 Ltd.", with a notoriously sketchy reputation[9]; and **(iii)** the geolocations of the IP addresses used by the hackers were traceable to Florida and New York.

118.    Not once did Mr. Dellone ever log into his Coinbase account using a VPN. In his eight years as a loyal Coinbase customer, Mr. Dellone consistently logged into his Coinbase account using familiar U.S.-branded internet and wireless service providers and networks.

119.    Since he opened his Coinbase account in late 2013, Mr. Dellone consistently accessed his Coinbase account from devices with unmasked IP addresses traceable to California. Mr. Dellone has never accessed his account from Florida or New York, and Coinbase had eight years' worth of information showing as much.

120.    In all his time as a Coinbase customer, Mr. Dellone had never once sent any of his digital currencies off the Coinbase Platform.

121.    Still, notwithstanding the troves of data Coinbase had collected from and about Mr. Dellone, purportedly for "security" purposes, Coinbase did not timely address, and apparently failed to even detect the parade of obviously fraudulent transactions characterized by exceptionally suspicious user data associated with individuals who made virtually zero effort to disguise their illicit acts and intentions.

---

[8] A VPN conceals the true IP address used by a device by redirecting the device's network connection through a remote server run by a VPN host, which essentially assigns the device a new IP address.

[9] See, *e.g.*, F5 Labs, *Cyber Threats Targeting Europe, Winter 2019*, https://www.f5.com/labs/articles/threat-intelligence/cyber-threats-targeting-europe--winter-2019 ("U.K. Internet infrastructure services provider M247 Ltd., with IP addresses geographically located in Switzerland, launched the most attack traffic directed toward systems in Europe, characterized by aggressive port scanning.") (accessed April 17, 2023).

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

122. In under 20 minutes, Coinbase facilitated more transactions for the hackers (DOES 1-50) than it had facilitated for Mr. Dellone in the preceding several months *combined*, despite the unprecedented transactional activity and data distinctly indicative of a SIM Swap attack and reeking of egregious fraud on the Coinbase Platform.

123. In the face of nearly a decade's worth of Mr. Delone's user information and behavioral data Coinbase maintained on Mr. Dellone, and in spite of the stark contrast between Mr. Dellone's Coinbase identity profile and hackers' data and behaviors on the Coinbase Platform, Coinbase irrevocably sent nearly the entire balance of Mr. Dellone's Coinbase account to an off-Platform Bitcoin Wallet that had no prior transaction history (about which Coinbase had no, or essentially no information), all in a single, irrevocable, and near-instantaneous peer-to-peer financial transaction worth more than the average American's annual salary.

124. No reasonable person—and certainly no regulatorily-compliant financial institution, Money Services Business, or custodial Wallet provider—in Coinbase's position would have approved or effectuated such a high-risk off-Platform transaction from Mr. Dellone's account, especially considering the eight-years-worth of data showing the off-Platform Bitcoin transfer was the first of its kind initiated from Mr. Dellone's account.

125. By facilitating the unauthorized transactions using Mr. Dellone's Coinbase account, Coinbase collected more than $300 *per minute*, on average, in transaction fee revenue.

126. By 3:50 p.m. PST on December 14, 2021, just a half hour after AT&T SIM swapped Mr. Dellone, Mr. Dellone's Coinbase account was utterly decimated.

127. Shockingly, Coinbase continued to facilitate the plundering of Mr. Dellone's privacy and digital assets, and worse, took actions that have further prevented him from mitigating his harms.

**1. Coinbase Approves More Bogus Transactions and Critical Account Changes**

128. Without instituting a 48-hour delay (or even a 48-minute delay) pursuant to the suspicious activity on Mr. Dellone's account, Coinbase approved the hackers' requests to make critical changes to Mr. Dellone's Coinbase account and identity profile, facilitating unauthorized transactions, and flouting its explicit legal duties and promises it made to Mr. Dellone.

129. Coinbase proceeded to approve and effectuate the hackers' requests to: **(i)** change the

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

email address associated with Mr. Dellone's Coinbase account; **(ii)** change the 2FA settings for his account; **(iii)** add a new phone number—a Voice-Over-Internet-Protocol (or "VOIP")[10] phone number, with a Montana area code—to his account; **(iv)** verify the VOIP number as the primary phone number for his account; **(v)** establish a new 2FA authentication mechanism for his account; **(vi)** remove Mr. Dellone's email address from his Coinbase account and digital identity profile; and **(vii)** remove his phone number from his account and digital identity profile.

130. No reasonable person in Coinbase's position would have approved the account changes DOES 1-50 requested because, not only were these changes highly suspicious based on the context, they were entirely unprecedented. The hackers requested to change the phone number, email address, and 2FA settings for Mr. Dellone's account, all at once, *for the first and only time in eight years*, while (or shortly after) transferring a six-figure U.S. dollar sum's worth of Bitcoin out of his account to an off-Platform Wallet—something Mr. Dellone has never done—using previously-unauthorized access devices with masked IP addresses linked to locations across the country from where Mr. Dellone had consistently accessed his account for nearly a decade.

131. After (or while) Coinbase approved the unauthorized account changes initiated (requested) by DOES 1-50, Coinbase approved and facilitated additional fraudulent electronic fund transfers and purchases using Mr. Dellone's Coinbase account.

132. Once again, Mr. Dellone's bank information was used to purchase approximately $200-worth Bitcoin. And again, Coinbase deposited the newly-purchased BTC in Mr. Dellone's Coinbase-hosted Bitcoin wallet, then transferred the BTC out of Mr. Dellone's account.

133. Coinbase also sent a cryptocurrency called "BSV" from Mr. Dellone's Coinbase-hosted BSV wallet to an off-Platform BSV Wallet, identifiable by the BSV public key Wallet address, ***14goHFL8GGyuKCvbFtGW9PqQ5Urspwn9uu***. Like the ***bc1 Wallet***, the off-Platform BSV Wallet had no prior connection to Mr. Dellone, or to his Coinbase account.

---

[10] See, *e.g.*, Federal Communications Commission, *Voice Over Internet Protocol (VOIP)*, https://www.fcc.gov/general/voice-over-internet-protocol-voip ("Voice over Internet Protocol (VoIP), is a technology that allows you to make voice calls using a broadband Internet connection instead of a regular (or analog) phone line. . . . VoIP can allow you to make a call directly from a computer, a special VoIP phone, or a traditional phone connected to a special adapter.")

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

134. Coinbase no longer supports BSV transactions or hosts BSV on the Coinbase Platform.[11]

**2. Plaintiff's Digital Asset Losses**

135. Coinbase collected at least $1,947.35 in transaction fees from Mr. Dellone's Coinbase account resulting from the unauthorized transactions Coinbase facilitated with his account.

136. Below is a table summarizing the known funds, assets, and digital currencies wrongfully exchanged and stolen from Mr. Dellone on December 14, 2021.

| | ***Table A*** "Digital Currencies Formerly in Plaintiff's Coinbase Account" | |
|---|---|---|
| | **Token** | **Number of Tokens** |
| 1 | ETH | 6.60611257 |
| 2 | LTC | 88.59916563 |
| 3 | ETC | 170.5156815 |
| 4 | CTSI | 1,931.78 |
| 5 | ADA | 637.4547 |
| 6 | ZRX | 804.0188919 |
| 7 | LINK | 122.1935986 |
| 8 | ANKR | 6,215.40 |
| 9 | LCX | 3,254.52 |
| 10 | SUKU | 4,161.78 |
| 11 | XTZ | 93.53412 |
| 12 | SHIB | 37,479,605.75 |
| 13 | EOS | 102.3689 |
| 14 | XLM | 1,021.82 |
| 15 | DNT | 1,955.06 |

[11] According to an email Coinbase sent to its customers on November 6, 2023: "Effective January 9, 2024, Coinbase will no longer support Bitcoin SV (BSV). . . . If you fail to withdraw your BSV funds, Coinbase will liquidate any BSV remaining in your Coinbase account. Upon liquidation, your BSV will be converted to the then-equivalent market value of another supported digital asset and credited back to your account, minus any transaction costs. . . . If you do not withdraw your BSV by January 9, 2024, you may incur tax liability or have other unanticipated tax consequences as a result of the liquidation or conversion and you are solely responsible for any taxes associated with transactions on Coinbase."

| | | |
|---|---|---|
| 16 | ASM | 2,750.43 |
| 17 | MATIC | 199.0150769 |
| 18 | BAT | 143.7168994 |
| 19 | OMG | 1.17787025 |
| 20 | TRAC | 204.2707539 |
| 21 | CVC | 346.1700191 |
| 22 | BTC | 2.05698427 |
| 23 | BSV | 1.72706484 |
| 24 | USD | 17,090.19 |

*(Table A: "Digital Currencies Formerly in Plaintiff's Coinbase Account")*

**3. Plaintiff Reports Fraud to Coinbase; Coinbase Tries to Deceive and Swindle Plaintiff, and Obstructs Plaintiff's Efforts to Recover His Assets**

137. Around 5:30 p.m. PST on December 14, 2021, Mr. Dellone woke up to get ready for work. When he opened the Coinbase application on his phone, he saw his Coinbase account had a $241 balance—nearly $100,000 less than when he went to sleep a few hours prior. Mr. Dellone called Coinbase and reported the fraud.

138. In response to Mr. Dellone's call, Coinbase opened a "support ticket" and sent Mr. Dellone an email (the "Recovery Email") explaining how to disable a 2FA mechanism and restore SMS 2FA on his Coinbase account.

139. The Recovery Email advised that Mr. Dellone must observe a 24-hour waiting period before Coinbase would restore his access to his Coinbase account.

140. On information and belief, Coinbase sent a copy of the Recovery Email to one or more DOES 1-50; and for at least several hours, if not days, Coinbase's "Support Team" communicated directly with the hackers, transmitting confidential and sensitive information to the hackers relating to Mr. Dellone's Coinbase account, intended for Mr. Dellone.

141. Mr. Dellone did not receive an update from Coinbase on the status of his account until two days after his account was breached. On December 16, 2021, Coinbase sent Mr. Dellone an email, which read, in substantive part: "***Our team has been able to successfully transfer the***

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

***balance from your old account to your new one. You should be able to access these funds immediately***." (Emphasis added.)

142. Since Mr. Dellone had not opened a "new" Coinbase account or (prior to Coinbase's December 16 email) received any information from Coinbase about a "new" account, Mr. Dellone replied to the email seeking clarity. When Coinbase did not respond in a reasonably timely manner under the circumstances, Mr. Dellone submitted another support ticket.

143. On December 17, 2021, Coinbase sent Mr. Dellone an email, which read, in part:

> Your Coinbase account is currently restricted due to an owed balance caused by an unsuccessful payment for a transaction that was credited to your Coinbase Digital Wallet. Per the terms of the User Agreement, you are responsible for the owed balance in your Coinbase account.

144. Mr. Dellone replied to Coinbase's December 17 email, explaining that the most recent transactions on his Coinbase account were fraudulent, and that Coinbase had already opened a support ticket regarding the fraud (in response to Mr. Dellone's call). He also explained that, despite Coinbase's previous email concerning a balance of funds purportedly transferred to his account, he did not see any amount credited to his account.

145. One of Coinbase's so-called "support" agents replied to Mr. Dellone via email. The support agent acknowledged that Mr. Dellone's account "may have been compromised and unauthorized activity occurred." Nevertheless, the agent informed Mr. Dellone that Coinbase had revoked his access to his account "due to reversed transactions with your bank and an outstanding balance owed to Coinbase." The support agent's email also stated that Coinbase would not "reimburse or credit" Mr. Dellone for "this outstanding balance owed to Coinbase," and that Coinbase would not consider restoring his access to his account until he "first resolve[s] the outstanding balance owed to Coinbase."

146. On December 23, 2021, Coinbase emailed Mr. Dellone, stating, "To complete our security review, we need to verify your identity. Please upload a dated 'ID Selfie' that shows your face and ID, both clearly visible, with you holding a piece of paper that reads 'For Coinbase Verification' and has today's date." The email included a link to Coinbase's purportedly "secure"

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

online SendSafely portal. The email instructed Mr. Dellone to upload his "ID selfie" to the SendSafely portal and complete the identity verification process using "the same email address that you used for this support case." According to the email, "After we [Coinbase] receive your [Mr. Dellone's] ID Selfie, we'll review it and get back to you."

147. Mr. Dellone completed Coinbase's ID Selfie procedure per Coinbase's instructions.

148. On December 27, 2021, Mr. Dellone emailed Coinbase to advise that he had completed the identification verification process according to Coinbase's ID Selfie procedure instructions.

149. In January 2022, Coinbase demanded that Mr. Dellone "reimburse" Coinbase for a "negative balance of 1,171.66 USD" on his Coinbase account, which, allegedly, is "due to bank returns of two transactions" affecting his account. According to Coinbase, Mr. Dellone "will need to reimburse Coinbase for that negative balance in order to regain use of the account and Coinbase's services."

150. Despite Mr. Dellone's diligent attempts to communicate with Coinbase's "Support Team" and verify his identity, Coinbase never restored Mr. Dellone's access to his account.

151. Plaintiff has demanded that Coinbase restore his access to his account on numerous occasions, as his access to his account permits him to verify and, if necessary, correct his Coinbase account data, submit information and data requests, and close his account.

152. Plaintiff has repeatedly demanded that Coinbase share records relevant to the fraudulent activity on his account, and his Coinbase account data, with him. Plaintiff is entitled to his account data under California law, and in general, Plaintiff's ability to access his full Coinbase account data and relevant records pertaining to the actions on his account are necessary for him to discern whether, how, and from whom he may pursue recovery.

153. Coinbase has suggested it has no obligation to provide Plaintiff the information Plaintiff has requested, and has stated that it is only "providing . . . information as a courtesy."

154. Coinbase also informed Plaintiff that, although Coinbase has allegedly communicated and "fully cooperat[ed]" with a law enforcement agency's investigation regarding the conversion and transfer of assets from his account, "the law enforcement agency has asked that we [Coinbase] not communicate with you [Plaintiff] regarding their [the agency's] involvement."

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

155. Except for information in the possession of AT&T and any law enforcement or government agencies that have investigated the SIM Swap attack and breach of Coinbase's Platform affecting Plaintiff's assets, Coinbase maintains and controls virtually all relevant information concerning the loss of Plaintiff's property and the breach of his Coinbase account.

156. On information and belief, Coinbase's decision to lock Plaintiff out of his account and prevent him from accessing relevant information and his account data is part of a strategically coordinated endeavor intended to avoid all liability for the harms and losses it caused Plaintiff.

157. Coinbase has advised Plaintiff that, in its view, "[u]nder the contractual agreement between Coinbase and Mr. Dellone," Mr. Dellone is "100% responsible for the activity or actions that resulted in the alleged negative balance" on his account, and Coinbase has "no liability" to Plaintiff for the "alleged compromise" of his account.

**III. Coinbase Caused Plaintiff's Losses By Leaking His Credentials, Ignoring Security Flaws, And Equipping Hackers With Tools To Loot His Account**

158. In spite of plentiful opportunities and simple, cost-effective measures available to Coinbase, which would have prevented the harms and losses Mr. Dellone has sustained, Coinbase failed to take reasonable steps to improve its inadequate customer authentication and credential management practices, sufficiently monitor its Platform, or address known attack vectors on its Platform previously exploited by bad actors.

159. Coinbase's failure to address the causes and risks posed by well-documented breaches of the Coinbase Platform[12] and known the SIM Swap attack vectors used by malicious hackers to target its customers[13] resulted in Mr. Dellone becoming a target and victim of unsolicited and harmful privacy intrusions, phishing attempts, highly-specific and unwanted advertisements, account breaches, exposure and exfiltration of his confidential, sensitive, and private personal and financial data, and other privacy violations further described herein.

---

[12] *See*, *e.g.*, ZDNet, *Coinbase sends out breach notification letters after 6,000 accounts had cryptocurrency stolen*, https://www.zdnet.com/article/coinbase-sends-out-breach-notification-letters-after-6000-accounts-had-funds-stolen/ (published October 1, 2021).

[13] *See*, *e.g.*, TechCrunch, *Coinbase vulnerability is a good reminder that SMS-based 2FA can wreak havoc*, https://techcrunch.com/2017/09/18/ss7-coinbase-bitcoin-hack-2fa-vulnerable/ (published Sept. 17, 2018).

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

160. Coinbase emboldened malicious actors, and a host of other third-parties ranging from marketing companies and data brokers to scammers and hackers, by maintaining an easily-exploitable website and API service, leaking its customers' "user credentials" to the public, and by recklessly offering its "developer tools" to insufficiently verified and disreputable individuals who utilized the Coinbase's products and services to target and pillage its customers' accounts.

161. Further, on information and belief, having determined that the costs of appropriately responding to the fraud reported by Plaintiff and other similarly-situated customers (victimized by SIM Swap attacks) were outweighed by the benefits of reporting the transaction fee revenue it generated by facilitating unauthorized or potentially fraudulent transactions on its Platform, Coinbase's decisionmakers implemented policies to prevent or discourage its employees from taking reasonable actions that would have prevented or substantially mitigated the harms and losses Mr. Dellone has incurred and will continue to incur for the remainder of his life.

**A. Coinbase Emboldened Hackers by Disregarding Dangerous, Easily-Reparable, and Widely-Recognized Attack Vectors on Its Platform**

162. The credentials necessary to log into a Coinbase account include an email address, a password, and a 2FA (or multi-factor authentication) mechanism.

163. For years, Coinbase's website leaked the email addresses and partial phone numbers used by its customers to log into their Coinbase accounts.

164. Coinbase exposed its customers' Coinbase-specific email addresses to the public, in plain-text form, by programming its automated webpage response forms to indiscriminately confirm whether a particular email address submitted to Coinbase's "sign up," or "log in" forms were already being used by Coinbase as an existing customer's valid "credentials." For example, Coinbase would respond to "sign up" (account creation) requests submitted through its website by either proceeding with the account creation process, which requires entry of an email address, or by divulging the existence of an account that uses the submitted email address as a credential.

165. Coinbase knew or should have known that confirming whether its existing customers use particular email addresses as log-in credentials for their Coinbase accounts presented severe and unacceptable risks to its customers and its customers' privacy and digital property.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

166. The risks inherent in exposing customers' credentials on Coinbase's publicly-accessible webpages are risks Coinbase customers could not sufficiently mitigate without knowing said risks exist and, accordingly, changing the email addresses associated with their accounts.

167. For several years before Mr. Dellone's Coinbase account was raided, Coinbase did not notice, or failed to address the dangers posed to its customers by this bug in Coinbase's Platform, and Coinbase failed to repair or disclose the risks presented by its persistent leaking of its users' credentials as a result of this bug. In turn, many Coinbase customers, including Mr. Dellone, were subject to heightened risks of targeted attacks on their Coinbase, mobile phone services, and other online accounts.

168. Coinbase could have easily reprogrammed its vulnerable webpages so that the automated responses were consistent with industry standard best practices or guidelines issued by the National Institute of Standards and Technology ("NIST"), or in a manner that, at least, would not expose its customers' account-specific email addresses to any individual's request (or, conceivably, any automated software or machine's request) to sign in to the Coinbase Platform.

169. For instance, Coinbase could have programmed its webpages to respond to account creation requests with, "Please check your email for further instructions," which is a response that does not divulge whether an email address is being used as a Coinbase account credential.

170. As a custodian of peer-to-peer transferable financial assets, Coinbase was required to address the bug in its Platform and webpage response forms (*i.e.*, indiscriminately disclosing or confirming its customers' valid Coinbase-specific credentials) because this bug allowed bad actors to repeatedly target and breach its Platform and many of its customers' accounts.

171. On information and belief, one or more of DOES 1-50 submitted Mr. Dellone's email address to Coinbase's webpage, attempting to "sign up" or "log in" to Mr. Dellone's Coinbase account using his specific email address, and Coinbase responded to the requests by confirming that Mr. Dellone used that specific email address as his Coinbase account credential.

172. The same webpage response form vulnerability (or bug) that exposed Coinbase customers' email addresses also exposed Coinbase customers' partial phone numbers. The bug allowed bad actors, including the Doe Defendants, to use email addresses previously identified

THE LAW OFFICE OF ETHAN MORA

1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

or verified by Coinbase as valid Coinbase customer credentials, to confirm—directly with Coinbase—the phone numbers used by Coinbase and its customers, in combination with the email addresses previously confirmed by Coinbase, as credentials to "secure" customer accounts.

173.    For example, when a Coinbase customer's email address was used to submit an account reset or 2FA bypass request on Coinbase's website, Coinbase would respond by revealing the final digits of the specific phone number associated with the specific email address submitted to Coinbase's webpage form; Coinbase would also indicate that it (Coinbase) had sent a text message regarding the requested account access to that phone number.

174.    As early as May 2021, Coinbase knew that the email addresses it had leaked through its webpage vulnerability were being actively exploited by hackers to identify, confirm, and obtain unauthorized control over mobile phone numbers and the mobile phone "credentials" that Coinbase and many of its customers, including Mr. Dellone, used to secure Coinbase accounts, and in particular, accounts using SMS-based 2FA.

175.    On information and belief, one or more of DOES 1-50 attempted to reset the password, or submitted "forgot password" requests on Coinbase's webpages, Platform, and/or using Coinbase's application programming interface ("API") by utilizing the email address associated with Mr. Dellone's Coinbase account—which the Doe Defendants had previously confirmed, directly with Coinbase, as the valid Coinbase account email address "credential" used for his account—and Coinbase responded to the Doe Defendants' requests, not only by disclosing Mr. Dellone's partial mobile phone number, but also by confirming that Mr. Dellone and Coinbase used SMS 2FA as a means to access, or permit access to, his Coinbase account.

176.    On information and belief, Coinbase's disclosure of a portion of Mr. Dellone's mobile phone number allowed the Doe Defendants to confirm which phone number Mr. Dellone and Coinbase used as a "credential" for Mr. Dellone's Coinbase account, which permitted the Doe Defendants to begin targeting Mr. Dellone's AT&T wireless services account, or provided important information DOES 1-50 needed to orchestrate the SIM Swap attack on Mr. Dellone.

177.    On information and belief, DOES 1-50 utilized Coinbase's "developer tools" and capitalized on Coinbase's irresponsible "rate limits" to brute force Mr. Dellone's Coinbase

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

account password by submitting repetitive guesses through Coinbase's API, which, due to Coinbase's design of its Platform, did not trigger a lockdown of Mr. Dellone's account or protect his account from the incessant and ongoing attempts to gain unauthorized access to his account.

178.    "Rate limits" are a software feature used by web-based service providers to control the rate at which the provider processes the requests sent to, or received by, the provider's network or application program interface controller.

179.    Coinbase permits users of its "developer tools" to submit requests on the Coinbase Platform (*e.g.*, using Coinbase's API), at rate limits up to or exceeding 100 requests per second.

180.    Considering the nature of Coinbase's business and the irreversible nature of certain cryptocurrency transactions Coinbase regularly facilitates, Coinbase's "rate limits" on log-in attempts, transaction requests, and other actions available to users of Coinbase's Platform, and specifically to users active in Coinbase's "developer" environment, are, and between January 2018 and March 2022 were, ineffective or unreasonably enforced by Coinbase.

181.    The unreasonableness of Coinbase's rate limit policies and irresponsible enforcement of its related security policies is evident in the information reflected in the "events" log for Mr. Dellone's account, which shows that, in the hours leading up to the raid and plundering of Mr. Dellone's account, devices apparently in Russia, Oman, Turkey, the Philippines, and other locations tried to log into Mr. Dellone's Coinbase account over forty (40) different times—and thirty-two (32) of those attempts were made in a span of less than two minutes.

182.    Additionally, on information and belief, Coinbase allowed DOES 1-50 to access to Mr. Dellone's Coinbase account both while Mr. Dellone had access to his account, and after Coinbase had locked Mr. Dellone out of his account.

183.    Mr. Dellone has never used Coinbase's developer tools, nor has he ever accessed or permitted access to his Coinbase account information through Coinbase's API. To the extent Coinbase's API or developer tools were used to access or take actions on or using Mr. Dellone's account, bank information, digital currencies, or digital currency wallets, Coinbase knew or should have known that said activity was highly suspicious and very likely unauthorized.

184.    On information and belief, before December 14, 2021, Doe Defendants used Coinbase's

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

API and "developer tools," and took advantage of Coinbase's laissez-faire "developer environment" and the account data Coinbase had leaked to the public, to identify Mr. Dellone's Coinbase account as an account was worth attempting to breach. Specifically, Doe Defendants used Coinbase's API and developer tools to verify Mr. Dellone's Coinbase account data and check the balance of funds stored in (or associated with the digital currency wallets in) Mr. Dellone's Coinbase account, before attempting to gain access to his account by carrying out the SIM Swap attack described herein.

185. On information and belief, DOES 1-50 would not have attempted to execute a SIM Swap attack on Mr. Dellone had Coinbase not previously confirmed or otherwise provided the Doe Defendants with the Mr. Dellone's email address and digits of Mr. Dellone's AT&T-provided phone number, both of which were associated with Mr. Dellone's Coinbase identity profile and used as credentials by Coinbase to permit access to its Platform and to Mr. Dellone's account.

186. On information and belief, one or more AT&T employees, agents, and/or representatives acting within the scope of their employment with AT&T while subject to AT&T's oversight and control, facilitated or aided in the SIM Swap attack on Mr. Dellone, intending to gain, or permit, or recklessly participating in, the unauthorized takeover of Mr. Dellone's Coinbase account.

187. In and before December 2021, Coinbase knew that SMS-based 2FA mechanisms substantially lower the barrier to using the Coinbase Platform, making it easier for consumers to use Coinbase services, thereby increasing the rate at which Coinbase's users can generate transaction fees on the Coinbase Platform, as compared to more laborious or less familiar hardware-based and third-party application-based forms of multi-factor authentication, which can often slow down the rates at which Coinbase's customers initiate or approve transactions.

188. On information and belief, because Coinbase Global generates an overwhelming proportion of its revenue from CBI's transactions fees, Coinbase, through the policies established and/or implemented by its executives and decisionmakers, made conscious business decisions to prioritize revenue generation and profits by sacrificing the security of its customers and its customers' assets by continuing to allow SMS-based text messaging as a form of 2FA on the Coinbase Platform, knowing that CBI did not have the resources, staffing, or tools necessary to

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

reasonably protect its customers' assets as if those assets were Coinbase's own.

189. Coinbase allowed SMS-based 2FA on its Platform, even though Coinbase knew or should have known, in December 2021, that Coinbase's webpage vulnerabilities, inability to monitor and respond to fraud on its Platform, and lax oversight of actions taken by users on its Platform, consistently exposed its customers who used SMS 2FA with their Coinbase accounts to increased risks of potentially devastating and irrecoverable privacy and property losses—which are risks that Coinbase's customers could not comprehend, or could not sufficiently appreciate, because Coinbase has withheld relevant information, including information that would have implored its customers, including Mr. Dellone, to change the email addresses and phone numbers associated with their accounts, given that Coinbase leaked those credentials, or portions thereof, to the public for years, unbeknownst to Mr. Dellone and many other consumers.

**B. Coinbase Allows Use of VOIP Numbers on Its Platform, Diminishing Victimized Customers' Prospects of Identifying and Pursuing Criminal Hackers**

190. VOIP service providers issue phone numbers that do not require a physical phone. Unlike traditional phone numbers, which are associated with physical phones connected to IMEI numbers registered and tracked by the mobile phone service provider, VOIP phone numbers can be utilized by virtually any internet-connected device (not just by a physical mobile phone with a registered IMEI number), and even by multiple devices simultaneously.

191. Devices using VOIP numbers do not make use of cellular telecommunications networks. Instead, devices using VOIP phone numbers make calls and send and receive text messages using internet (not cellular) wireless service connections. VOIP phone numbers can also be used with VPNs to further obscure the location and identification characteristics of the device or devices using a VOIP phone number. For these reasons, VOIP numbers can be exceptionally difficult to link to a specific device and device user's identity, as VOIP phone numbers are typically not associated with a Device ID registered by a wireless service provider or with a carrier network.

192. VOIP phone numbers can also be used as a means to protect against SIM Swap attacks, as SIM Swap attacks depend on the hackers' or scammers' ability to work with, or trick a common carrier wireless telecommunications provider's employees, representatives, or agents

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

into transferring control of a carrier subscriber's phone number. Unlike with phone numbers provided by common carriers, the users of VOIP phone numbers often have at least some degree of control over, and insight as to which devices use the phone number.

193. Coinbase has claimed that it does not allow users of its Platform to use VOIP phone numbers as a form of credential on its Platform. *See, e.g.,* Coinbase, *Set up two-step verification – Add a Phone Number*, https://www.coinbase.com/setup/phone ("For your security, Coinbase does not accept VOIP phone numbers.").

194. Nonetheless, Coinbase consistently permitted customer accounts to be created and used with VOIP phone numbers on its Platform, without implementing or enforcing reasonable measures to address the evident risks to its customers imposed thereby.

195. As early as 2019, Coinbase knew or should have known that bad actors frequently use VOIP phone numbers to make themselves harder to identify and track when committing unlawful acts, like theft and money laundering, using online financial accounts "secured" with phone-based identity authentication mechanisms permitted by the financial account providers.

196. The ability to use VOIP numbers with Coinbase accounts on the Coinbase Platform provided malicious actors low- or no-cost means to conceal their identities while exploiting the phone-based user authentication processes Coinbase enabled and used to verify its customers.

197. However, because Coinbase falsely represented that it does not allow the use of VOIP numbers with Coinbase customer accounts, innocent customers, like Mr. Dellone, have borne the brunt of substantial cybersecurity risks and consequences that they could not have known when they believed Coinbase's representations and used or continued using their non-VOIP phone numbers as credentials and authentication mechanisms for their Coinbase accounts.

198. Had Coinbase prevented DOES 1-50 from using a VOIP number (or numbers) with Mr. Dellone's Coinbase account, Mr. Dellone would likely have been able to identify and track the perpetrators involved in the breach of his account by the Device IDs associated with physical device(s) used by the Doe Defendants to pillage his account. A Device ID, like the IMEI number that would have been connected to the device associated with the Doe Defendants' Montana-based VOIP number, may have allowed Coinbase to locate and identify the Doe Defendants

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

because the wireless service carrier that would have provided the phone number would have also registered the device using the number, and recorded data linked to the network connection (including data associated with the device users' geolocation) the carrier provided for that device.

199. Mr. Dellone's prospects of identifying DOES 1-50 are now, because of Coinbase's misrepresentations and negligence relating to the use of VOIP numbers on its Platform, drastically lower than they otherwise would have been, had Coinbase banned the use of VOIP numbers as Coinbase had represented.

200. Notwithstanding Coinbase's misrepresentations, promises, and explicit duties to Mr. Dellone, Coinbase facilitated dozens of highly-suspicious transactions, initiated critical and prospectively irreprable changes to Mr. Dellone's digital identity profile data, and heedlessly transferred the entire balance of Mr. Dellone's online financial account (his Coinbase-hosted Bitcoin wallet) to a Bitcoin Wallet controlled neither by Mr. Dellone nor (apparently) by Coinbase, all in one irreversible, egregiously unauthorized peer-to-peer electronic fund transfer.

201. While Coinbase is by no means charged with preventing every cyberattack or scam targeting its customers' online accounts, the very nature of Coinbase's business as a financial institution that operates an online digital currency trading marketplace, and its perceived status as purportedly "the most trusted" custodial wallet service provider in the U.S., responsible for handling retail consumers' valuable digital data and property—specifically, financial assets that can be remotely, directly, and irretrievably transferred to and from virtually anywhere on earth—along with Coinbase's past experiences, industry knowledge, and the vast amount of resources and financing Coinbase has at its disposable, subject Coinbase to considerably higher standards of care than most online service providers (*i.e.*, those that do not take custody of, or bargain for the opportunity to take custody of, their customers' cryptocurrencies; those that do not facilitate transactions using their customers' funds, valuable assets, and bank account information to generate revenue based on facilitation of such transactions).

**IV. Related Criminal Investigation Supposedly Initiated By Department of Justice**

202. On or about January 6, 2022, Plaintiff filed a police report with the Fresno Police Department through the "CopLogic" online portal, and a criminal complaint with the Federal

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

Bureau of Investigation via the Internet Crime Complaint Center ("IC3") online platform, concerning the SIM Swap attack, computer fraud and abuse, privacy violations, and money and digital asset theft he experienced, as detailed in this Complaint.

203. On or about June 29, 2023, Mr. Dellone received a letter via email from the Department of Justice's U.S. Attorney's Office for the District of New Jersey, advising him that he had been identified as a "victim or potential victim during the investigation" of a criminal case initiated in the United States District Court for the District of New Jersey, *USA v. Katz*, Mag. No. 21-10413 (D.N.J.) (filed Dec. 9, 2021) (the "*Katz* case").

204. The facts of the *Katz* case are similar to the facts alleged in this Complaint. Attached to this Complaint and incorporated herein as "Exhibit D" is a true and correct copy of the criminal complaint filed by the Department of Justice in the *Katz* case.

205. On information and belief, Coinbase is referenced in the criminal complaint filed in the *Katz* case as, "Crypto Currency Exchange-1." Ex. D, at 5.

206. On information and belief, AT&T is referenced in the criminal complaint filed in the *Katz* case as, "Company-1." *Id.*, at 3-5.

207. In or around October 2023, an Assistant U.S. Attorney ("AUSA") for the U.S. Attorney's Office for the District of New Jersey informed undersigned counsel that, due to a "mistake," Mr. Dellone had been misidentified as a victim or potential victim in the *Katz* case; however, according to the AUSA, Mr. Dellone is a victim or potential victim in another criminal case, which (per the AUSA) is, or was, the subject of a grand jury investigation.

208. Plaintiff has been unable to determine the status of, or obtain information about, or discover any facts whatsoever related to the supposed criminal grand jury investigation, despite that he is apparently a victim or potential victim of one or more prospective crimes that would seem to be the subject of the purported investigation.

209. On November 28, 2023, pursuant to Plaintiff's status as a party in the instant litigation, Plaintiff's counsel (undersigned) submitted a third-party discovery (or "*Touhy*") request to United States Attorney's Office for the District of New Jersey, seeking documents and information concerning or relating to: **(i)** the Bitcoin Wallet with the public key address,

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

***bc1qjp79ak6fxm4h7j0tsrwqx2n2k4tcqqveqxrvgm***; **(ii)** Mr. Dellone's status as a victim or potential victim of one of more cyber-crimes; **(iii)** transactions involving Mr. Dellone's Coinbase account; and **(iv)** any SIM Swap attacks affecting Mr. Dellone's wireless communications service or mobile phone.

210. On December 4, 2023, a New Jersey-based AUSA advised Plaintiff's counsel, via email, that the U.S. Attorney's Office for the District of New Jersey District "has received your attached Touhy request regarding the Dellone litigation. . . . We are reviewing the request and will provide a response shortly."

211. Notwithstanding over a dozen instances of follow-up correspondence (all initiated by Plaintiff's counsel) between Plaintiff's counsel and the AUSA who stated that he is responsible for responding to Plaintiff's *Touhy* request—including telephone calls on December 5 and 8, 2023, and on January 2 and 9, 2024; and emails on December 5, 8, 11, 12, and 29, 2023, and January 2, 5, 8, and 18, 2024—no responses to Plaintiff's *Touhy* requests have been provided as of the filing of this Complaint.

212. Without cooperation, *Touhy* responses, or assistance from the Department of Justice, or information in the possession of AT&T and Coinbase regarding the SIM Swap attack and fraud on Mr. Dellone's Coinbase account, Plaintiff has no conceivable way to identify DOES 1-50.

## V. Enforcement Of Conflicting Arbitration Agreements Will Likely Result In Inconsistent Rulings, Or Prejudice Plaintiff's Ability To Seek Full Recovery

213. Both the AT&T Consumer Service Agreement, and at least one version of Coinbase's user agreement, contain terms pertaining to online cryptocurrency accounts and Plaintiff's use of AT&T's telecommunications equipment and services.

214. A true and correct copy of the "AT&T Consumer Service Agreement" is attached hereto and incorporated herein as "Exhibit A." The AT&T Consumer Service Agreement (the "AT&T Agreement") contains an arbitration provision. Ex. A, at p. 4.

215. Plaintiff does not dispute that some of his claims against AT&T are arbitrable. However, Plaintiff would likely be unable to obtain full, effective, and final relief on all his claims, or obtain enforceable, non-conflicting remedies binding DOES 1-50 and/or Coinbase pursuant to

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

the outcome of arbitration with AT&T.

216. Although Coinbase has indicated its intent to move to compel arbitration of Plaintiff's claims against Coinbase in the instant litigation, pursuant to the terms of a version of Coinbase's arbitration agreement, Plaintiff presently lacks information as to which (if any) version of Coinbase's arbitration provision and underlying user agreement Coinbase might seek to enforce.[14]

217. The arbitration agreement incorporated into the December 6, 2021 version of Coinbase's user agreement (the "December 2021 Agreement") is unenforceable as against Plaintiff; and even if it were, this Court (not an arbitrator) should determine whether Plaintiff's claims stated as against all Defendants are subject to arbitration, and if so, whether all parties to the instant litigation may be properly joined in hypothetical arbitration with Coinbase, in light of AT&T's distinct arbitration agreement and Plaintiff's pending arbitration with AT&T pursuant to the terms of the AT&T Agreement.

218. Coinbase is not a party to the AT&T Agreement attached hereto and incorporated herein as Exhibit A.

219. On information and belief, AT&T is not a party to any version of any valid arbitration agreement containing terms enforceable by Coinbase as against Plaintiff.

220. DOES 1-50 are not subject to any valid arbitration agreement containing terms enforceable by Coinbase as against Plaintiff.

221. Under California law, an arbitrator has no power to determine the rights and obligations of an entity or individual who is not a party to the arbitration agreement in question.

222. Furthermore, Plaintiff's right to obtain restitution, full compensatory damages, or replacement, or restoration of his assets, whether in the instant litigation, or in any criminal, administrative, or independent arbitration proceedings involving Coinbase, DOES 1-50, and/or

---

[14] Plaintiff's Original Complaint, filed September 26, 2023 (Doc. No. 1, "Original Complaint"), states allegations regarding the unenforceability of Coinbase's December 6, 2021 version of Coinbase's user agreement (the "December 2021 Agreement"); in the event Coinbase were to move to enforce that version of its agreement, Plaintiff in filing this First Amended Complaint, does not intend to entirely abandon his position regarding the unenforceability of that agreement. *See* Doc. No. 1, pp. 41 – 45 (at ¶¶ 274 – 298), and 75 – 81 (at ¶¶ 591 – 578).

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

AT&T would be impacted and potentially conflict with a prospective ruling by an arbitrator interpreting only the terms of the AT&T agreement, absent coordination, and rulings enforceable in those matters.

**A. AT&T's Arbitration Agreement Delegates Issues Of Scope and Enforceability to the Court; Plaintiff's Reservation of Rights**

223. On November 27, 2023, Plaintiff filed a statement of claim against AT&T and demand for arbitration with the American Arbitration Association ("AAA"), pursuant to AT&T's Consumer Services Agreement (the AT&T Agreement, Ex. A), stating claims herein alleged and additional claims supported by facts alleged in Plaintiff's statement of claim.

224. On December 29, 2023, AAA determined that Plaintiff had satisfied the requirements for initiating arbitration with AT&T per the terms of the AT&T Agreement.

225. On January 17, 2024, AAA confirmed receipt and filing of AT&T's answer to Plaintiff's statement of claim.

226. According to the AT&T Agreement, "All issues are for the arbitrator to decide, *except issues relating to the scope and enforceability of the arbitration provision or whether a dispute can or must be brought in arbitration are for the court to decide*." *See* Ex. A, p. 2 (¶ 1.3.2.3, "Arbitration Procedure") (emphasis added).

227. Plaintiff names AT&T as a defendant in this litigation to resolve issues concerning whether his claims may be fully and finally resolved in the pending arbitration with AT&T, and whether Plaintiff would be denied of his opportunity to obtain complete and effective relief against Coinbase and DOES 1-50 if he were to proceed in arbitration against AT&T under the terms of the AT&T Agreement.[15]

228. In naming AT&T as a defendant in the instant litigation, Plaintiff does not intend to waive any right of arbitration against AT&T.

229. To the extent Plaintiff's claims against AT&T are determined by this Court to be arbitrable under the scope of the AT&T Agreement, Plaintiff intends to move the Court for an order to stay further proceedings against AT&T in this action.

[15] Defendants, for example, may be held jointly and severally liable under certain claims Plaintiff alleges herein.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

**B. Plaintiff Did Not Agree to the Terms of Coinbase's User Agreement**

230. According to the "events log" for Plaintiff's Coinbase account, only two events are labeled "accepted user agreement": the first event is dated October 21, 2013 (the day Plaintiff opened his Coinbase account); the second even is dated June 1, 2014.

231. Plaintiff last logged into his Coinbase account on or around December 17, 2021.

232. The December 6, 2021 version of Coinbase's user agreement (referenced herein as the "December 2021 Agreement") states: "If Coinbase suspends or closes your account, or terminates your use of Coinbase Services for any reason, we will provide you with notice of our actions unless a court order or other legal process prohibits Coinbase from providing you with such notice."

233. Prior to Plaintiff's filing of his Original Complaint on September 26, 2023, no court order or legal process prohibited Coinbase from providing Plaintiff with notice that Coinbase had closed Plaintiff's Coinbase account.

234. The December 2021 Agreement also contains the following language:

> Your continued use of the Services after the posting of a Revised Agreement constitutes your acceptance of such Revised Agreement. If you do not agree with any such modification, your sole and exclusive remedy is to terminate your use of the Services and close your account.

235. Additionally, the December 2021 Agreement provides that Coinbase may:

> . . . amend or modify this Agreement by posting on the Coinbase Site or emailing to you the revised Agreement, and the revised Agreement shall be effective at such time. If you do not agree with any such modification, your sole and exclusive remedy is to terminate your use of the Services *and close your account*.

(Emphasis added.)

236. On January 31, 2022, Coinbase revised and made material changes to its user agreement. Coinbase posted the following statement on its website regarding the changes it made to its user agreement: "We revised our Arbitration Agreement, which explains what legal rights you have and what you can expect from us in case of any issues." Coinbase, *January 2022 Coinbase User*

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

*Agreement Update*, https://help.coinbase.com/en/coinbase/other-topics/legal-policies/coinbase-user-agreement-updates (accessed December 13, 2023).

237. On or about March 11, 2022, Plaintiff submitted a "Formal Complaint" to Coinbase's "Support team" using the appropriate form provided on Coinbase's website, which Plaintiff obtained from the following link: https://support.coinbase.com.

238. In July 2022, Coinbase informed Plaintiff that Coinbase "continues to have a commercial relationship" with Plaintiff.

239. Plaintiff never agreed to the revised terms of the "January 2022 Coinbase User Agreement" (the "January 2022 Agreement") or any subsequent version of Coinbase's user agreement.

240. To the extent Plaintiff assented to the terms of the December 2021 Agreement, Plaintiff's assent was the result of Coinbase's nondisclosure or concealment of pertinent facts and information concerning material terms of that contract.

241. Coinbase failed to inform Plaintiff that the only way to close his Coinbase account pursuant to the terms of the December 2021 Agreement is by logging into his Coinbase account, which requires that Coinbase actually provide him access to his account. Coinbase had a duty to inform Plaintiff of this contingency because Coinbase retains exclusive and unilateral control over whether Plaintiff can close his Coinbase account, and the language set out in the December 2021 Agreement (and preceding versions of Coinbase's user agreement) suggest that Coinbase customers can close their accounts simply by visiting a hyperlink provided in the user agreement.

242. The terms of the June 2014 version of the Coinbase user agreement (the "June 2014 Agreement"), and the December 2021 Agreement, both specify that continued use of Coinbase's "Services" after Coinbase has posted a "revised Agreement" constitutes a customer's "acceptance of such revised Agreement," and the sole and exclusive remedy for a customer who does not consent to any revised version of the user agreement is to close his or her account.

243. The terms of the June 2014 Agreement and the December 2021 Agreement state that Coinbase customers may close or cancel their accounts by "visiting https://www.coinbase.com/settings/cancel" (hereinafter, the "Cancel Hyperlink"). However,

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

unless a Coinbase customer is logged into his or her Coinbase account when visiting the Cancel Hyperlink, the Cancel Hyperlink redirects to Coinbase's "login" or "sign in" page.

244. Plaintiff has been unable to close or cancel his account by visiting the Cancel Hyperlink because Coinbase has prevented Plaintiff from logging into his Coinbase account.

245. From the moment Coinbase locked Plaintiff out of his Coinbase account and refused to restore his account access, Coinbase prevented Plaintiff from rejecting or accepting the terms of any revised versions of Coinbase's user agreement, including the January 2022 Agreement.

246. Coinbase also concealed the material fact that, as of December 6, 2021 and for several months if not years thereafter, Coinbase had neither the personnel, nor the resources or tools to investigate and address suspicious activity on its customers' accounts reported to Coinbase; and the fact that Coinbase had a substantial backlog of unresolved transaction monitoring alerts, which rendered untrue its representations concerning its compliance with, *inter alia*, FinCEN regulations and anti-money laundering and Know Your Customer laws, which were material to Plaintiff's willingness to continue using Coinbase's custodial (hosted) services.

247. The December 2021 Agreement and the January 2022 Agreement both contain a paragraph titled, "Access," but notably, the January 2022 Agreement omits the following language from the "Access" paragraph, which is present in the December 2021 Agreement:

> To access the Coinbase Services*, you must have the necessary equipment (such as a smartphone or laptop) and the associated telecommunication service subscriptions to access the Internet*.

(Emphasis added.)

248. To the extent the language omitted from the "Access" paragraph in the January 2022 Agreement would relieve Plaintiff of his obligation to acquire "necessary equipment" and "telecommunications service subscriptions" in order to access Coinbase's services or his Coinbase account, this change is material and relevant to Plaintiff's willingness to contract with Coinbase, and to his dispute with Coinbase and AT&T.

249. Plaintiff's dispute with Coinbase concerns Coinbase's use of identifying information and data collected by Coinbase from and about Plaintiff, including: his mobile phone number; his

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

device types and unique device identification numbers associated with his use of Coinbase's services; how his devices interact with Coinbase's sites, Platform, and services; other technical data Coinbase collected through cookies, pixel tags and similar technologies that uniquely identify Plaintiff based on his use of his devices with Coinbase's services, such as the geolocation/tracking details, browser fingerprints, operating systems, browser names and versions, and personal IP addresses used by his devices; as well as assorted information Coinbase collects from Coinbase's "affiliates and third parties" about Plaintiff, his devices, and his use of his devices, including his use of his mobile phone in connection with Coinbase's services. This identifying information includes, and is directly related to, "the necessary equipment (such as a smartphone or laptop) and the associated telecommunication service subscriptions to access the Internet" that AT&T provided Plaintiff.

250. The Coinbase Privacy Policy and the Coinbase Cookie Policy referenced in the December 2021 Agreement address the identifying information and data Coinbase collected from and about Plaintiff, including data associated with Plaintiff's AT&T wireless service subscription and his smartphone.

251. True and correct copies of the Coinbase Privacy Policy and the Coinbase Cookie Policy are incorporated herein and attached hereto as, respectively, as "Exhibit B" (Privacy Policy) and "Exhibit C" (Cookie Policy).

252. Coinbase has suggested that, despite the identifying information and data it collected from and about Plaintiff, the unauthorized use of his mobile phone number and AT&T wireless service by hackers during the SIM Swap attack on Plaintiff purportedly fooled Coinbase into believing the hackers were, in fact, Plaintiff. The reasonableness of such a position, were Coinbase to assert as much, implicates Coinbase's and AT&T's relationship with one another.

253. According to AT&T's website, "Non-AT&T companies like your [the AT&T customers'] bank may receive limited information from us [AT&T] to help protect your accounts from fraud, verify your identity and make sure it's really you authorizing a transaction." AT&T, *AT&T Privacy Notice*, https://about.att.com/privacy/privacy-notice.html#privacy-choices (accessed January 29, 2024).

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

254. On information and belief, Coinbase and AT&T are parties to one or more agreements for which Plaintiff is a third-party beneficiary or concerning the exchange of Plaintiff's data, including his PII and/or CPNI.

255. On information and belief, AT&T and Coinbase have used Plaintiff's PII or CPNI, or both, to confirm Plaintiff's identity in the context of their respective relationships with Plaintiff, prior to December 2021.

**1. The Delegation Provision of Coinbase's Agreement is Unconscionable**

256. By preventing Plaintiff from closing his Coinbase account, and by asserting that Coinbase's contractual relationship with Plaintiff continues, seemingly without end or subject to Coinbase's sole, unilateral discretion, Coinbase has indicated that its user agreement contains a delegation provision that it is unenforceable as against Plaintiff.

257. The validity of a delegation provision is properly examined in the context of an arbitration agreement as a whole.

258. To the extent the delegation provision of Coinbase's user agreement unfairly, unjustly, and (to a reasonable consumer) unexpectedly delegates, exclusively to Coinbase, decisions as to which version of Coinbase's user agreement is valid and enforceable in the context of Plaintiff's herein alleged dispute with Coinbase, the arbitration agreement is unenforceable.

259. To the extent the delegation provision of any agreement Coinbase might seek to enforce in this action would afford Coinbase the exclusive authority to "decide who decides" whether Plaintiff is bound by the terms of an agreement to which Plaintiff has not consented, the terms of such agreement are unconscionable and unenforceable as against Plaintiff.

260. To the extent the delegation provision of any purportedly enforceable arbitration agreement would limit Plaintiff's rights to public injunctive relief pursuant to applicable claims herein alleged, or Plaintiff's rights under the California Consumer Privacy Act of 2018 (Cal. Civ. Code §§ 1798.100., *et seq.*) (*e.g.*, Plaintiff's right to know, and to receive notice regarding the data collected and shared by Coinbase about Plaintiff), such agreement is contrary to public policy and thus unenforceable.

***

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

**FIRST CLAIM FOR RELIEF**

**VIOLATION OF COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030 ("CFAA")**

**(AGAINST COINBASE, AT&T, AND DOES 1-50)**

261. Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 260, as though fully set forth in this cause of action.

262. Plaintiff has spent over $5,000 investigating who accessed, damaged, interfered with, and abused his mobile device and damaged information on it; and investigating who accessed, damaged, interfered with, stole, or wrongfully transferred Plaintiff's BTC and BSV Wallets and the BTC and BSV therein.

263. Plaintiff's mobile device is capable of connecting to the internet.

264. Defendants AT&T and DOES 1-50 intentionally accessed Plaintiff's mobile device without Plaintiff's authorization, in order to assist or benefit from the theft, exchange, or sale of Plaintiff's valuable digital assets.

265. Defendants, and as applicable, Defendants' agents, representatives, and employees, SIM swapped Plaintiff and took the actions described in this Complaint, knowing that they would cause damage to Plaintiff's mobile device and damage to the information on his mobile device.

266. Defendants AT&T and DOES 1-50 caused Plaintiff's mobile device and certain valuable data on it—including text messages sent to his device and data pertaining to his digital assets and Coinbase account—to be unusable to him.

267. As a direct and proximate result of AT&T's and the Doe Defendants' actions, Plaintiff has suffered damage to his mobile device, and damage to or loss of information on his mobile device, which Plaintiff was unable to access for a critical period of time, or which he is permanently unable to access.

268. The act of SIM swapping, or performing a change (or swap) of Plaintiff's mobile SIM card, was in the scope of work for the employees, representatives, and agents of AT&T.

269. The act of SIM swapping, or performing a change (or swap) of Plaintiff's mobile SIM card, was in the scope of work for the employees, representatives, and agents of one or more of DOES 1-50.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

270. Plaintiff's BTC Wallet is capable of connecting to the Bitcoin network and the internet.

271. Plaintiff's BSV Wallet is capable of connecting to the BSV network and the internet.

272. Defendants Coinbase and DOES 1-50 intentionally accessed Plaintiff's digital currency and crypto-asset Wallets, including his BTC and BSV Wallets, and his cryptocurrencies associated with those Wallets, without Plaintiff's authorization.

273. Defendants Coinbase and DOES 1-50 caused Plaintiff's BTC and BSV Wallets and the valuable assets therein, specifically bitcoins and BSV tokens, to be unusable to him.

274. Defendant Coinbase, including its agents, representatives, and employees took these actions, or programmed software permitting these actions, knowing that it would cause damage to Plaintiff's BTC and BSV Wallets, as well as damage to the cryptocurrencies in those Wallets and to the BTC and BSV networks, respectively, as well as to Plaintiff's ability to interact with those networks.

275. As a direct and proximate result of Coinbase's and the Doe Defendants' actions, Plaintiff has suffered damage to his BTC and BSV Wallets, and damage to, or loss of his bitcoins, BSV tokens, and his ability to interact with the BTC and BSV networks by accessing his Wallets, which Plaintiff has been unable to access since December 2021, or of which Plaintiff has been permanently deprived.

276. The act of performing, programming, or instructing the performance of automated software to transfer cryptocurrencies between Wallets on the BTC and BSV networks, and specifically, as relevant to this claim, from Plaintiff's BTC and BSV Wallets, were in the scope of work for the employees, representatives, and agents of Coinbase.

277. The act of authorizing, instructing the authorization of, or programming automated software to permit access devices on the Coinbase Platform and send mobile unlock codes to access devices associated with accounts hosted by Coinbase was in the scope of work for the employees, representatives, and agents of Coinbase.

**SECOND CLAIM FOR RELIEF**

**VIOLATION OF FEDERAL COMMUNICATIONS ACT, 47 U.S.C. § 207 ("FCA")**

**(AGAINST AT&T)**

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

278. Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 277, as though fully set forth in this cause of action.

279. Defendant AT&T's acts, as alleged above, constitute knowing violations of the FCA, including violations of sections 201(b) and 222, as well as the CPNI Rules.

280. AT&T has violated 47 U.S.C. § 222(a) by failing to protect the confidentiality of Plaintiff's CPNI.

281. Upon information and belief, during an in-store visit, or over the phone, Plaintiff's CPI and CPNI were disclosed to someone other than Plaintiff or authorized members of Plaintiff's family subscribed to Plaintiff's AT&T wireless service plan, by an agent, representative, or employee of AT&T acting within the scope of his or her employment with AT&T; and during an in-store visit, or over the phone, Plaintiff's CPI and CPNI were disclosed to someone who was not properly authenticated by AT&T.

282. AT&T has violated 47 U.S.C. § 222(c) by using, disclosing, or permitting access to Plaintiff's CPNI without the notice, consent, or legal authorization required under the FCA, and by disclosing Plaintiff's CPNI and "Customer Proprietary Information" ("CPI") to a person or persons who did not first present a valid photo ID to AT&T.

283. AT&T's violation of the FCA allowed unauthorized persons to impersonate Plaintiff in interstate transactions and in communications with others.

284. AT&T is liable for the acts, omissions, and failures of its employees, representatives, agents, and other persons acting for or on behalf of AT&T.

285. Upon information and belief, AT&T's agents, representatives, or employees generally act on their own, regardless of what information is contained in the notes (*e.g.*, "call notes") of an AT&T customer's account.

286. AT&T's agents, representatives, or employees failed to accommodate requests for additional account security on Plaintiff's wireless service account, which required the entry of a PIN code to make changes to or on Plaintiff's AT&T wireless services account.

287. AT&T violated the FCA when AT&T, its agents, employees, officers, and/or representatives: **(i)** failed to establish and enforce rules and procedures sufficient to ensure only

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

authorized persons have access to AT&T customer accounts; **(ii)** failed to establish appropriate rules, policies and procedures for the adequate supervision and control of its officers, agents and employees; **(iii)** failed to establish and enforce rules and procedures, or provide adequate supervision or training sufficient to ensure that its employees, representatives, and agents follow such rules and procedures restricting access to customer accounts and information by unauthorized persons; **(iv)** failed to establish and enforce rules and procedures reasonably necessary to ensure AT&T's employees, representatives, and agents adhere to the security instructions of customers regarding accessing AT&T customer accounts; **(v)** failed to adequately safeguard and protect its customers' wireless service accounts; **(vi)** permitted the sharing of, and access to, user credentials among AT&T's agents, representatives, and employees absent a pending request from the customer, thus reducing the likelihood of detecting and determining accountability for unauthorized access; **(vii)** failed to appropriately supervise the AT&T employees, representatives, or agents who granted unauthorized access to customers' accounts, including Plaintiff's account; **(viii)** failed to adequately train and supervise its employees, representatives, and agents regarding requisite steps to prevent unauthorized access to customer accounts; **(ix)** failed to prevent its employees, representatives, and agents from accessing and making changes to customer accounts without first obtaining legitimate customer authorization; **(x)** allowed the unauthorized "porting out" and SIM swapping of mobile phone numbers without first confirming that the SIM card and account change requests were coming from legitimate customers; **(xi)** failed to monitor its systems for the presence of unauthorized access in a manner that would have allowed AT&T to detect intrusions, breaches of security, and unauthorized access to CPNI, CPI, and other customer information; **(xii)** failed to implement, maintain, or enforce readily available best practices for safeguarding customer information by wireless service common carriers; **(xiii)** failed to diagnose and timely determine the cause of Plaintiff's wireless communications service interruption; **(xiv)** failed to timely notify Plaintiff of the cause of Plaintiff's communications service interruption; and **(xv)** failed to implement and maintain internal controls to help protect against complete account takeovers associated with SIM Swap attacks by unauthorized persons.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

288. As a direct consequence of AT&T's violations of the FCA, Plaintiff has incurred damages through the loss of his CPNI and the various digital assets accessible by using his CPI, CPNI, and personal information.

289. Had AT&T not allowed the unauthorized access to Plaintiff's and his family's AT&T account, Plaintiff would not have suffered the losses herein described.

290. On information and belief, AT&T employs inadequate security measures, ineffective policies, and inappropriate or unreasonable safeguards to this day, which creates ongoing, foreseeable, and dangerous risks of unauthorized access to its customers' AT&T accounts and its customers' personal, valuable, and sensitive data.

291. AT&T has persisted in its efforts and representations to mislead and induce its customers into believing that AT&T's systems are, have been, or were secure and compliant with applicable laws, including the FCA, when that is not, has not been, or was not true between 2017 and 2022, and AT&T knew that was not true at the time AT&T made such efforts and representations.

292. Despite knowing the serious and foreboding risks associated with unauthorized access to AT&T customer accounts, AT&T has failed to utilize basic, accessible, cost-effective methods to reasonably prevent or limit such risks and the open attack vectors used to exploit unauthorized access to its customers' accounts.

293. AT&T's security measures were, at all times relevant to the allegations stated in this Complaint, inadequate to prevent the damages caused to Plaintiff, and Plaintiff's damages were reasonably foreseeable to AT&T as a result of its inadequate security measures.

294. AT&T's acts as alleged herein were unlawful and prohibited under the FCA.

295. Had AT&T implemented appropriate and reasonable security measures, as required by the FCA, Plaintiff would not have been injured, nor would Plaintiff's valuable information and personal properties have been damaged, stolen, or lost.

296. Plaintiff has suffered anxiety, depression, mental anguish, and injuries to his property, privacy, and his emotional and mental health as consequences of AT&T's FCA violations.

297. Plaintiff requests the full amount of damages he has sustained as a consequence of AT&T's violations of the FCA, together with reasonable attorneys' fees and costs.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

**THIRD CLAIM FOR RELIEF**

**BREACH OF IMPLIED CONTRACT**

**(AGAINST AT&T)**

298. Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 297, as though fully set forth in this cause of action.

299. There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything to injure the right of the other to receive the benefits of the agreement.

300. Under the express and implied terms of the contractual relationship between Plaintiff and AT&T, Plaintiff was to benefit from his use of AT&T's wireless services, while AT&T was to benefit from the money received in exchange for his use of AT&T's services.

301. AT&T exhibited bad faith through its awareness and deliberate indifference to the severe and impending risks to Plaintiff's personal information by: **(a)** failing to implement reasonable security measures reasonably necessary, or required by law, to protect Plaintiff's personal information; **(b)** improperly hiring, training, and supervising its employees; and **(c)** failing to invest in, or implement adequate security protections aimed at mitigating, the risks and harms of SIM Swap attacks on AT&T customers, including Plaintiff.

302. By exposing Plaintiff to vastly greater security risks than AT&T had disclosed, AT&T breached its implied covenant of good faith and fair dealing with respect to the terms of the implied warranties of its contractual relationship with Plaintiff as a "Plan Participant" and user of AT&T's services.

303. Plaintiff was harmed because of AT&T's breach of the implied covenant of good faith and fair dealing because Plaintiff's personal information in AT&T's control was compromised by unknown and unauthorized third-parties before and during the December 14, 2021 SIM Swap attack on Plaintiff, which culminated in monetary losses Plaintiff has sustained, of approximately $100,000.

304. AT&T's misconduct, as herein alleged, constitutes fraud, in that AT&T's deceit or concealment of material facts known to AT&T were conducted with intent on the part of AT&T to deprive Plaintiff of legal rights.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

305. AT&T's misconduct, as alleged herein, constitutes malice, fraud, or oppression, in that the despicable acts carried on by AT&T were done with willful and conscious disregard of the rights and safety of Plaintiff, and have subjected Plaintiff to cruel and unjust hardship in conscious disregard of his rights. Plaintiff is therefore entitled to punitive damages against AT&T.

306. Plaintiff demands entry of a judgment against AT&T for damages, including compensatory damages, punitive damages, interest, expenses, and for any other relief as the Court deems just and proper.

**FOURTH CLAIM FOR RELIEF**

**BREACH OF IMPLIED CONTRACT**

**(AGAINST COINBASE)**

307. Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 306, as though fully set forth in this cause of action.

308. Plaintiff and Defendant Coinbase entered into contracts with implied provisions, the terms of which were found in Sections 1, 2, 3 5, 6, 7, 10, 11, 13, 14, 15, and 16 of Coinbase's Privacy Policy, and in Coinbase's Cookie Policy. A true and correct copy of Coinbase's Privacy Policy is attached hereto and incorporated herein as Exhibit B. A true and correct copy of Coinbase's Cookie Policy is attached hereto and incorporated herein as Exhibit C.

309. Coinbase stated that it collects confidential and private personal identification data about Plaintiff to recognize him and maintain information about his access devices, in order to mitigate risk, help prevent fraud, and promote trust and safety on the Coinbase Platform.

310. Plaintiff agreed to provide Coinbase with his sensitive, personal, financial, and confidential data, including his PII, because Coinbase agreed to monitor and take reasonable steps secure Plaintiff's Coinbase account using the data Coinbase collected from and about Plaintiff, as well as take actions including but not limited to permitting him to exercise his rights under California law and responding to his exercise of such rights, to maintain Coinbase's legal and regulatory compliance, detect and prevent fraud and/or loss of Plaintiff's funds, ensure Coinbase's network and information security, and to protect Plaintiff's vital interests.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

311. By failing to use Plaintiff's data and information to secure his account, safeguard his assets, prevent fraud, maintain legal and regulatory compliance, enforce the terms of its Privacy Policy, ensure quality control, and for the purposes for which Plaintiff consented, Coinbase breached the terms found in Coinbase's Cookie Policy and in Sections 3, 5, 6, 7, 9, 10, 11, 13, and 14 of Coinbase's Privacy Policy.

312. By failing to permit Plaintiff to access his account and by denying him his consumer rights under California law, Coinbase breached the terms of Sections 14 and 15 of Coinbase's Privacy Policy.

313. Coinbase breached its contractual obligations to Plaintiff by misusing the data it collects from and about Plaintiff, and by failing to utilize said data to detect, monitor, and make the proportionally-necessary efforts required to prevent SIM Swap attacks and the related fraud on Plaintiff's Coinbase account.

314. Coinbase breached the contractual obligations it owed Plaintiff by failing to use the data it collected from and about Plaintiff to mitigate the harms and losses caused by reasonably detectable fraud on the Coinbase Platform, including fraud accomplished by exploitations of well-known attack vectors persistently left open for multiple years on the Coinbase Platform, which Coinbase was exclusively or best positioned to address and prevent.

315. Plaintiff has performed all covenants and conditions required by the implied provisions of the contract, or has been excused from doing so by Coinbase's breach.

316. As a proximate result of Coinbase's breach, Plaintiff has suffered economic loss.

317. Coinbase's breach of its Privacy Policy and Cookie Policy has resulted in damages sustained by Plaintiff, in an amount no less than $210,000.

**FIFTH CLAIM FOR RELIEF**

**TRESPASS TO CHATTELS**

**(AGAINST AT&T AND DOES 1-50)**

318. Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 317, as though fully set forth in this cause of action.

319. Defendants AT&T and DOES 1-50 (current or former employees, representatives,

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

agents, or independent contractors of AT&T) deprived Plaintiff his use of his mobile phone for several hours on December 14, 2021.

320. Plaintiff's mobile phone was in his possession when Defendants intentionally interfered with the physical condition of his phone, and with Plaintiff's use of his mobile phone.

321. Defendants interfered with Plaintiff's rights to his personal property by depriving him of his use of his mobile phone without his permission.

322. Plaintiff did not consent to Defendants' interference with his use of his mobile phone.

323. Plaintiff was harmed by Defendants' interference with his use of his mobile phone.

324. Defendants' interference with Plaintiff's mobile phone, and with his use of his mobile phone's wireless communications service, were substantial factors resulting in Plaintiff's harms.

325. As a proximate and legal result of Defendants' interference with Plaintiff's property and his use of his property, Plaintiff has sustained damages in an amount according to proof at time of trial.

326. Defendants are subject to exemplary damages in favor of Plaintiff because Defendants' trespass to Plaintiff's property was oppressive, fraudulent, and malicious.

**SIXTH CLAIM FOR RELIEF**

**TRESPASS TO CHATTELS**

**(AGAINST COINBASE)**

327. Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 326, as though fully set forth in this cause of action.

328. Plaintiff owned and had a right to possess the crypto-assets, funds, and blockchain-based Wallets associated with the digital currency and digital currency wallets accessible from his Coinbase account, which Defendant Coinbase exchanged on its Platform, or which Coinbase transferred to the Bitcoin Wallet with the following public key Wallet address (the "Hot Wallet"): ***3DcopM3iaoL2siD3BgGpGoENFwa5anJoKj***.

329. Coinbase interfered with the physical condition of Plaintiff's funds, crypto-assets, and with his possession of his private keys corresponding to his blockchain-based Wallets, including his respective portion of the bitcoins sent from the Hot Wallet, by intruding upon and using the

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

private keys for his various crypto-assets to transfer or exchange his crypto-assets, without his knowledge, consent, or express permission.

330. Plaintiff was harmed by Coinbase's interferences with his private keys, crypto-assets, and funds; and Coinbase's intrusion upon, exchange, and transfer of those assets—including the various crypto-assets represented by Coinbase hosted digital currencies, and the bitcoins transferred to the Hot Wallet—was a substantial factor in causing Plaintiff's harms.

331. Plaintiff did not consent to Coinbase's interference with his possession and use of the physical private keys for his blockchain-based Wallets, including the Hot Wallet.

332. Coinbase has prevented Plaintiff from exercising dominion and ownership over his crypto-assets by interfering with his ability to transfer his funds and assets off the Coinbase Platform to a more secure location.

333. Plaintiff has been deprived of his possession and his use of his funds and crypto-assets since December 14, 2021.

334. Coinbase's conduct was a substantial factor in causing Plaintiff's losses, harms, and the damages sustained by Plaintiff, as herein alleged.

335. As a proximate and legal result of Coinbase's wrongful interferences, Plaintiff has suffered personal property damages in an amount no less than $99,815.16.

**SEVENTH CLAIM FOR RELIEF**

**CONVERSION**

**(AGAINST COINBASE AND DOES 1-50)**

336. Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 335, as though fully set forth in this cause of action.

337. In California, " ' "[c]onversion is a strict liability tort," ' . . . . Financial institutions can be liable to their depositors for transferring money out of their accounts on forged instruments." *Fong v. East West Bank*, 19 Cal.App.5th 224, 235 (2018) (internal citation omitted).

338. Plaintiff owned and has the right to possess the bitcoins transferred to the Bitcoin Wallet with the public key Wallet address, ***bc1qjp79ak6fxm4h7j0tsrwqx2n2k4tcqqveqxrvgm***.

339. Plaintiff owned, possessed, and has the right to possess the "Digital Currencies Formerly

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

in Plaintiff's Coinbase Account": 6.60611257 ETH ($25,245.43); 88.59916563 LTC ($13,216.36); 170.5156815 ETC ($5,992.54); 1,931.78 CTSI ($1,205.33); 637.4547 ADA ($801.33); 804.0188919 ZRX ($611.70); 122.1935986 LINK ($2,231.04); 6,215.40 ANKR ($608.66); 3,254.52 LCX ($490.52); 4,161.78 SUKU ($2,068.70); 93.53412 XTZ ($416.93); 37,479,605.75 SHIB ($1,256.74); 102.3689 EOS ($341.23); 1,021.82 XLM ($270.60); 1,955.06 DNT ($251.65); 2,750.43 ASM ($240.96); 199.0150769 MATIC ($378.81); 143.7168994 BAT ($151.01); 1.17787025 OMG ($6.97); 204.2707539 TRAC ($222.03); 346.1700191 CVC ($111.90); 0.5482645 BTC ($26,604.53); and $17,090.19 digital dollars (USD).

340. The "Digital Currencies Formerly in Plaintiff's Coinbase Account" were sent in the form of Bitcoin from Plaintiff's Bitcoin Wallet controlled by Coinbase (public key Wallet address: *3DcopM3iaoL2siD3BgGpGoENFwa5anJoKj*) (the "Hot Wallet") to the Bitcoin Wallet with the public key address, ***bc1qjp79ak6fxm4h7j0tsrwqx2n2k4tcqqveqxrvgm*** ("***bc1 Wallet***"), in the transaction identifiable on the Bitcoin blockchain by the following transaction ID: *dbaba1aad772b7e62995668f69ddf73d4d20031f5fe15cd4d23a618e831c1fe1*.

341. Plaintiff owned, possessed, and has the right to possess the U.S. dollar amounts representing the transaction fees wrongfully debited or taken from his account.

342. Coinbase substantially interfered with the "Digital Currencies Formerly in Plaintiff's Coinbase Account," by intentionally preventing Plaintiff from accessing those assets, which are in Coinbase's possession or located on the Coinbase Platform; and by refusing to return to those assets to Plaintiff after Plaintiff demanded those assets be returned to him; and by refusing to restore or credit those assets to his Coinbase account, digital currency wallets, or blockchain-based Wallets.

343. Coinbase substantially interfered with Plaintiff's 2.05698427 bitcoins by knowingly or intentionally transferring those assets to the ***bc1 Wallet***.

344. Coinbase substantially interfered with Plaintiff's 2.05698427 bitcoins by knowingly or intentionally taking possession of those bitcoins in the *3DcopM3iaoL2siD3BgGpGoENFwa5anJoKj* Bitcoin Wallet, and by destroying or preventing

Plaintiff from having access to those bitcoins, by wrongfully transferring the bitcoins to the ***bc1 Wallet***.

345. One or more of Defendants DOES 1-50 substantially interfered with Plaintiff's 2.05698427 bitcoins by knowingly or intentionally taking possession of said bitcoins in the ***bc1 Wallet***, and by destroying, or preventing Plaintiff from having access to those bitcoins.

346. Coinbase substantially interfered with the digital dollars stored in his Coinbase account, by intentionally taking possession of Plaintiff's funds, and preventing Plaintiff from accessing and having access to that money, which remains in Coinbase's possession or located on the Coinbase Platform; and by refusing to return to the funds and/or money to Plaintiff after Plaintiff demanded that amount be returned to him.

347. Plaintiff did not consent to Defendants' interferences with his "Digital Currencies Formerly in Plaintiff's Coinbase Account," or his 2.05698427 bitcoins, or his money.

348. Plaintiff has suffered actual injury and damages of compensable value stemming from the conversion of the "Digital Currencies Formerly in Plaintiff's Coinbase Account." Coinbase's conduct was a substantial factor in causing Plaintiff's harms or losses, as herein alleged.

349. Plaintiff has suffered actual injury and damages of compensable value stemming from the transfer of his bitcoins out his Coinbase account, which Coinbase transferred out of his account based on a forged instrument. Coinbase's conduct was a substantial factor in causing Plaintiff's harms and losses, as herein alleged.

350. Plaintiff has suffered actual injury and damages of compensable value stemming from the conversion of his money, which Coinbase transferred out of his account based on a forged instrument. Coinbase's conduct was a substantial factor in causing Plaintiff's harm.

351. Plaintiff has suffered actual injury and damages of compensable value stemming the conduct of DOES 1-50.

352. Defendants' actions as fully alleged above, were each, separately, a substantial factor in causing Plaintiff's harms and losses, and the damages Plaintiff sustained.

353. As a reasonably foreseeable consequence of Defendants' conduct, Plaintiff has spent substantial time and money attempting to recover his bitcoins and digital currencies.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

354. As a proximate and legal result of Coinbase's wrongful interferences, Plaintiff has suffered personal property damages in an amount no less than $203,500.

**EIGHTH CLAIM FOR RELIEF**

**VIOLATION OF CALIFORNIA PENAL CODE § 496**

**(AGAINST COINBASE)**

355. Plaintiff realleges and incorporates each of the above paragraphs 1 – 354, as though fully set forth in this cause of action.

356. California Penal Code § 496(a) prohibits any person from buying or receiving "any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained."

357. Coinbase is a "person," as that term is used in Cal. Pen. Code § 496.

358. Coinbase violated California Penal Code § 496 by buying and receiving personal property—specifically, crypto-assets, tokens, virtual currencies, and U.S. dollar-denominated financial obligations—belonging to Plaintiff, by theft, and by knowingly selling and withholding said property from Plaintiff, knowing said property was stolen and obtained by theft, and that the sale was the result of theft.

359. Coinbase violated California Penal Code § 496 by aiding in selling, obtaining, concealing, or withholding digital dollars, virtual currencies, tokens, and U.S. dollars, and crypto-assets belonging to Plaintiff, which Coinbase knew to be stolen, or which Coinbase knew it had obtained in a manner constituting theft.

360. As a result of Coinbase's violation of California Penal Code § 496, Plaintiff has sustained actual damages in an amount no less than $101,762.51.

361. Plaintiff is entitled to three times the amount of his actual damages, in an amount not less than $305,287.53, plus cost of suit, and reasonable attorneys' fees.

**NINTH CLAIM FOR RELIEF**

**AIDING AND ABETTING**

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

**(AGAINST COINBASE AND AT&T)**

362. Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 361, as though fully set forth in this cause of action.

363. Defendants DOES 1-50 violated Plaintiff's right to privacy, and the CFAA; stole Plaintiff's data and information; and committed a trespass to Plaintiff's personal property, and interfered with his rights to inherit, purchase, lease, sell, hold, and convey the personal property Plaintiff entrusted to Coinbase's custody.

364. Coinbase committed a trespass to Plaintiff's personal property, and interfered with his rights to inherit, purchase, lease, sell, hold, and convey the personal property Plaintiff entrusted to Coinbase's custody.

365. AT&T violated the FCA and committed a trespass to Plaintiff's personal property, and interfered with his rights to inherit, purchase, lease, sell, hold, and convey the personal property Plaintiff entrusted to Coinbase's custody.

366. AT&T knew or should have known that one or more DOES 1-50 were trespassing to Plaintiff's property, violating Plaintiff's privacy, violating the CFAA, and stealing Plaintiff's data and information.

367. AT&T gave DOES 1-50 substantial assistance in committing the trespass to Plaintiff's property and the SIM Swap attack on Plaintiff.

368. AT&T's conduct in facilitating the SIM card change on Plaintiff's AT&T wireless account was a substantial factor in causing harm to Plaintiff.

369. AT&T is vicariously liable for the actions of its employees, representatives, or agents who specifically intended to carry out the SIM Swap attack on Plaintiff.

370. AT&T's respective agents, representatives, and employees did not merely fail to prevent the unlawful acts of DOES 1-50, but instead cooperated in the wrongful and unlawful acts.

371. Coinbase knew or should have known that one or more of DOES 1-50 were trespassing to Plaintiff's property, violating Plaintiff's privacy, violating the CFAA, and stealing Plaintiff's data and information.

372. Coinbase knew or should have known that AT&T or one or more of DOES 1-50 were

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

committing a SIM Swap attack on Plaintiff.

373. Coinbase gave DOES 1-50 substantial assistance in committing the trespass to Plaintiff's property, violating Plaintiff's privacy, violating the CFAA, stealing Plaintiff's data and information, and committing a SIM Swap attack against Plaintiff by facilitating the activity on Plaintiff's Coinbase account.

374. Coinbase's conduct in facilitating the fraudulent activities, including the critical account changes and transactions, using Plaintiff's account was a substantial factor in causing harm to Plaintiff.

375. Coinbase specifically intended to collect, retain, and withhold from Plaintiff relevant information and the transaction fees or payments resulting from the Doe Defendants' fraudulent activity using Plaintiff's Coinbase account, and Coinbase intended to wrongfully withhold and benefit from the theft and deprivation of Plaintiff's property.

376. Coinbase did not merely fail to prevent such unlawful acts of DOES 1-50, but instead cooperated in the wrongful and unlawful acts to retain its ill-gotten transaction fees and unfairly and unjustly prevent Plaintiff from obtaining information demonstrating Coinbase's liability.

377. Even if AT&T or Coinbase did not trespass to or steal Plaintiff's data and property, violate Plaintiff's privacy, or commit fraud on and harming Plaintiff, AT&T and Coinbase intended to assist DOES 1-50 in their unlawful acts, and committed overt acts in furtherance of such plan, as fully alleged herein.

378. Plaintiff requests compensatory damages, along with reasonable attorney's fees and costs, and all further relief the Court deems proper.

## **TENTH CLAIM FOR RELIEF**

## **VIOLATION OF CALIFORNIA UNIFORM COMMERCIAL CODE § 8507(b)**

## **(AGAINST COINBASE)**

379. Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 378, as though fully set forth in this cause of action.

380. Defendant Coinbase characterizes itself as a "securities intermediary" and Coinbase characterizes Coinbase-hosted digital currency wallets as "financial assets," subject to Division

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

8 of the California Uniform Commercial Code ("UCC").

381. Under UCC § 8102(a)(7), the owner of assets held in an account with a securities intermediary is an "entitlement holder."

382. Plaintiff was an "entitlement holder" with respect to assets held in his Coinbase account.

383. Under UCC § 8102(a)(8), an order for a securities intermediary to transfer assets is an "entitlement order."

384. Under UCC § 8107(b), an entitlement order is only "effective" if it is made by the entitlement holder or an authorized agent, or ratified by the entitlement holder.

385. The orders for unauthorized transfers from Plaintiff's Coinbase account were not effective because they were not made by Plaintiff or by his authorized agent, nor were they ratified by Plaintiff.

386. Coinbase completed the unauthorized transfer of Plaintiff's "Tez" or "XTZ" tokens, and the XTZ "staking" or "baking" rewards that had accrued in his Coinbase account, pursuant to an entitlement order, which was not effective under UCC § 8107(b).

387. Pursuant to UCC § 8507(b), Coinbase is obligated to credit Plaintiff's Coinbase account to correct the unauthorized transfers and pay or credit any payments or distributions Plaintiff did not receive due to the wrongful transfers, in addition to liability for damages.

388. As direct and foreseeable consequences of Coinbase's transfer of Plaintiff's assets pursuant to ineffective and invalid entitlement orders, and Coinbase's failure to credit Plaintiff's Coinbase account and correct said unauthorized transfers, Plaintiff has been injured

## ELEVENTH CLAIM FOR RELIEF

## VIOLATION OF CALIFORNIA CONSUMER PRIVACY ACT OF 2018, CAL. CIV. CODE §§ 1798.100 ET SEQ. ("CCPA")

## (AGAINST COINBASE)

389. Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 388, as though fully set forth in this cause of action.

390. Civil Code section 1798.150, subdivision (a)(1), provides,

> Any consumer whose nonencrypted and nonredacted personal information is subject to

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

> an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for any of the following: [**(i)** statutory damages or actual damages, whichever is greater; **(ii)** injunctive or declaratory relief; and **(iii)** any other relief the court deems proper.]

See Cal. Civ. Code. §1798.150.

391. Plaintiff is a "consumer" within the meaning of Cal. Civ. Code § 1798.140(g).

392. Defendant Coinbase is a "business" within the meaning of Cal. Civ. Code § 1798. 140(0).

393. Plaintiff has provided Coinbase "personal information" within the meaning of Cal. Civ. Code § 1798. 140(V).

394. From October 2013 to the present, Coinbase was aware of the confidential and sensitive nature of the personal and financial information Plaintiff provided to Coinbase.

395. Coinbase subjected Plaintiff's nonencrypted personal and confidential information, including his personally identifiable information, to unauthorized access, exfiltration, theft, and disclosure as a result of Coinbase's violations of its duties to implement and maintain reasonable security procedures and practices appropriate for the nature and sensitivity of such information, in violation of Cal. Civ. Code § 1798.150(a).

396. Plaintiff has suffered injuries stemming from Coinbase's loss and unauthorized exposure of Plaintiff's valuable and confidential personal information and digital assets, including: **(i)** the lost or diminished value of his identification data—for instance, whereas legitimate buyers of consumer identification data compensate consumers with contracted-for services in exchange for personal information, as a result of Coinbase's disclosures of Plaintiff's data to unauthorized parties, now, third-parties (including marketing companies, salespeople, scammers, and hackers) can obtain this information for free; **(ii)** out-of-pocket expenses associated with the prevention, detection, and recovery from potential identity theft, tax fraud, and unauthorized use of Plaintiff's PII; **(iii)** lost opportunity costs associated with efforts expended, and Plaintiff's loss of productivity in attempting to mitigate the consequences of Coinbase's actions and omissions,

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

including but not limited to Plaintiff's lost time, at an estimated average loss of $125 per hour in lost labor hours, which he has spent and will spend mitigating his potential and realized losses; as well as restoring the ability to log into and completely recover his Coinbase account; dealing with impersonation activities, including phishing emails; reviewing his credit reports; scrutinizing his financial information; detecting identity theft; and changing his passwords; **(iv)** continuing risks to Plaintiff's PII, to the extent it is still in Coinbase's possession and subject to further unauthorized disclosures, for as long Defendants fail to protect his PII; and **(v)** future costs in terms of loss of time, effort, and money that will be expended to monitor, prevent, detect, contest, and repair the impact of the cyber-identification data compromised and altered as a result of Coinbase's actions and omissions, for the remainder of Plaintiff's life.

397. Pursuant to Cal. Civ. Code § 1798.150(b), prior to the filing of this Complaint, on April 20, 2023, Plaintiff served Coinbase with notice of alleged CCPA violations by certified mail, return receipt requested, and by email.

398. Cures to Coinbase's CCPA violations are possible. Coinbase has failed to cure these violations, or has failed to provide Plaintiff written notice that such violations have been cured.

399. Under California Civil Code section 1798.150(a), Plaintiff is entitled to actual damages, public injunctive relief, and other relief this Court deems proper.

400. Plaintiff seeks public injunctive relief in the form of an order enjoining Coinbase from continuing to violate the CCPA—specifically, an order requiring that Coinbase cease its practice of concealing or withholding information from its customers concerning the information Coinbase and its "Affiliates" share with, disclose, sell to, purchase, and collect from wireless telecommunications common carrier service providers, about Coinbase's customers.

401. Unless and until Coinbase is restrained by order of this Court, Coinbase will continue causing injuries, privacy violations, and unmitigable harms to the public, including prospectively irreprable harms to consumers across the United States who are participating or who are considering whether to participate in the virtual currency economy, or who have or will purchase or contract for services relating to digital financial payments facilitated by regulated financial institutions, including Coinbase, that use mobile phone numbers provided by wireless service

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

providers to verify its consumers' and users' identities.

**TWELFTH CLAIM FOR RELIEF**

**INTENTIONAL MISREPRESENTATION**

**(AGAINST COINBASE)**

402. Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 401, as though fully set forth in this cause of action.

403. Defendant Coinbase represented to Plaintiff that, according to the terms of a valid, enforceable contract between Plaintiff and Coinbase, Plaintiff's account access is conditional upon him reimbursing Coinbase for purported "outstanding amounts" resulting from timely-reported fraudulent activity on his Coinbase account. To regain access to his account, Plaintiff is not required by any valid, enforceable agreement between Coinbase and Plaintiff, to reimburse Coinbase for transactions Plaintiff timely reported to Coinbase as fraud, and which Coinbase has acknowledged as fraudulent or unauthorized transactions.

404. When Coinbase represented that Plaintiff's access to his Coinbase account was conditioned upon Plaintiff reimbursing Coinbase for the fraudulent and refunded bank transactions herein described, Coinbase had no reasonable grounds for believing that Plaintiff was contractually obligated to reimburse Coinbase for such transactions or that the terms of an agreement enforceable by Coinbase as against Plaintiff permitted Coinbase to prevent Plaintiff from accessing his account pending his reimbursement of Coinbase for the refunded bank transactions.

405. Coinbase intended that Plaintiff would rely on its representations that Plaintiff had assented to contract terms permitting Coinbase to prevent him from regaining access to his Coinbase account unless or until he reimburses Coinbase for "outstanding amounts" Coinbase has claimed Plaintiff owes Coinbase.

406. Coinbase made its representations intentionally, for the purpose of deceiving Plaintiff, or to actively conceal information from Plaintiff.

407. To the extent Coinbase made these misrepresentations inadvertently or unintentionally, Coinbase did do with reckless disregard for the truth.

408. Plaintiff reasonably relied on Coinbase's misrepresentations regarding Coinbase's interpretation of the agreement or alleged agreement by and between Coinbase and Plaintiff.

409. Plaintiff was harmed by his reliance on Coinbase's misrepresentations, as a result of his inability to close, access, and utilize features within his Coinbase account, and correct his inaccurate Coinbase account information.

410. Plaintiff's reliance on Coinbase's misrepresentations was a substantial factor in causing Plaintiff's harms.

411. Plaintiff is entitled to punitive damages under California Civil Code § 3294(a) because Coinbase made its representations with fraud, oppression, or malice.

**THIRTEENTH CLAIM FOR RELIEF**

**NEGLIGENT MISREPRESENTATION**

**(AGAINST COINBASE)**

412. Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 411, as though fully set forth in this cause of action.

413. Defendant Coinbase represented that Coinbase only allows its users to reset their account passwords from devices they have previously used to log into their accounts, or from devices in locations where they have previously signed into their accounts. This representation was not true at the time Coinbase made the representation. As a result of Plaintiff's reliance on this misrepresentation, Plaintiff became extraordinarily vulnerable to financially devastating cyber-attacks that were reasonably foreseeable to, and preventable by Coinbase, which Plaintiff could not have anticipated or reasonably prevented.

414. Coinbase represented to Plaintiff that it had "successfully transferred the balance" of his Coinbase account to his "new" Coinbase account, when in fact, at the time Coinbase made that representation, Coinbase had not transferred the balance of his account to a new account created for the benefit of, accessible to, or controllable by Plaintiff. This caused Plaintiff to believe that, unless he agreed to be bound by the terms of a revised contract presented by Coinbase, he would not have access to his funds, which Coinbase purportedly transferred to his "new" account.

415. In July 2022, Coinbase represented to Plaintiff that Coinbase "continue[d] to have a

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

commercial relationship" with Plaintiff, and in so doing, Coinbase misrepresented the terms or the applicability of the terms of its relationship with Plaintiff, which prevented Plaintiff from taking steps to close his Coinbase account by causing Plaintiff to believe that he may be bound by revised contract terms to which he did not agree, based on his "continued use" of Coinbase's "services." Coinbase's representation was not true when Coinbase made this representation.

416. Plaintiff relied on Coinbase's misrepresentations, and Plaintiff's reliance on Coinbase's misrepresentations was a substantial factor in causing Plaintiff's harms.

417. Plaintiff was harmed by his reliance on Coinbase's misrepresentations in an amount not less than Plaintiff's investigation fees and costs, attorney's fees, and costs of this suit.

**FOURTEENTH CLAIM FOR RELIEF**

**NEGLIGENCE**

**(AGAINST COINBASE)**

418. Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 417, as though fully set forth in this cause of action.

419. Defendant Coinbase owed a duty to Plaintiff to exercise reasonable care in safeguarding his sensitive personal and financial information. This duty included designing, maintaining, monitoring, and testing Coinbase's, and its agents', partners', and Affiliates' protocols, and practices, to help secure Plaintiff's digital assets in Coinbase's custody, and prevent unauthorized transfers of its customers' assets on and from the Coinbase Platform. Coinbase's duty arose from the sensitivity of its customers' (including Plaintiff's) account data and the foreseeability of harms to Plaintiff should Coinbase fail to safeguard and protect his digital assets.

420. Coinbase owed a duty to Plaintiff to provide security consistent with industry standard cybersecurity measures, its own internal policies, and the promises Coinbase made to Plaintiff. This duty required Coinbase to ensure that its computer systems, software, and personnel, are adequately trained or instructed on how to take actions necessary to protect the financial and personal information of Coinbase's customers. This duty also required Coinbase to take reasonable steps to ensure Plaintiff's Coinbase credentials would not be exposed to the public in unencrypted, plain-text form.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

421. Coinbase owed a duty to Plaintiff to implement a security and monitoring system reasonably designed to detect, respond to, and prevent unauthorized transfers its customers' Coinbase accounts in a reasonably timely manner, as was required of Coinbase by, *inter alia*, the Bank Secrecy Act, the Patriot Act, and the EFTA.

422. Coinbase owed a duty to Plaintiff to exercise due care in designing a reasonably secure website and Platform that do not leak or indiscriminately confirm customers' Coinbase-specific credential data by disclosing said information to the public in plain-text form.

423. Coinbase owed a duty to Plaintiff to take reasonable steps to protect his sensitive customer account data and identity information from unauthorized use, access, and disclosure.

424. Coinbase owed a duty to Plaintiff to ensure that his personally identifiable information (PII) was only used, accessed, and disclosed with Plaintiff's proper authorized consent.

425. Coinbase owed a duty to Plaintiff to disclose the material fact that its data security practices and monitoring of its Platform were inadequate to prevent Plaintiff's Coinbase account information from being improperly accessed and exfiltrated by unauthorized third-parties, which was a foreseeable result of permitting improper access to customer data by Coinbase's employees, agents, Affiliates, or software and computer programs subject to Coinbase's control.

426. Coinbase was uniquely positioned to provide material information to Plaintiff regarding the features and quality of Coinbase's cybersecurity. Coinbase owed Plaintiff a duty to adequately disclose its inability to prevent his confidential data from unauthorized dissemination.

427. Coinbase owed a special duty of care to Plaintiff because Plaintiff was a retail consumer customer of Coinbase for over eight years, and on that basis, he was a reasonably foreseeable and likely target for bad actors engaged in, or seeking to carry out SIM Swap attacks using the data Coinbase collected and leaked to the public in unencrypted, plain-text forms.

428. Coinbase owed a special duty to Plaintiff to actively take steps to address SIM Swap attacks involving consumer financial accounts hosted by Coinbase on the Coinbase Platform.

429. Coinbase knew or should have known, in and before December 2021, that its cybersecurity practices and customer dispute resolution policies, as then implemented, were inadequate for a financial technology company facilitating cryptocurrency and digital peer-to-

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

peer financial asset exchanges.

430. Plaintiff reasonably believed and relied upon Coinbase's representations that Coinbase securely locks its customers' accounts whenever potentially fraudulent or suspicious behavior is reported or detected on a Coinbase customer's account.

431. Plaintiff reasonably believed and relied upon Coinbase's representations that Coinbase requires sufficient proof of customer identification prior to approving and facilitating critical account actions and irreversible transfers initiated and requested on a Coinbase customer account by one or more previously-unauthorized devices.

432. Plaintiff's willingness to contract with Coinbase and entrust his confidential and sensitive data to Coinbase was predicated on his reasonable belief that Coinbase had implemented statutorily-required electronic fund transfer procedures and customer-authentication protocols required of regulated consumer financial institutions subject to FinCEN regulations.

433. As a consumer financial account provider and a custodial Wallet services provider, Coinbase breached its duties to Plaintiff by failing to: **(i)** implement and maintain appropriate security procedures necessary to safeguard Plaintiff's Coinbase account and data, including his PII, from unauthorized access and misuse; **(ii)** detect and respond to unauthorized account activity on its Platform in a timely manner; **(iii)** timely disclose that Coinbase's data security practices were inadequate to protect Plaintiff's assets; **(iv)** adequately supervise its employees and software to prevent unlawful utilization of Plaintiff's account information and data without proper authorization that involves obtaining current proof of valid user identification; and **(v)** recredit Plaintiff's Coinbase account for fraudulent transactions, which Coinbase has recognized as fraud, and which were not the fault of Plaintiff or consequence of Plaintiff's actions.

434. Coinbase breached its duties of care to Plaintiff by failing to treat Plaintiff's digital assets with an appropriate degree of care, or with the same degree of care with which Coinbase treats its own assets in its custody.

435. Coinbase's disrespect for Plaintiff's digital assets, and its recklessness with respect to the transfers it facilitated from his account, are exemplified by Coinbase's failures to: **(i)** establish adequate user-authentication measures consistent with industry standards, governmental

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

regulations, and its own promises; **(ii)** implement reasonable cybersecurity protocols consistent with industry standards, governmental regulations, and its own internal policies; **(iii)** enforce or adhere to Coinbase's own purported security procedures, including Coinbase's self-imposed obligation to ensure that a 2FA code has been input by its verified customers as a condition precedent to executing transfers of cryptocurrencies from its customers' accounts or Wallets, to another Coinbase users' accounts or Wallets; **(iv)** appropriately respond to, address, and monitor customer complaints concerning hackers and scammers targeting Coinbase customers for the customers' personal and confidential data, despite knowing these issues were prevalent on the Coinbase Platform; and **(v)** require that the input of a 2FA code Coinbase has sent to a phone number is connected to a verified and authenticated physical mobile device associated with that particular phone number, prior to executing any transfer of funds off the Coinbase Platform.

436. Coinbase breached its duty to exercise reasonable care in monitoring and safeguarding Plaintiff's Coinbase account by failing to implement reasonable security measures designed to prevent SIM Swap attacks, even though such attacks had been widely recognized as likely to result in unauthorized transactions and losses of valuable digital assets that Coinbase's retail customers entrusted to Coinbase's custody.

437. Coinbase breached its duty to provide Plaintiff a reasonable means to contact an appropriately authorized and sufficiently trained Coinbase employee, representative, or agent, without undue delay.

438. Coinbase breached its duties of care to Plaintiff by determining that the economic risk of admitting any responsibility for the fraud on Plaintiff's account was outweighed by the economic benefits of reporting transaction revenues it recognized in its financial reports.

439. The harms, losses, and property damage Plaintiff has sustained, as well as the imminent, substantial, and impending harms to his mental health, online privacy, and personal property, have been directly and proximately caused by Coinbase's breaches of its duties to Plaintiff.

440. Coinbase's derogations of its legal duties caused Plaintiff to lose his valuable personal information and digital assets, and his control of said information accessible through his Coinbase account, as well as his sensitive and confidential financial information and private

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

credential data accessible from his account(s) hosted by Coinbase on the Coinbase Platform.

441. Coinbase's breaches of its duties to Plaintiff have resulted in reasonably foreseeable damages that were actually and proximately caused by Coinbase's failures to use Plaintiff's data to secure his account and assets, and to mitigate and prevent harms to Plaintiff.

442. Plaintiff did not contribute to the insufficient measures and practices Coinbase used to ineffectively safeguard his digital assets and privacy.

443. Plaintiff has been significantly harmed as a legal result of Coinbase's negligent conduct, and Plaintiff continues to suffer increased risks of future online account compromises and fraud to this day.

444. The increased risks of future digital interferences and trespasses make Plaintiff's expenditure of time and resources aimed at monitoring and mitigating harms to his digital and personal life reasonably necessary. Monitoring and mitigation tools exist that make early detection, prevention, and mitigation of future harms to Plaintiff possible and beneficial.

445. Plaintiff seeks compensatory damages for the harms he has sustained, and for the damages to his property, in an amount sufficient to compensate him for his actual harms and losses, and restore him to his original position prior to Coinbase's unauthorized disclosure of his Coinbase account credentials and breach of his account(s) hosted on Coinbase's Platform, considering: **(a)** the difference between the current value of his lost and damaged assets and the value of those assets had the harms not been done; **(b)** the costs of repair or restoration of his property; **(c)** the emotional and potential future harms sustained by Plaintiff; **(d)** Coinbase's need for and development of an adequate loss mitigation and refund or reimbursement plan consistent with industry standard online financial business practices, as an element of damages; and **(e)** the actual, consequential, and nominal damages flowing from Coinbase's negligence, to the extent those damages are the natural and proximate result of Coinbase' conduct as herein alleged.

446. Plaintiff is entitled to compensatory damages with pre-and post-judgment interest, costs of suit, attorneys' fees, and other relief as this Court deems just and proper, in an amount to be determined at time of trial.

447. As a direct and proximate result of Coinbase's grossly negligent conduct—including,

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

*inter alia*, Coinbase's false statements that Plaintiff owes "reimbursement" amounts to Coinbase—Plaintiff is entitled to punitive damages, in an amount to be proved at time of trial.

**FIFTEENTH CLAIM FOR RELIEF**

**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200 ET SEQ. ("UCL")**

**(AGAINST AT&T)**

448. Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 447, as though fully set forth in this cause of action.

449. California's Unfair Competition Law (UCL) prohibits any "unlawful, unfair or fraudulent business act or practice."

450. The UCL imposes strict liability. Plaintiff need not prove that Defendant AT&T intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

451. In determining whether to contract with a mobile phone and wireless services provider such as AT&T, a reasonable person would attach importance to the privacy and security of his or her CPNI and sensitive wireless services account data.

452. AT&T had exclusive knowledge of material facts not known or knowable to Plaintiff and AT&T customers. AT&T actively concealed these material facts from its customers, and made material misrepresentations and omissions concerning the acts AT&T takes, and had taken, to safeguard Plaintiff's CPNI.

453. AT&T was obligated to disclose its inadequate customer authorization practices, and AT&T had a duty to disclose the nature of its inadequate security practices and its persistent failures in hiring, training, and supervising its personnel.

454. AT&T intentionally misled its customers regarding its security practices in order to attract and retain customers, and evade prosecution for its unlawful acts.

455. Plaintiff has been misled regarding the nature and integrity of AT&T's services, and as a result, he has suffered injury. AT&T's representations that it protects customers' personal information, when in fact AT&T did not take reasonably necessary steps to protect its customers'

personal information, including its customers' CPNI, were false, deceptive, and misleading, and constitute a violation of the FCA. The magnitude of the harm suffered by Plaintiff underscores the materiality of AT&T's misrepresentations and omissions.

456. Additional disclosures were necessary to materially qualify AT&T's representations that it does not sell consumer data (except in the limited instances AT&T has specified in AT&T's own policies, and in accordance with the FCA), and that it takes or has taken measures to protect such sensitive data, and to materially qualify AT&T's partial disclosures concerning its use of customers' CPNI.

457. Plaintiff has a reasonable expectation of privacy in his mobile device and his AT&T account information. AT&T intentionally intruded on and into the Plaintiff's solitude, seclusion, or private affairs when its employees improperly accessed his confidential AT&T account information without consent or authorization.

458. The reasonableness of the Plaintiff's expectations of privacy is supported by AT&T's unique ability to safeguard Plaintiff's AT&T account data, and AT&T's exclusive ability to prevent and protect Plaintiff from SIM Swap attacks.

459. AT&T's employees', representatives', or agents' intrusions into Plaintiff's respective privacy are highly offensive to a reasonable person. The offensive nature of AT&T's intrusions is evidenced by federal legislation enacted by Congress, and by rules promulgated, and enforcement actions undertaken by the FCC, which are aimed at protecting AT&T customers' sensitive account information from unauthorized use and access.

460. The offensiveness of AT&T's conduct is further heightened by AT&T's material misrepresentations to Plaintiff concerning the purported safety and security of Plaintiffs' account and account information. For instance, AT&T has represented that AT&T: **(i)** "work[s] hard to safeguard your [its customers'] data using a range of technological and organizational security controls"; **(ii)** uses "security procedures that require employees to authenticate themselves to access sensitive data"; **(iii)** "maintain[s] and protect[s] the security of computer storage and network equipment"; **(iv)** limits access to Personal Information "to only those with jobs requiring such access"; **(v)** does not sell or disclose users' "Personal Information" to anyone; **(vi)** has

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

"implemented technology and security features and strict policy guidelines to safeguard the privacy of your Personal Information"; **(vii)** "require[s] callers and online users to authenticate themselves before providing account information"; **(viii)** "will notify [its customers] as required by applicable law" if a breach of their account occurs; **(ix)** ensures that its employees "protect confidential and proprietary information and prevent its improper, unauthorized, or inadvertent disclosure," and "will also not misuse the assets . . . of others"; and **(x)** ensures that AT&T's employees, specifically, its supervisors, are "alert to potential unlawful conduct in our department and take steps to prevent such conduct from occurring."

461. A reasonable person would be deceived and misled by AT&T's misrepresentations, which indicated that AT&T takes appropriate actions necessary to adequately protect its customers' personal and customer proprietary information.

462. The FCA and its regulations require mobile carriers to disclose customers' CPNI only upon proper notice, consent, and authorization—AT&T's obligations are intended to vest AT&T customers, including Plaintiff, with control over their carrier-subscriber account information and data. As this Complaint reveals, AT&T's practices were contrary to the letter and spirit of the FCA and its corresponding regulations. Due to the surreptitious nature of AT&T's actions, Plaintiff could not have reasonably avoided the harms he has sustained as a result.

463. According to the FCA, allowing unauthorized carrier employees or other parties to access, use, or disclose carrier customers' sensitive account information is against public policy. The effects of AT&T's conduct are comparable to, or the same as a violation of the FCA.

464. AT&T's actions, as detailed above, constitute an unlawful business act or practice because AT&T's conduct constitutes violations of the FCA, the CFAA, and Plaintiff's right to privacy under the California Constitution. AT&T's unlawful and unfair conduct lacks reasonable and legitimate justification.

465. Plaintiff has suffered economic harm and injuries in fact, as a result of AT&T's acts constituting unfair competitive behavior. Had AT&T disclosed the true nature and extent of its inadequate security and data protection practices and the flaws inherent in its internal authentication systems, or had AT&T appropriately revealed its unwillingness or inability to

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

adequately protect its customers from the foreseeable consequences of unauthorized SIM Swaps by its employees, agents, and representatives, Plaintiff would not have used AT&T's services, or he would have taken additional precautions, or chosen to acquire wireless services from one of AT&T's competitors.

466. The gravity of the harms caused by AT&T's unlawful and unfair practices far outweigh the utility of AT&T's conduct as herein described.

467. Plaintiff seeks a mandatory cessation of AT&T's practices, and assurance that AT&T is now, and will continue properly safeguarding Plaintiff's CPNI and wireless account data.

**SIXTEENTH CLAIM FOR RELIEF**

**VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT – UNFAIR AND DECEPTIVE PRACTICES, CAL. CIV.CODE §§ 1770, ET SEQ. ("CLRA")**

**(AGAINST COINBASE)**

468. Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 467, as though fully set forth in this cause of action.

469. The California Civil Code section 1750, *et seq.*, also known as the Consumers Legal Remedies Act ("CLRA"), prohibits various "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

470. Plaintiff sought and acquired services from Coinbase for his personal, family and household purposes.

471. Defendant Coinbase's actions and conduct constituted transactions for the sale or lease of goods or services to consumers under the terms of the CLRA. The assets involved in the unauthorized transactions are "goods" and Coinbase's financial and online platform services are "services" under the CLRA.

472. Coinbase violated the CLRA by, *inter alia*, making false statements and omitting truthful information about the quality and features of its services, and by including or attempting to misrepresent unconscionable and/or unlawful provisions in its contracts with Plaintiff.

473. Coinbase's actions, as herein alleged, violate the CLRA, specifically: section 1770(a)(5),

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

for making representations that its services have characteristics, uses, or benefits which they do not; section 1770(a)(7), for making representations that its services are of a particular quality, which they are not; and section 1770(a)(9), for advertising services with intent not to sell them as advertised. Plaintiff has been harmed as a direct consequence of Coinbase's CLRA violations.

474.    Regarding Coinbase's use of the data it collected from and about its retail customers, Coinbase made the following representations: Coinbase claimed it used Plaintiff's PII, his mobile device information, and the geolocations from which he accessed the Coinbase Platform and used Coinbase's services, as well as Cookies, "to recognize" its customers, and that Coinbase's services include characteristics it uses "to collect information about your [the Coinbase customer's] computer or other access device to mitigate risk, help prevent fraud, and promote trust and safety." When Coinbase made these statements, Coinbase knew that it was collecting IP addresses, device IDs, and PII, and was installing Cookies, Flash Cookies, and Web Beacons on Plaintiff's and its Platform users' devices, and was collecting and profiting from the resulting information, primarily for purposes *not* related to security.

475.    Coinbase advertised, without the intent to sell its services: as including a means by which its customers can resolve their "disputes" concerning fraudulent financial transactions (*e.g.*, refunded bank transactions) in a fair and reasonably timely manner; as including a means by which Coinbase customers can limit their liability for unauthorized transactions and stolen cryptocurrencies by timely reporting the unauthorized transactions to Coinbase; and as requiring users of its services to acquire and maintain mobile phone numbers and associated telecommunications services provided by a branded wireless network provider. Coinbase also stated that it engages in the "monitoring of IP addresses" as part of what it believes is a "reasonable risk-based program" aimed at complying with Anti-Money Laundering and Know Your Customer regulations.

476.    Coinbase also made the following statements, which indicate that Coinbase's cybersecurity was of a particular quality, which it was not: Coinbase claimed that no customer assets had ever been lost due to a breach of the Coinbase Platform; and Coinbase represented that VOIP numbers are not allowed on the Coinbase Platform for use with Coinbase accounts.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA  93720

Coinbase further represented that its custodial services included reasonable, competent support services, including adequately trained and sufficiently authorized live agents who respond to urgent customer reports and take timely actions involving Coinbase accounts, including locking access to accounts, and provisionally recrediting accounts when appropriate. Coinbase did not, in fact, provide services with those characteristics and benefits.

477.    Coinbase's misrepresentations were material and are likely to mislead reasonable consumers, and were a substantial factor in causing Plaintiff to use Coinbase's services.

478.    As a direct and proximate consequence of these actions, Plaintiff suffered injury.

479.    Coinbase's conduct was malicious, fraudulent, and wanton. Coinbase intentionally and knowingly provided misleading information to Plaintiff and refused to remedy the breach of its Platform long after Coinbase learned of the inadequacy of its data protection and security measures and the unauthorized access and use of its customers' accounts.

480.    Pursuant to section 1782(a) of the CLRA, on April 20, 2023, Plaintiff's counsel notified Coinbase, in writing, by certified mail of its alleged violations of section 1770 of the CLRA, and demanded that it rectify the problems associated with Coinbase's prohibited conduct.

## SEVENTEENTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT

## (AGAINST COINBASE)

481.    Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 480, as though fully set forth in this cause of action.

482.    Defendant Coinbase has been unjustly enriched by its misappropriation of Plaintiff's transaction fees and his digital account data, and as a direct result, Coinbase has received and retained benefits that it would not have received, but for its wrongful conduct.

483.    Between October 2013 and January 2022, Plaintiff conferred direct benefits upon Coinbase when he provided Coinbase with his private and sensitive digital data, including his financial information and PII.

484.    Plaintiff conferred a direct benefit upon Coinbase when he deposited and stored his funds and digital assets on the Coinbase Platform. The funds and assets in Plaintiff's Coinbase account

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

allowed Coinbase to generate revenue by investing, trading, selling, buying, loaning, or otherwise exchanging Plaintiff's assets with third-parties, and with Coinbase's "Affiliates."

485. Coinbase collected more than $1,900 in transaction fees from unauthorized transactions it facilitated on Plaintiff's Coinbase account, which represents approximately half the transaction fee revenue Coinbase collected on the fraudulent transactions involving his account.

486. Plaintiff conferred a direct benefit upon Coinbase by providing Coinbase fees and data, which Coinbase used primarily for purposes other than safeguarding Plaintiff's Coinbase account and assets.

487. Coinbase deceived Plaintiff, causing him to into assume unnecessary risks inherent in trading or investing in Security Tokens on the Coinbase Platform, which were unknowable to Plaintiff before December 14, 2021.

488. Coinbase was unjustly enriched by its circulation of Security Tokens on Coinbase's Platform, which conferred a direct benefit upon Coinbase—specifically, Coinbase traded and leveraged those assets for several years, while ignoring and failing to comply with applicable statutes, regulations, and consumer protection laws, as herein alleged.

489. Coinbase promised Plaintiff that it would take reasonable efforts to protect Plaintiff's data, but instead, Coinbase collected thousands of dollars in transaction fees and revenue from facilitating and failing to recredit Plaintiff's account for indisputably unauthorized transactions on Plaintiff's Coinbase account.

490. Coinbase has unfairly restricted Plaintiff's access to his Coinbase account, and has refused or reimburse him for fraudulent transactions it facilitated using his account.

491. Coinbase knew of the benefits Plaintiff conferred upon it, and Coinbase has unjustly retained those benefits and enriched itself by its deceitful conduct, at Plaintiff's direct expense. The circumstances under which Plaintiff conferred, and Coinbase accepted, the benefits Plaintiff provided Coinbase render Coinbase's retention of the benefits inequitable.

492. Plaintiff has been harmed by Coinbase's sale and exploitation of Plaintiff's PII and personal identification data, and by the fraudulent cryptocurrency and money transactions Coinbase effectuated using Plaintiff's confidential information and data.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

493. Coinbase has received financial benefit from Plaintiff's information, data, Security Token staking rewards, and from the transaction fees it collected from the fraudulent transactions it effectuated using Plaintiff's digital assets.

494. Under principles of equity and good conscience, Coinbase should not be permitted to retain the fees Coinbase collected on transactions initiated using Plaintiff's Coinbase account. Equity requires that Coinbase return to Plaintiff the benefits he conferred upon Coinbase.

495. Plaintiff is entitled to restitution from Coinbase, and disgorgement of all profits, benefits and other compensation obtained by Coinbase through its wrongful conduct.

496. Plaintiff seeks an order from this Court instructing Coinbase to disgorge the fees, profits, revenue, and rewards Coinbase has collected from the financial transactions involving Plaintiff's Coinbase account and from the exchanges of Plaintiff's digital data, which Coinbase has inequitably retained, as well as the reasonable U.S. dollar value of the revenues Coinbase collected from exploiting Plaintiff's data, from October 2013 to the present.

497. Punitive damages are appropriate under this cause of action because Coinbase knew, or should have known about the egregious and dangerous security vulnerabilities in its products and services—*i.e.*, those that directly caused Plaintiff's Coinbase account to be drained—and Coinbase willfully disregarded those preventable risks for its own economic and reputational benefit, at Plaintiff's direct expense.

**EIGHTEENTH CLAIM FOR RELIEF**

**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200 ET SEQ. ("UCL")**

**(AGAINST COINBASE)**

498. Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 498, as though fully set forth in this cause of action.

499. California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.* ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice."

500. The UCL imposes strict liability. Plaintiff need not prove that Defendant Coinbase intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

only that such practices occurred

501. Plaintiff has suffered injuries in fact and lost money and property as a result of Coinbase's violations of the UCL.

***"Unfair Prong"***

502. A business act is "unfair" where it is immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious, contrary to legislatively declared public policy, and the harm it caused to consumers is outweighed by its utility.

503. Coinbase made material misrepresentations and omissions concerning its safeguarding of Plaintiff's digital data and personal information. A reasonable person would attach importance to the privacy of Plaintiff's sensitive account data in determining whether to contract with a custodial wallet services provider.

504. Coinbase had exclusive knowledge of material facts not known or knowable to Coinbase customers and Coinbase actively concealed these material facts from customers. Coinbase had a duty to disclose the nature of its inadequate security practices and failures in hiring, training, and supervising staff.

505. Additional disclosures were necessary to materially qualify Coinbase's representations that it did not sell consumer data and took measures to protect that data, and its partial disclosures concerning its use of customers' PII. Coinbase was obligated to disclose its practices. The magnitude of the harm suffered by Plaintiff underscores the materiality of Coinbase's omissions.

506. A reasonable person would be deceived and misled by Coinbase's misrepresentations, which indicated that Coinbase would safeguard its customers' personal and sensitive information.

507. Coinbase intentionally misled its customers regarding its security and data protection practices in order to attract customers and evade prosecution for its unlawful acts.

508. The harm to Plaintiff outweighs the utility of Coinbase's practices. There were reasonably available alternatives to further Coinbase's legitimate business interests other than the misleading and deceptive conduct described herein.

***"Unlawful Prong"***

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

509. A business act or practice is "unlawful" when it is proscribed by some other statute, regulation or constitutional provision.

510. As a money services business, Coinbase is strictly obligated under the Bank Secrecy Act to diligently watch and supervise transactions within its system and report any suspicious activities to law enforcement authorities. See 31 U.S.C. § 5311; 12 C.F.R. § 208.63. 237. Coinbase failed to perform adequate "anti-money laundering" and "combined KYC/AML" procedures, as those procedures are commonly known under FinCEN guidelines and enforcement rules.

511. In violation of the Bank Secrecy Act, Coinbase failed to take the necessary steps to implement and enforce risk-based security and user-authentication measures, which would have prevented the theft of Plaintiff's assets from his Coinbase account.

512. Defendants' practices were contrary to the letter and spirit of the CCPA, which aims to vest customers with control over their data, Cal. Civ. Code §§ 1798.100 *et seq.*; as well as the EFTA and its corresponding regulations. These laws respectively require Coinbase: to provide Plaintiff with an express written statement that its herein alleged violations have been cured; and to provide disclosures compliant with 12 C.F.R. § 1005.7(b), and timely and in good faith investigate the unauthorized electronic fund transfers from Plaintiff's Coinbase account, as required by 15 U.S.C. § 1693f(a)(3) and 15 U.S.C. § 1693f(d).

513. The Consumer Legal Remedies Act, Cal. Civ. Code § 1770(a)(9), ("CLRA"), prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised." As fully alleged above, Coinbase violated the CLRA.

514. According to Section 5(a) of the FTC Act, 15 U.S.C. §45(a) (the "FTC Act"), "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." Coinbase violated the FTC Act.

515. The Stamp Payments Act of 1862, 18 U.S.C. § 336, reads:

> Whoever makes, issues, circulates, or pays out any note, check, memorandum, token, or other obligation for a less sum than $1, intended to circulate as money or to be received or used in lieu of lawful money of the United States, shall be fined

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

under this title or imprisoned not more than six months, or both.

516. Coinbase makes, issues, pays out, and circulates digital dollars for sums less than $1.00, in violation of the Stamp Payments Act of 1862 (18 U.S.C. § 336). Coinbase subverts U.S. law and violates public policy concerning the integrity of the U.S. dollar, by exerting sole authority, through its user agreement, to spend and withhold (as collateral) the "digital dollars" it issues and pays out, as a means to coerce consumers like Plaintiff, into paying "reimbursement" amounts to Coinbase in the form of legitimate U.S. currency.

517. Had Coinbase disclosed the true nature and extent of its data security and protection practices—and the flaws inherent in their systems—and their unwillingness to properly protect its customers, Plaintiff would not have subscribed to or paid as much money for Coinbase's services, or transacted on Coinbase's Platform using "digital dollars."

518. Coinbase's actions detailed herein constitute unlawful business acts and practices, and Coinbase's conduct constitutes violations of the CLRA, the FTC Act, the Stamp Payments Act of 1865, the CCPA, and the EFTA.

519. Plaintiff's representations, nondisclosures and misleading statements, as set forth above, were false, misleading and likely to deceive the consuming public within the meaning of California Business & Professions Code § 17200.

520. Coinbase's conduct lacks reasonable and legitimate justification. Plaintiff has been misled as to the nature and integrity of Coinbase's goods and services and has suffered injury as a result, which, due to the surreptitious nature of Coinbase's actions, Plaintiff could not have reasonably avoided.

521. The gravity of Coinbase's wrongful conduct outweighs any alleged benefits attributable to such conduct.

522. There were reasonably available alternatives to further Coinbase's legitimate business interests other than engaging in this wrongful conduct.

523. Coinbase's violation of the UCL, through its unlawful and unfair business practices, are ongoing and present a continuing threat that the public will be deceived into purchasing products based on Coinbase's representations that digital dollars are redeemable for legal tender by U.S.

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

customers. These purchases have resulted and will likely result in financial damage for consumers like Plaintiff.

524. Plaintiff seeks public injunctive relief against Coinbase's unfair and unlawful practices to protect the public, in the form of an order requiring a mandatory cessation of Coinbase's practices, and proper safeguarding of Coinbase account data, as well as disgorgement and restitution to Plaintiff of Coinbase's revenues associated with its unfair competition, or such portion of those revenues as the Court may find equitable.

**NINETEENTH CLAIM FOR RELIEF**

**REPLEVIN – CLAIM AND DELIVERY**

**(AGAINST *2.05698427 BITCOINS*)**

525. Plaintiff Ryan Dellone realleges and incorporates each of the above paragraphs 1 – 526, as though fully set forth in this cause of action.

526. This is an action to recover possession of personal property.

527. The personal property at issue is 2.05698427 bitcoins transferred from the Coinbase-hosted Hot Wallet, ***3DcopM3iaoL2siD3BgGpGoENFwa5anJoKj***, in a transaction recorded on the Bitcoin blockchain with the following Bitcoin transaction ID: *dbaba1aad772b7e62995668f69ddf73d4d20031f5fe15cd4d23a618e831c1fe1*) (hereafter, the "*res*").

528. As of January 20, 2024, the *res* is believed to be stored in the Bitcoin Wallet with the public key address, ***bc1qjp79ak6fxm4h7j0tsrwqx2n2k4tcqqveqxrvgm*** (the ***bc1 Wallet***).

529. The *res* was wrongfully taken from Plaintiff on December 14, 2021, and the *res* was transferred from Plaintiff's Bitcoin Wallet, or from the Hot Wallet representing the bitcoins owned by Plaintiff, to the ***bc1 Wallet***, without Plaintiff's knowledge, permission, or consent, and through no fault of his own.

530. Plaintiff owned and has the right to possess the *res*, and not just a mere right to payment for the value of the *res*.

531. Defendant *2.05698427 BITCOINS* has intentionally exercised control, or continues to exercise control, over the bitcoins currently associated with the ***bc1 Wallet***, in a manner that

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

excludes Plaintiff from using or possessing the *res*.

532. Plaintiffs did not consent to Defendant taking the *res* from him.

533. Defendant's conduct was a substantial factor in Plaintiffs' dispossession of the *res*.

534. The *res* has not been taken for any tax assessment or fine pursuant to law, nor has the *res* been taken under an execution or attachment, and the *res* is not exempt from execution.

535. The *res* has been unlawfully detained by Defendant, and has not been returned to Plaintiff as of the date of filing of this Complaint.

536. Plaintiff is entitled to the issuance of a Writ of Replevin for the return of the *res*.

**TWENTIETH CLAIM FOR RELIEF**

**CONSTRUCTIVE TRUST**

**(AGAINST COINBASE AND DOES 1-50)**

537. Plaintiff realleges and incorporates each of the above paragraphs 1 – 538, as though fully set forth in this cause of action.

538. The assets for which Plaintiff seeks imposition of a constructive trust are "Digital Currencies Formerly in Plaintiff's Coinbase Account," namely: 6.60611257 ETH ($25,245.43); 88.59916563 LTC ($13,216.36); 170.5156815 ETC ($5,992.54); 1,931.78 CTSI ($1,205.33); 637.4547 ADA ($801.33); 804.0188919 ZRX ($611.70); 122.1935986 LINK ($2,231.04); 6,215.40 ANKR ($608.66); 3,254.52 LCX ($490.52); 4,161.78 SUKU ($2,068.70); 93.53412 XTZ ($416.93); 37,479,605.75 SHIB($1,256.74); 102.3689 EOS ($341.23); 1,021.82 XLM ($270.60); 1,955.06 DNT ($251.65); 2,750.43 ASM ($240.96); 199.0150769 MATIC ($378.81); 143.7168994 BAT ($151.01); 1.17787025 OMG ($6.97); 204.2707539 TRAC ($222.03); 346.1700191 CVC ($111.90); 0.5482645 BTC ($26,604.53); and $17,090.19 digital dollars (USD).

539. Defendant Coinbase obtained Plaintiff's "Digital Currencies Formerly in Plaintiff's Coinbase Account," through actual fraud, misappropriation, conversion, theft, or by other unlawful or unethical means.

540. In equity and good conscience, Coinbase should not be permitted to retain Plaintiff's "Digital Currencies Formerly in Plaintiff's Coinbase Account."

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

541. Coinbase took actions and made promises with the intent to defraud Plaintiff, and to induce him to store, and continue storing and exchanging his digital assets on or using the Coinbase Platform.

542. Defendants DOES 1-50 stole, or Coinbase and DOES 1-50 intended to permanently deprive Plaintiff of his "Digital Currencies Formerly in Plaintiff's Coinbase Account."

543. Coinbase caused one or more of DOES 1-50 to acquire and retain Plaintiff's property, and the proceeds thereof or the profits therefrom, for Defendants' respective benefits.

544. Defendants Coinbase and DOES 1-50, and each of them, have no legal or equitable right, claim or interest in Plaintiff's "Digital Currencies Formerly in Plaintiff's Coinbase Account"; instead, Defendants, and each of them, are involuntary trustees holding said property and any appreciation thereof and/or other profits therefrom, in constructive trust for Plaintiff with a duty to convey the same to Plaintiff.

545. Plaintiff hereby demands the equitable imposition of a constructive trust over the "Digital Currencies Formerly in Plaintiff's Coinbase Account."

546. Plaintiff seeks an order that all assets being held by Defendants constituting or representing the "Digital Currencies Formerly in Plaintiff's Coinbase Account," be disgorged and held in trust for Plaintiff's benefit, as Defendants are not entitled to the benefit of misappropriated, converted, or stolen funds or assets.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiff demands judgment against Defendants as follows:**

a. Requiring Coinbase Defendants to pay the actual damages sustained by Plaintiff by reason of the acts and transactions herein alleged, plus punitive damages;

b. For an order requiring Coinbase to restore or reimburse Plaintiff for the 2.05647153 BTC transferred from the Bitcoin Wallet with the public key Wallet address, ***3DcopM3iaoL2siD3BgGpGoENFwa5anJoKj*** in the Bitcoin transaction with the transaction ID, *dbaba1aad772b7e62995668f69ddf73d4d20031f5fe15cd4d23a618e831c1fe1*;

c. For general damages against Defendants, and each of them, jointly and severally, in an

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720

amount to be determined at trial, an amount sufficient to restore Plaintiff to the position he was in prior to the damages herein alleged, but in no event less than 2.05647153 BTC and 1.727 BSV, or $101,762.51;

d. For an award of restitution, and an order for the disgorgement of all of Defendants' ill-gotten gains from the unlawful conduct alleged herein;

e. Public injunctive relief requiring cessation of Defendants' acts and practices complained of herein pursuant to Cal. Bus. & Prof. Code § 17200;

f. For injunctive relief in the form of an order enjoining Coinbase from continue to conceal or withhold information from its customers concerning the information Coinbase and its "Affiliates" share with, disclose or sell to, or purchase or collect from wireless telecommunications service providers, about Coinbase's customers;

g. For an order permanently and publicly restraining each and every person with possession of the private key(s) for the ***bc1 Wallet*** from taking any action that would, or reasonably could cause the 2.05647153 BTC presently in the ***bc1 Wallet***, to be transferred to another Bitcoin Wallet, or to otherwise become irrecoverable;

h. For an order for a writ of detinue directing the United States Marshal in any district where the Plaintiff's bitcoins may be located to repossess the bitcoins presently located in the ***bc1 Wallet***, on behalf of Plaintiff Ryan Dellone, or to otherwise assist Plaintiff in repossessing those bitcoins;

i. For an order compelling Defendant 2.05698427 BITCOINS to transfer to Plaintiff the control, legal title, and possession of the bitcoins presently located at the Bitcoin public key address, ***bc1qjp79ak6fxm4h7j0tsrwqx2n2k4tcqqveqxrvgm***; and to do the same with respect to Defendant(s) in possession of the XTZs and XTZ rewards earned through Plaintiff's Coinbase account; and with respect Defendants in possession of the BSV presently located at the BSV public key address, ***14goHFL8GGyuKCvbFtGW9PqQ5Urspwn9uu***;

j. For an order requiring Defendants AT&T and Coinbase to engage in necessary corrective actions, so that consumer online accounts and consumer funds and digital assets can be

appropriately secured, accessed, and exchanged between Plaintiff and any individual persons or entities currently in possession of such accounts, funds, and assets belonging to Plaintiff;

k. Awarding Plaintiff prejudgment and post-judgment interest, as well as well as reasonable attorneys' fees, expert fees and other costs and expenses of this litigation; and

l. Awarding such other relief as the Court deems just and proper.

***

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury on all issues so triable.

**DATED:** January 31, 2024 THE LAW OFFICE OF ETHAN MORA

By: /s/ Ethan E. Mora

Ethan E. Mora, Esq.

*Attorney for Plaintiff Ryan Dellone*

THE LAW OFFICE OF ETHAN MORA
1040 E. HERNDON AVE., SUITE 105
FRESNO, CA 93720